# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| ANTHONY SWAIN; ALEN BLANCO; BAYARDO CRUZ; RONNIEL FLORES; WINFRED HILL; DEONDRE WILLIS; PETER BERNAL, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>DANIEL JUNIOR, in his official capacity as Director of the Miami-Dade Corrections and Rehabilitation Department; MIAMI-DADE COUNTY, FLORIDA,<br><br>      Defendants. | Case No. 1:20-cv-21457<br><br>**Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief**<br><br>Class Action<br><br>**IMMEDIATE RELIEF SOUGHT** |

## CLASS ACTION COMPLAINT

1.     Jails and prisons are rapidly becoming the epicenter of this country's fight against the novel coronavirus and its resulting disease, COVID-19. The rate at which this disease is ravaging the globe is unprecedented in modern society, and an outbreak in Miami-Dade County's jails will cause death and devastation to countless lives, including the people jailed, the people who work in the jail, and their families. Understanding the need for immediate action to slow the spread of this virus and to protect public health, medical experts have urged sweeping protective measures in everyday life. Yet the very steps they deem necessary—such as social distancing, regular handwashing, adequately cleaning their surroundings, access to testing, prompt medical attention, and wearing protective gear—have been made impossible for the people jailed in the Metro West Detention Center by the very officials responsible for their well-being.

1

2.      Given reports that at least fifteen County jail employees have already tested positive for COVID-19,[1] an outbreak in the County's jails is imminent. However, the County and the officials responsible for operating the Metro West Detention Center ("Metro West") have failed to respond to the obvious and urgent threats posed by this growing pandemic. The over 1,800 people jailed at Metro West are forced to suffer unconstitutional conditions that deny them the precautions and protections necessary to mitigate against the risks of COVID-19.

3.      In contradiction to public claims by the jail, the human beings confined inside the jail do not have adequate soap, have no safe way to dry their hands, sleep within one to two feet of one another, must wait days to seek medical attention, share with dozens of other people high-touch surfaces that are infrequently cleaned, and are denied basic hygienic supplies such as laundry detergent, cleaning supplies, or tissues.  Disregarding known, obvious risks of illness and death and needlessly exposing people to a highly fatal infectious disease violates the Eighth and Fourteenth Amendment rights of the people jailed at Metro West. This indifference also puts the broader community at risk from the creation of a site of widespread contagion.

4.      People confined in jails and prisons must "be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citations omitted). Yet Plaintiffs, as well as the class and subclass they represent, all face imminent risk of serious injury or death due to COVID-19 at Metro West. In the midst of a public health crisis, the people confined at Metro West have not been provided adequate safeguards against the severe threat of the coronavirus. They ask to be treated humanely while they are in Miami-Dade County's custody during this perilous time.

---

[1] David Ovalle, *Behind bars, in tight quarters, Miami inmates and officers alike dread coronavirus spread*, Miami Herald (Apr. 4, 2020), https://amp.miamiherald.com/news/local/crime/article241740576.html.

5.      Because of the ongoing, systemic violations of Petitioners/Plaintiffs' constitutional rights, Petitioners/Plaintiffs seek class-wide relief requiring Defendants to take basic and necessary steps to safeguard the health of people who, due to the nature of their confinement, are not only at heightened risk of infection and death but are also rendered unable to take the simple steps to protect themselves that have become a necessary part of everyday life for those people not in jail. Petitioners/Plaintiffs further request a writ of habeas corpus for all those who are medically vulnerable and at particularly grave risk of infection and death from COVID-19.

## JURISDICTION AND VENUE

6.      This is a civil rights action arising under 42 U.S.C. § 1983, 22 U.S.C. § 2241, and 28 U.S.C. § 2201, *et seq*., as well as the Eighth and Fourteenth Amendments to the United States Constitution.

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. § 2241, and 28 U.S.C. § 1651.

8.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## PARTIES

9.      Petitioner/Plaintiff Anthony Swain is a forty-three year-old man who currently resides in Miami-Dade County, Florida.  At all times relevant to this Complaint, Mr. Swain was in the custody of Miami Dade Corrections and Rehabilitation ("MDCR") at Metro West.  He has cystic myelomalacia from the C3 to C6 vertebrae, which causes respiratory issues and difficulty breathing, and is a paraplegic.  He is awaiting trial and is presumptively innocent.

10.      Petitioner/Plaintiff Alen Blanco is a thirty-nine year-old man who currently resides in Miami-Dade County, Florida.  At all times relevant to this Complaint, Mr. Blanco was in MDCR

custody at Metro West. He has had severe asthma since birth. He is awaiting trial and is presumptively innocent.

11.     Petitioner/Plaintiff Bayardo Cruz is a thirty year-old man who currently resides in Miami-Dade County, Florida. At all times relevant to this Complaint, Mr. Cruz was in MDCR custody at Metro West. He has asthma and chronic bronchitis. He is awaiting trial and is presumptively innocent.

12.     Petitioner/Plaintiff Ronniel Flores is a twenty-three year-old man who currently resides in Miami-Dade County, Florida. At all times relevant to this Complaint, Mr. Flores was in MDCR custody at Metro West. He has Type 1 diabetes, with blood sugar that has been spiking to more than 600 while in the jail. He is awaiting trial and is presumptively innocent.

13.     Petitioner/Plaintiff Winfred Hill is a fifty-nine year-old man who currently resides in Miami-Dade County, Florida. At all times relevant to this Complaint, Mr. Hill was in MDCR custody at Metro West. He is HIV positive and also has diabetes. He is awaiting trial and is presumptively innocent.

14.     Petitioner/Plaintiff Deondre Willis is a twenty-four year-old man who currently resides in Miami-Dade County, Florida. At all times relevant to this Complaint, Mr. Willis was in MDCR custody at Metro West. He has epilepsy and has had over twenty seizures in jail over a fifteen-month period. He is awaiting trial and is presumptively innocent.

15.     Petitioner/Plaintiff Peter Bernal is a thirty-five year-old man who currently resides in Miami-Dade County, Florida. At all times relevant to this Complaint, Mr. Bernal was in the custody of MDCR at Metro West. He suffers from chronic asthma, which causes severe respiratory problems. He is confined in the jail because he does not have enough cash to pay the financial condition of his pretrial release.

16.     Defendant Daniel Junior is the Director of the Miami-Dade Department of Corrections and Rehabilitation and is being sued in his official capacity.  As the Director, Defendant Junior has custody of all people incarcerated in MDCR facilities, including Metro West, and is responsible for developing, administering, and enforcing MDCR policies, including those that relate to health and safety.

17.     Defendant Miami-Dade County is a political subdivision of the State of Florida that can be sued in its own name.  Miami-Dade County is responsible for the acts of MDCR, an administrative department of Miami-Dade County that operates the County's jails, including Metro West.  MDCR is responsible for the custody and care of all persons detained or incarcerated in the County's jails, and it currently has immediate custody over Petitioners/Plaintiffs and other putative class members.

## THE GRAVE RISK OF HARM POSED BY THE COVID-19 PANDEMIC REQUIRES AN EMERGENCY RESPONSE

18.     We are in the midst of an unprecedented global health emergency.[2]  On March 11, 2020, the World Health Organization declared the outbreak of COVID-19 a global pandemic.[3]  Citing "deep[] concern[] both by the alarming levels of spread and severity, and by the alarming levels of inaction," it called for countries to take "urgent and aggressive action."[4]

19.     The number of people infected by COVID-19 is growing exponentially.[5]  On

---

[2] *See* World Health Organization, Director-General Opening Remarks (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *Id.*

[4] *Id.*; *see also Coronavirus: COVID-19 Is Now Officially A Pandemic, WHO Says*, NPR (March 11, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/11/814474930/coronavirus-covid-19-is-now-officially-a-pandemic-who-says.

[5] The death toll in Italy, which began experiencing this epidemic about a week earlier than the first diagnosed American case, saw a rise of 30% overnight in the 24 hours between March 5, 2020,

January 1, 2020, the first confirmed COVID-19 case was diagnosed in the United States.[6]  As of April 4, 2020, 277,205 people have been diagnosed with COVID-19 in the United States, with 6,593 deaths confirmed.[7]  Nationally, CDC projections indicate that over 200 million individuals in the United States could be infected with COVID-19 over the course of the epidemic without effective public health intervention,[8] with as many as 2.2 million deaths in the worst projections.[9]

20.     COVID-19 is highly contagious.  The virus is thought to spread through respiratory droplets or by touching a surface or object that has the virus on it.[10]  COVID-19 is thought to survive for three hours in the air in droplet form, up to twenty-four hours on cardboard, up to two days on plastic, and up to three days on steel.[11]

21.     Infected people—who may be asymptomatic and not even know they are infected—

---

and March 6, 2020 and a rise of 25% on March 15 alone—a day that killed 368 people in Italy. Crispian Balmer & Angelo Amante, *Italy coronavirus deaths near 200 after biggest daily jump*, Reuters (Mar. 6, 2020), https://www.reuters.com/article/us-health-coronavirus-italy/italy-coronavirus-deaths-near-200-after-biggest-daily-jump-idUSKBN20T2ML.

[6] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, New York Times (Mar. 2020), https://www.nytimes.com/article/coronavirus-timeline.html (last visited March 24, 2020).

[7] Coronavirus 2019, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/cases-in-us.html (last visited Apr. 4, 2020).

[8] James Glanz, et al., *Coronavirus Could Overwhelm U.S. without Urgent Action, Estimates Say*, N.Y. Times (Mar. 20, 2020), *available at* https://www.nytimes.com/interactive/2020/03/20/us/coronavirus-model-us-outbreak.html.

[9] Holly Yan, *More than 3,000 people in the US have died from coronavirus*, CNN (last updated: Mar. 31, 2020), https://www.cnn.com/2020/03/30/health/us-coronavirus-updates-monday/index.html.

[10] Coronavirus Factsheet, Centers for Disease Control (Mar. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[11] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Medicine (March 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973.

can spread the disease even through indirect contact with others.[12] Given that many people are asymptomatic transmitters and very few people have been tested,[13] the number of people diagnosed with COVID-19 reflects only a small portion of those infected.[14]

22.     Everyone is at risk of contracting the novel coronavirus disease, but certain populations are at higher risk for severe illness from COVID-19.  People of any age with lung disease or other conditions like asthma, chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, stroke, and pregnancy face increased risk of serious COVID-19 disease.[15]  Older individuals also face greater chances of serious illness or death from COVID-19.[16]  For people over the age of 50 or with medical conditions that increase the risk of serious COVID-19 infection, symptoms such

---

[12] *See, e.g.,* Marilynn Marchione/AP, *Novel Coronavirus Can Live on Some Surfaces for Up to 3 Days, New Tests Show*. TIME, (Mar. 11, 2020), https://time.com/5801278/coronavirus-stays-on-surfaces-days-tests/; Cai J, Sun W, Huang J, Gamber M, Wu J, He G. *Indirect virus transmission in cluster of COVID-19 cases, Wenzhou, China, 2020*. 26 Emerg Infect Dis. 6, (2020), https://doi.org/10.3201/eid2606.200412 (last visited Mar. 20, 2020).

[13] Roni Caryn Rabin, *They Were Infected with the Coronavirus. They Never Showed Signs*, N.Y. Times (Feb. 26, 2020, updated Mar. 6, 2020), https://www.nytimes.com/2020/02/26/health/coronavirus-asymptomatic.html; Aria Bendix, *A Person Can Carry And Transmit COVID-19 Without Showing Symptoms, Scientists Confirm*, Bus. Insider (Feb. 24, 2020), https://www.sciencealert.com/researchers-confirmed-patients-can-transmit-the-coronavirus-without-showing-symptoms.

[14] Melissa Healy, *True Number of US Coronavirus Cases is Far Above Official Tally, Scientists Say*, L.A. Times (Mar. 10, 2020), https://www.msn.com/en-us/health/medical/true-number-of-us-coronavirus-cases-is-far-above-official-tally-scientists-say/ar-BB110qoA.

[15] Ex. 1, Expert Declaration of Dr. Jonathan Golob ¶ 4, ECF Doc. 5, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or. Filed March 16, 2020).

[16] Golob Decl. ¶ 3; Xianxian Zhao, et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis (March 20, 2020), https://cutt.ly/etRAkmt.

as fever, coughing, and shortness of breath can be especially severe.[17]

23.    COVID-19 can severely damage lung tissue (sometimes leading to a permanent loss of respiratory capacity), lead to acute respiratory distress syndrome, affect cardiac functions (including the possibility of heart failure), and cause widespread damage to other organs.[18] Emerging evidence also suggests that COVID-19 can trigger an over-response in the immune system and further damage the body's tissues or organs, including permanent harm to the kidneys or neurologic injury.[19]

24.    The experiences of those infected with COVID-19 are "a lot more frightening" than the flu.[20]  The sensation of acute respiratory distress syndrome has been compared to "essentially drowning in [one's] own blood."[21]  Even relatively young people with minimal health history can be "wiped out" by the virus, "like they've been hit by a truck," and people who are infected by the virus can "all of a sudden" go into complete respiratory failure.[22]

25.    These complications can manifest at an alarming pace, and the required levels of support can quickly exceed local health care resources.[23]  Patients with serious cases of COVID-

---

[17] Golob Decl. ¶ 5; *see also* Ex. 15, Declaration of Dr. Carlos Franco Paredes, *Fraihat, et al. v. U.S. Immigration and Customs Enforcement*, ECF Doc. 81-12, 5:19-cv-01546-JGB-SHK (E.D. Cal., filed Mar. 24, 2020) (outlining the heightened risk of severe harm or death for those populations deemed medically vulnerable to COVID-19, including higher fatality rates, severe damage to organs and other capacities, and the need for advanced support).

[18] Golob Decl. ¶ 7.

[19] Golob Decl. ¶ 7.

[20] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, Propublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[21] *Id.*

[22] *Id.*

[23] Golob Decl. ¶ 6.

19 will need advanced medical support requiring highly specialized equipment that is in limited supply, such as ventilator or oxygenation assistance, as well as an entire team of care providers that can include 1:1 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.[24]

26.    The current estimated incubation period is between 2 and 14 days.[25] Approximately 20% of people infected experience life-threatening complications, and of those infected, between 1% and 3.4% die.[26]   According to recent estimates, the fatality of people infected with the coronavirus is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[27] Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage and loss of respiratory capacity.[28]

27.    There is neither a vaccine nor any known medication to prevent or cure infection from the virus.[29]  A vaccine is likely at least 12 months away.[30]

28.    The only known effective measure to reduce the risk of severe illness or death to

---

[24] Golob Decl. ¶¶ 5-6.

[25] *Coronavirus Disease COVID-19 Symptoms*, Centers for Disease Control (updated: Feb. 29 2020), https://www.cdc.gov/coronavirus/2019-ncov/about/symptoms.html.

[26] *Why Covid-19 is worse than the flu, in one chart*, Vox (Mar. 18, 2020), https://www.vox.com/science-and-health/2020/3/18/21184992/coronavirus-covid-19-flu-comparison-chart.

[27] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020), https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879.

[28] Golob Decl. ¶ 4.

[29] Golob Decl. ¶ 8.

[30] Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update.

individuals is to prevent them from being infected with the coronavirus in the first place.[31] Accordingly, officials and experts urge "social distancing"—isolating oneself from other people as much as possible.[32] For this reason, governors and mayors across the country are ordering entire cities and states to "shelter in place" and "stay at home."[33] Other federally recommended precautions include frequent hand-washing, alcohol-based hand sanitizers, and frequent cleaning and disinfecting of any surfaces touched by any person.[34]

## INCARCERATED PEOPLE AND CORRECTIONAL STAFF ARE AT HEIGHTENED RISK DURING THE COVID-19 PANDEMIC

29.     Substantial epidemiological research "shows that mass incarceration raises contagion rates for infectious disease—both for people in jails, and for the community at large."[35]

---

[31] Golob Decl. ¶ 8.

[32] Given COVID-19's contagiousness and relatively high death rate, particularly in vulnerable populations, the President ordered a 15-day directive to avoid gatherings in groups of more than 10 people. The President's Coronavirus Guidelines for America, Whitehouse.gov (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf. *See also* Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update.

[33] The governors of California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Vermont, Washington, West Virginia, and Wisconsin, as well as local officials of numerous counties in Florida, Georgia, Kansas, Missouri, North Carolina, Pennsylvania, Tennessee, and Texas, have all ordered residents to "shelter in place" or stay at home. *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (Mar. 27, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[34] Centers for Disease Control, Steps to Prevent Illness, *available at* https://www.cdc.gov/coronavirus/2019-ncov/about/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fprevention-treatment.html; *see also* Saralyn Cruickshank, *Experts Discuss Covid-19 and Ways to Prevent Spread of Disease*, John Hopkins Mag. (Mar. 17, 2020), https://hub.jhu.edu/2020/03/17/coronavirus-virology-vaccine-social-distancing-update.

[35] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, The Appeal (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

During pandemics, jail facilities become "ticking time bombs" as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases."[36]

30.     According to Dr. Jaimie Meyer, an expert in public health in jails and prisons: "[T]he risk posed by COVID-19 in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected."[37] This is due to a number of factors, including:

  a.   The close proximity of individuals in those facilities;

  b.   Their reduced ability to protect themselves through social distancing;

  c.   The lack of necessary medical and hygiene supplies ranging from hot water, soap or hand sanitizer, to protective equipment;

  d.   Ventilation systems that encourage the spread of airborne diseases;

  e.   Difficulties quarantining individuals who become ill;

  f.   The enhanced susceptibility of the population in jails and prisons due to chronic health conditions;

  g.   The fact that incarcerated people, rather than professional cleaners, are often responsible for cleaning the facilities and are not given appropriate supplies;

  h.   The fact that jails and prisons normally have to rely heavily on outside hospitals that will become unavailable during a pandemic, as well as the loss of both medical and correctional staff to illness.[38]

---

[36] *See* St. Louis Univ., "Ticking Time Bomb," *Prisons Unprepared For Flu Pandemic*, ScienceDaily (2006), https://www.sciencedaily.com/releases/2006/09/060915012301.htm.

[37] Ex. 2, Expert Declaration of Dr. Jaimie Meyer ¶ 7, ECF Doc. 42, *Velesaca v. Wolf*, Case No. 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020).

[38] *See* Meyer Decl. ¶¶ 7-19; "The pathway for transmission of pandemic influenza between jails and the community is a two-way street. Jails process millions of bookings per year.  Infected individuals coming from the community may be housed with healthy inmates and will come into contact with correctional officers, which can spread infection throughout a facility." *Pandemic Influenza & Jail Facilities & Populations*, Am. J. of Pub. Health, October 2009; *See also* Dr. Anne Spaulding, Coronavirus and the Correctional Facility: for Correctional Staff Leadership, Mar. 9,

31.     Additional reasons for the increased risk of transmission and infection include the constant cycling of people in and out of the jail (including correctional staff)[39] and inadequate medical care within the jail itself.

32.     And jail screening procedures are ineffective. COVID-19 poses a particular threat to public health because a person can be asymptomatic yet spread the disease to others. Most people do not show symptoms for two to fourteen days while being contagious. Others never exhibit any symptoms at all. Thus, while screening for fevers and other symptoms associated with COVID-19 may stop some infected people from entering, it cannot catch many of those actively spreading the virus. The drastic social distancing measures that have been imposed across the country are designed to combat exactly this problem—staying at home, we are able to limit our contact with other persons, even the asymptomatic. But every day hundreds of jail employees, working on multiple different shifts, travel into and out of the jail. Any one of those employees can be asymptomatically carrying and transmitting COVID-19, and the jail has no means of stopping this disease vector.

33.     The guidance from the Centers for Disease Control and Prevention ("CDC") for correctional and detention facilities, including local jails, was published on March 23, 2020.[40] The guidance acknowledges that incarcerated people are forced to exist "within congregate

---

2020,                                     *available*                                   *at*
https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf.

[39] *See* Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

[40] Ex. 3, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

environments" that "heighten[] the potential for COVID-19 to spread once introduced," especially given that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants."[41]   In light of these concerns, the guidance recommends that the correctional facility:

    a.    Post signage throughout the facility communicating COVID-19 symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;

    b.    Ensure sufficient stocks of hygiene and cleaning supplies, including tissues; liquid soap where possible; hand drying supplies; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;

    c.    Provide incarcerated people no-cost access to soap (providing liquid soap where possible), running water, hand drying machines or disposable paper towels for hand washing, and tissues (providing no-touch trash receptacles for disposal);

    d.    Consider relaxing restrictions on allowing alcohol-based hand sanitizer where security concerns allow;

    e.    Provide a no-cost supply of soap sufficient to allow frequent hand washing, providing liquid soap where possible;

    f.    Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

    g.    Even if COVID-19 cases have not been identified locally or inside, implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and ensure adequate supplies to support intensified cleaning and disinfection practices";

    h.    Perform pre-intake screening and temperature checks for all new entrants.

---

[41] *Id.*

i.      If an individual has symptoms of COVID-19 (fever, cough, shortness of breath), require the individual to wear a face mask and place her under medical isolation;

j.      Implement social distancing strategies to increase the physical space between incarcerated people, ideally a distance of six feet "regardless of the presence of symptoms"; and

k.      Implement daily temperature checks in housing units where COVID-19 cases have been identified.

34.     Correctional officials around the country agree that particular care must be taken to stop the spread of COVID-19 within the nation's jails.  For example, Leann Bertsch, the Director of the North Dakota Department of Corrections and Rehabilitation, concluded that "ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all" and that "putting public health first is the best, and only, way to effectively achieve [a department of correction's] public safety mission during the COVID-19 pandemic."[42]

35.     The global path of the virus confirms that jails and prisons are epicenters for transmission.  Approximately one month into the pandemic in the province of Hubei, China, over half of reported COVID-19 cases were from jails.[43]  In South Korea, which has had tremendous success in slowing and stopping the spread of the virus, "the single largest COVID-19 outbreak and mortality cluster was from the Daenam Prison Hospital, where 101 inmates were infected and seven died."[44]

---

[42] Brie Williams and Leanne Bertsch, *A public health doctor and head of corrections agree: we must immediately release people from jails and prisons*, The Appeal (Mar. 27, 2020), https://theappeal.org/a-public-health-doctor-and-head-of-corrections-agree-we-must-immediately-release-people-from-jails-and-prisons/.

[43] Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, Diplomat (Mar. 9, 2020), https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

[44] Nancy Gertner & John Reinstein, *Compassionate Release Now for Prisoners Vulnerable to the Coronavirus*, Boston Globe (Mar. 23, 2020),

36.     The coronavirus has already started to spread inside other prisons, jails, and detention centers in the United States.  Experts predict that a mass contagion is only a matter of time and that "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility."[45]

37.     Once the virus enters a jail or prison, infection rates are much higher than in the broader community.  In New York City, for example, the COVID-19 infection rate in the city's jails is about eight times higher than the rest of the city, which already sits at one of the highest rates in the world.[46]  The first case of COVID-19 on Rikers Island, New York City's largest jail complex, was confirmed on March 18, 2020.[47] By Thursday, April 2, 2020, 231 people incarcerated at Rikers as well as 223 jail staff had tested positive;[48] two jail officers have died; and more than 800 incarcerated people were held in isolation or quarantined.[49]  The dramatic outbreak

---

https://www.bostonglobe.com/2020/03/23/opinion/compassionate-release-now-prisoners-vulnerable-coronavirus/.

[45] Evelyn Cheng & Huileng Tan, *China Says More than 500 Cases of the New Coronavirus Stemmed from Prisons*, CNBC, (Feb. 20, 2020), *available at* https://www.cnbc.com/2020/02/21/coronavirus-china-says-twoprisons-reported-nearly-250-cases.html (quoting Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis).

[46] *COVID-19 Infection Tracking in NYC Jails*, The Legal Aid Society NYC (last visited Mar. 28, 2020), https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/.

[47] *21 Inmates, 17 Employees Test Positive for COVID-19 on Rikers Island: Officials*, NBC New York (Last updated: Mar. 22, 2020), https://www.nbcnewyork.com/news/coronavirus/21-inmates-17-employees-test-positive-for-covid-19-on-rikers-island-officials/2338242/

[48] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, Slate (Apr. 2, 2020) https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html.

[49] Jay Ransom and Alan Feuer, *'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail*, N.Y. Times (Last updated: Mar. 31, 2020), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

of COVID-19 in the Cook County Jail is also illustrative.[50]

38.     For this reason, medical and public health experts have urged emergency action to fight the spread of COVID-19 in jails and other carceral facilities, including decarceration, improved access to medical care, and compliance with CDC guidelines.[51]  Medical experts explain that the need for action is urgent given that "[t]he window of opportunity is rapidly narrowing for mitigation of COVID-19" — outbreaks are measured "in a matter of days, not weeks," with this type of novel virus.[52]

39.     Medical experts have also explained that urgent action in the jails is an essential public health priority given that any outbreaks will place incredible strain on regional hospitals and health centers.  These institutions would bear the brunt of having to treat all infected people and would have fewer resources available to treat anyone who required medical attention, which will be disastrous when medical needs overwhelm the institutions' resources.[53]  Experts, like Dr.

---

[50] Cook County Jail Coronavirus Tracker, Injustice Watch (last visited: Apr. 4, 2020), https://datastudio.google.com/reporting/1AI4THiXJ_6Nt-9NXwE0MfO_DUaa1Koxi/page/hcyJB?s=oQGghs5nYPk (210 incarcerated people and 60 people working in the jail tested positive for COVID-19 as of April 3, 2020).

[51] See, e.g., Ex. 4, Brad Lander, Doctors in NYC Hospitals, Jails, and Shelters Call on the City to Take More Aggressive Action to Combat the Spread of Coronavirus, Medium (Mar. 12, 2020), https://medium.com/@bradlander/doctors-in-nyc-hospitals-jails-and-shelters-call-on-the-city-to-take-more-aggressive-action-to-fb75f0b131c2; Ex. 5, Letter from Johns Hopkins faculty to Governor Hogan, Mar. 25, 2020, https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf; Ex. 6, Declaration of Marc Stern ¶ 11, ECF Doc. 6, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or. Filed March 16, 2020); Ex. 7, Declaration of Dr. Ranit Mishori ¶ 46, ECF Doc. 2-3, *Coreas v. Bounds, et al.*, Case No. 8:20-cv-00780 (D. Md., filed March 24, 2020); Ex. 8, Declaration of Robert B. Greifinger ¶ 13, ECF Doc. 4, *Dawson v. Asher*, Case No. 2:20-cv-00409-JLR-MAT (D. Or., filed March 16, 2020).

[52] Mishori Decl. ¶ 46, *supra* note 51.

[53] *See* Meyer Decl. ¶¶ 16, 22, *supra* note 37; Ex. 9, Expert Declaration of Elizabeth Y. Chaio ¶ 28, *Russell, et al. v. Harris County, Texas*, No. 4:19-cv-00226, ECF Doc. 32-2 (S.D. Tex. Mar. 27, 2020).

Meyer, make clear that "[r]educing the size of the population in jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large."[54]

40.     Numerous public health experts, including Dr. Gregg Gonsalves,[55] Ross MacDonald,[56] Dr. Marc Stern,[57] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[58] Dr. Anne Spaulding,[59] Homer Venters,[60] and Josiah Rich[61] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

41.     Given this urgency, jails and prisons nationwide have released people with the aim of preventing community outbreaks of severe illness and death from COVID-19. States and counties that have released people from incarceration in response to the COVID-19 crisis include,

---

[54] Meyer Decl. ¶ 37, *supra* note 37.

[55] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[56] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[57] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[58] Oluwadamilola T. Oladeru, et al., What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind, (March 10, 2020), https://cutt.ly/QtRSYNA.

[59] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (March 9, 2020).

[60] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/jtRSPnk.

[61] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

but are not limited to: Los Angeles County, California (1,700 people);[62] New York (more than 1,100 people);[63] New Jersey (1,000 people);[64] Cuyahoga County, Ohio (approx. 600 people),[65] among others.

42.     Internationally, governments have also responded to the threat posed by COVID-19 by releasing people from incarceration. To take one of many examples, in Iran, more than 80,000 people were temporarily released from prison in the early stages of the pandemic to protect them and to protect the community from propagation of an outbreak.[66] In Ethiopia, more than 4,000 people were pardoned and released from incarceration to help prevent the spread of COVID-19.[67]

43.     States and other local jurisdictions have also made changes to existing carceral policies in response to the COVID-19 pandemic, including eliminating medical co-pays for

---

[62] *LA County Releases 1,700 Inmates to Reduce Jail Population Due to Coronavirus*, NBC Los Angeles (Mar. 24, 2020), https://www.nbclosangeles.com/news/local/la-county-releases-1700-inmates-to-reduce-jail-population-due-to-coronavirus/2334809/.

[63] Brendan Lyons, *NY to release 1,100 parole violators as coronavirus spreads*, Times Union (Mar. 27, 2020), https://www.timesunion.com/news/article/Deaths-surge-again-in-New-York-from-coronavirus-15160973.php.

[64] *1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/coronavirus-nj-inmates-release.html.

[65] Scott Noll, *Cuyahoga County Jail releases hundreds of low-level offenders to prepare for coronavirus pandemic*, News 5 Cleveland (Mar. 20, 2020), https://www.news5cleveland.com/news/local-news/oh-cuyahoga/cuyahoga-county-jail-releases-hundreds-of-low-level-offenders-to-prepare-for-coronavirus-pandemic.

[66] Parisa Hafezi, *Iran Temporarily Frees 85,000 From Jail Including Political Prisoners*, Reuters (Mar. 17, 2020), *available at* https://www.reuters.com/article/us-health-coronavirus-iran-prisoners/iran-temporarily-frees-85000-from-jail-including-political-prisoners-amid-coronavirus-idUSKBN21410M.

[67] Bukola Adebayo, *Ethiopia pardons more than 4,000 prisoners to help prevent coronavirus spread*, CNN (Mar. 26, 2020), https://www.cnn.com/2020/03/26/africa/ethiopia-pardons-4000-prisoners-over-coronavirus/index.html.

incarcerated people and waiving fees for phone calls and video communication.[68] Others have required facilities to distribute and make available sanitation supplies and hand sanitizer to everyone who is incarcerated, arranged for the immediate evaluation and treatment of anyone with symptoms, and enacted screening procedures for everyone who enters the jail or prison.[69]

44.     Over the past two weeks, multiple courts have also acknowledged the severe and urgent threats posed by COVID-19 and have accordingly ordered the release of detained and incarcerated persons.[70]

**THE COVID-19 PANDEMIC HAS REACHED MIAMI-DADE COUNTY, WHERE THERE HAVE BEEN WIDESPREAD CALLS FOR PREVENTIVE MEASURES AND HUMANE TREATMENT FOR INCARCERATED PEOPLE**

45.     As of April 4, 2020, 3,667 people have been diagnosed with COVID-19 in Miami-

---

[68]     *Responses to the COVID-19 Pandemic*, Prison Policy (Mar. 27, 2020), https://www.prisonpolicy.org/virus/virusresponse.html.

[69] *See, e.g.*, *Preparedness and Response Plan 5-8*, Indiana Dep't of Correction (2020), available at https://www.in.gov/idoc/files/IDOC%20Pandemic%20Response%20Plan%203-3-2020.pdf#response%20plan

[70] *See, e.g.*, *Castillo et al. v. Barr*, 5:20-cv-00605, ECF Doc. 32 (C.D. Cal. Mar. 27, 2020) (ordering petitioners be released from immigration detention in light of COVID-19 and noting "the risk of infection in immigration detention facilities – and jails – is particularly high"); *USA v. Garlock.*, No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (ordering, sua sponte, extension of convicted defendant's surrender date and noting "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020) (ordering, sua sponte, that petitioner be immediately released from immigration detention "[i]n light of the rapidly escalating public health crisis" related to COVID-19 that"public health authorities predict will especially impact immigration detention centers"); *U.S. v. Stephens,* 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting motion for reconsideration of defendant's bail conditions and releasing him from jail to home confinement, explaining that "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop"); *In re. Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, (N.D. Cal. March 19, 2020) (ordering release on bond despite government assertions that facility has preparedness plan in place and no cases have been confirmed).

Dade County, with 30 deaths confirmed.[71]

46.    The Governor of Florida declared a public health emergency (March 1, 2020) as well as a state of emergency (March 9, 2020) due to the presence of COVID-19 in Florida.[72]  On March 12, 2020, Miami-Dade County Mayor Carlos A. Gimenez declared a local state of emergency to respond to the threat posed by COVID-19, which remains in effect.[73]  Understanding the preventive measures that each person "must take . . . to help stop the spread of this virus," including sanitation and "strict social distancing of at least six feet between people," County Mayor Gimenez took further executive action.[74]  He cancelled mass gatherings,[75] prohibited groups of 10 or more people from congregating in public spaces,[76] ordered nonessential establishments to close,[77] and required all essential establishments to ensure that customers and employees

---

[71] Florida Dep't of Health, Division of Disease Control and Health Protection, Florida's COVID-19 Data and Surveillance Dashboard (last visited Apr. 4, 020), https://fdoh.maps.arcgis.com/apps/opsdashboard/index.html#/8d0de33f260d444c852a615dc7837c86

[72] *Miami-Dade County Executive Order Extending Declaration of Local State of Emergency*, Miami-Dade County (Mar. 25, 2020), https://www.miamidade.gov/information/library/2020-03-25-state-of-emergency-extension-2.pdf.

[73] *Id.*

[74] *Mayor-Dade County Mayor Carlos A. Gimenez issues Executive Order closing all non-essential businesses*, Miami-Dade County News Release (Mar. 19, 2020), https://www.miamidade.gov/releases/2020-03-18-COVID-business-closures.asp.

[75] *Statement from Miami-Dade County Mayor Carlos A. Gimenez on cancellation of mass gatherings*, Office of the Mayor (Mar. 12, 2020), https://www.miamidade.gov/releases/2020-03-12-mayor-covid-events.asp.

[76] *Miami-Dade County Emergency Order 10-20*, Miami-Dade County (Mar. 24, 2020), https://www.miamidade.gov/information/library/coronavirus-emergency-order-10-20-public-gatherings.pdf.

[77] *Mayor-Dade County Mayor Carlos A. Gimenez issues Executive Order closing all non-essential businesses*, Miami-Dade County News Release (Mar. 19, 2020), https://www.miamidade.gov/releases/2020-03-18-COVID-business-closures.asp.

maintained appropriate social distancing while present.[78]

47.     On March 12, 2020, MDCR suspended all visitation in the Miami-Dade County jails to protect "[t]he health of individuals in []MDCR custody" given fears of COVID-19 transmission.[79]

48.     On March 15, 2020, a coalition of civil rights, public health, and grassroots community organizations published an open letter to the State Attorney's Office, the Eleventh Judicial Circuit, and police departments across the county to urge immediate action in response to COVID-19.[80]  The letter observed that "incarcerated people are at increased risk of exposure and death" given the "unsanitary and dangerous living conditions" in the jails, the impossibility of practicing physical distancing, the forced proximity to other people in cells and other communal spaces within the jails, "sparse and inadequate" medical care, and the jail's lack of "capacity to handle such a large outbreak."[81]  Given that the jails are "a petri dish for viral infection," the letter demanded immediate steps, including the release of people and a moratorium on new bookings.[82]

49.     Around that same time, State Attorney Candidate Melba Pearson issued a press release demanding that the County take steps to decarcerate and improve conditions within the

---

[78] *Miami-Dade County Emergency Order 13-20*, Miami-Dade County (Mar. 27, 2020), https://www.miamidade.gov/information/library/coronavirus-emergency-order-13-20-social-distancing.pdf.

[79] Ex. 10, MiamiDadeCorrections (@MDCCorrections), Twitter (Mar. 12, 2020, 5:27 PM), https://twitter.com/MDCCorrections/status/1238215082275938307.

[80] Freedom from Cages is a Public Health Issue: Legal experts, Healthcare professionals, and Local Activists Urge Action to Immediately Decrease Miami Jail Population In Order to Save Lives Amid COVID-19 Crisis, Medium (Mar. 15, 2020), https://medium.com/@dreamdefenders/legal-experts-healthcare-professionals-and-local-activists-urge-action-to-immediately-decrease-44e500043ef7.

[81] *Id.*

[82] *Id.*

jails, including providing sanitation supplies, hiring more medical personnel and suspending costs for phone calls, in response to the growing COVID-19 crisis.[83]  Pearson similarly noted that "[j]ails are notorious for the spread of disease to staff and incarcerated persons."[84]

50.     On March 16, 2020, State Attorney Katherine Fernandez Rundle acknowledged that COVID-19 poses a "threat to inmates who may be at heightened risk" and stated that she had reached out to the Public Defender's Office, MDCR, and the Eleventh Judicial Circuit of Florida to develop a process of releasing certain populations of people from the jails.[85]  On April 3, 2020, she announced that, "as a result of [this] collaborative effort," eighteen individuals whose term of incarceration was due to expire in the next two months would be released early.[86]  This coalition of decision makers correctly "recognize that [they] need to reduce the number of people held in our local jails to reduce the chances that COVID-19 could spread among the officers, staff, and inmates."  *Id.*

51.     On March 20, 2020, MDCR posted a video from St. Mary's County Sherriff's Office that "provides some helpful tips on how to prevent the introduction and spread of COVID-19 into jails nationwide."[87]  The video features Dr. Anne Spaulding, a physician trained in internal medicine and infectious disease, who has multiple decades of experience working in carceral facilities. Dr. Spaulding's recommendations included: conducting daily screening procedures for

---

[83] *See* Jerry Iannelli, *Advocates Demand Miami-Dade Empty Jails During COVID-19 Outbreak*, Miami New Times (Mar. 15, 2020), https://www.miaminewtimes.com/news/miami-jails-should-release-inmates-amid-coronavirus-activists-say-11596818.

[84] *Id.*

[85] Ex. 11, Kathy Rundle (@KathyFndzRundle), Twitter (Mar. 16, 2020, 6:14 PM), https://twitter.com/KathyFndzRundle/status/1239676493464252418.

[86] Ex. 12, Apr. 3, 2020 Press Release from State Attorney Katherine Fernandez Rundle.

[87] Ex. 13, MiamiDadeCorrections (@MDCCorrections), Twitter (Mar. 20, 2020, 10:05 PM), https://twitter.com/MDCCorrections/status/1241184064977149953.

symptoms for each person who enters the facility; providing N-95 masks, surgical masks or other personal protective equipment to staff and incarcerated people; providing sufficient physical distance between incarcerated people; ensuring sufficient cleaning of high-touch areas (like door handles); providing sufficient cleaning materials that will destroy coronaviruses; and providing sufficient space or facilities (like a negative pressure room) to care for individuals who experience symptoms.[88] MDCR said it was "implementing some of the same preventative measures" in its facilities but did not specify which measures it put into place.[89]

52.     On March 24, 2020, the County confirmed that three corrections officers had tested positive for COVID-19. The three officers had worked at three jails—Metro West, the Turner Guilford Knight Correctional Center, and the Pre-Trial Detention Center—where all three individuals had shared contact with incarcerated people.[90]   On April 4, 2020, reports indicate that fifteen people who work in the County jails have tested positive for COVID-19 and that hand sanitizer, masks, and gloves are in short supply.[91]

53.     Hospitals in Miami-Dade County are already suffering.   Jackson Memorial Hospital, one of the largest hospitals in the United States and the largest hospital in the state of Florida, is also the hospital where the jail sends the people in its custody who require serious medical attention.   Jackson Hospital is already experiencing a shortage of supplies as its intensive care unit is beginning to reach capacity, and a trauma physician who works there says they "are

---

[88] *Id*.

[89] *Id*.

[90] Charles Rabin, *Miami-Dade corrections officers who worked courthouse, 3 jails test positive for COVID-19*, The Miami Herald (Mar. 24, 2020), https://www.miamiherald.com/news/coronavirus/article241484201.html.

[91] Ovalle, *see supra* note 1.

slowly descending into chaos."[92]

54.     On March 27, 2020, the MDCR issued a press release identifying steps it claims to

have taken "to protect the health and well-being of [its] employees and inmates in [its] custody."[93]

These steps include:

> a.   "Following the Centers for Disease Control and Prevention's Interim Guidance
>       on the Management of Coronavirus Disease 2019 (COVID-19) in Correctional
>       and Detention Facilities";
>
> b.   "Cancelled inmate visitation and all other non-essential public access";
>
> c.   "Working with our criminal justice partners to identify inmates who could be
>       released to minimize the inmate population";
>
> d.   "Conducting daily screening of anyone, including MDCR employees, medical
>       staff, police officers, entering our facilities";
>
> e.   "Screening all inmates at intake for possible COVID-19";
>
> f.   "Separately housing newly arrested persons, and inmates who are being
>       investigated for possible COVID19 or test positive, from the general population
>       inmates";
>
> g.   "Conducting enhanced cleaning and sanitizing of high touch areas within our
>       facilities";
>
> h.   "Practicing social distancing among all persons, staff, and inmates";
>
> i.   "Issuing personal protective equipment to our staff";
>
> j.   "Collaborated with our vendors to provide free weekly telephone calls for
>       inmates and additional postage to encourage continued communication with
>       their families";
>
> k.   "Increased recreational activities";
>
> l.   "Limiting inmate movement inside, outside, and within the facilities"; and

---

[92] Paul Murphy, *Trauma physician at Florida's biggest hospital: 'We are slowly descending into chaos,'* CNN (Mar. 29, 2020), https://www.cnn.com/world/live-news/coronavirus-outbreak-03-29-20-intl-hnk/h_7375d7e4bc0904963554159cb3f2cfc0.

[93] Ex. 14, MDCR Mar. 27, 2020 News Release.

   m. "Working with our Criminal Justice Partners to increase the use [of] video-conferencing for court proceeding and attorney visitation."

55. Many of the measures listed in the MDCR March 27 news release have not been implemented at Metro West.

### DEFENDANTS' RESPONSES TO THE COVID-19 PANDEMIC ARE CONSTITUTIONALLY DEFICIENT AND PLACE THE PEOPLE IN ITS CUSTODY AT HEIGHTENED RISK

56. All people incarcerated in the Miami-Dade County jails face a significant risk of exposure to COVID-19. Defendants are aware of the heightened threat of COVID-19 in the jails—the CDC, the County Mayor, medical experts, and various advocates have already alerted them of this risk as well as the preventive measures needed to protect against the further spread of COVID-19.

57. Despite these widespread warnings, Defendants remain woefully unprepared and incapable of taking necessary precautions to protect the people in their custody against this unprecedented, life-threatening public health crisis.

58. Urgent action is required, or many people will die.

59. Currently in Metro West, up to sixty people are forced to live in the same jail cell where dozens of bunk beds are placed only one to two feet apart. Even if they sleep head to foot, they remain within less than six feet apart.

60. Defendants do not give Class Members the ability to practice safe social distancing, and conditions force them to sit, stand, walk, eat, and sleep within six feet of another person.

61. People are also forced to share communal sinks, showers, and toilets in small common areas in each cell. Because sinks, toilets, and showers are often broken, there are only a handful of each available for everyone in the cell, which can range from 45 to over 60 people.

They are not cleaned or disinfected between each use, and Defendants do not provide supplies for disinfection or cleaning between each use.

62.     In each cell, the people incarcerated in Metro West are forced to share a limited number of phones, approximately five to six, when calling family members, loved ones, or lawyers.  Defendants do not provide people with disinfectant supplies in this high-touch area, nor do they provide for the cleaning of phones between each use.  Each person must therefore risk COVID-19 infection when touching and speaking through the phone.

63.     Defendants do not provide free hygiene or personal sanitation supplies to anyone jailed at Metro West beyond a small, non-antibacterial bar of soap that is insufficient for the routine handwashing and cleaning necessary to mitigate against the spread of COVID-19.  Those without access to the jail's commissary due to lack of funds or status are unable to access more substantial anti-bacterial soap during the growing escalation of COVID-19.

64.     Defendants have also not provided access to hand sanitizer, have denied requests to use hand sanitizer, or have removed hand sanitizer that was previously available to incarcerated people.

65.     Staff often do not wear protective personal equipment like gloves or masks when interacting with people jailed at Metro West, and there have been shortages in protective personal equipment for all people incarcerated and working in the jails.  Defendants do not provide any personal protective equipment for the people jailed at Metro West, even if they exhibit symptoms of COVID-19, are within close proximity of someone exhibiting symptoms of COVID-19, or request such equipment.

66.     Defendants do not post or provide sufficient information about COVID-19, including protective or preventive measures to avoid transmission, to the people jailed in Metro

West.

67.     Defendants do not provide adequate cleaning supplies, free of charge and in the proper concentrations of strength to prevent transmission of the virus, to anyone jailed at Metro West.

68.     Incarcerated people are forced to conduct their own cleanings of the cells and communal areas once per eight-hour shift.  Defendants designate particular people in each cell to be a "trustee" for this cleaning purpose.  Even when asked, Defendants do not provide the protective personal equipment needed, such as masks or gloves, that allow the people burdened with cleaning duties to protect themselves from the virus.  When gloves are provided, they are in scarce supply and people are forced to reuse them for multiple days, practically eliminating any protective benefit in slowing virus transmission.

69.     Defendants do not provide adequate cleaning supplies to anyone jailed at Metro West so they can clean their own personal living spaces or high-touch surfaces or objects, ensuring that the dozens of people who share the same cell will quickly transmit the illness to each other.

70.     Defendants have provided neither paper towels nor other sanitary means to dry hands after washing them, meaning that people who do wash their hands must reuse the same bath towels repeatedly, or wipe their hands on their jail-issued uniforms which are exposed to contaminated surfaces or laundered infrequently (due to lack of access or cost).

71.     Prior to the COVID-19 pandemic, people were required to fill out a written request to see a doctor before they were permitted to do so, and they were often forced to wait three days before visiting a nurse.  During the pandemic, people are forced to wait three days or more to visit a nurse, even when they exhibit known physical symptoms of COVID-19.

72.     When people confirm they have symptoms of COVID-19 and request a test, they

are denied.  They are told there are no tests available in the jail.

73.    People jailed at Metro West are still required to pay a monetary co-pay for each visit to the doctor, when the visit finally occurs.

74.    When people begin to show symptoms of COVID-19, such as a dry cough, they are not tested or quarantined.  Nor are the people in proximity of others who exhibit symptoms.

75.    In the last two weeks, approximately 60 people were told by jail officials at Metro West that they were being "quarantined" due to someone testing positive for COVID-19. Instead of being separated and provided additional medical care as advised by public health experts, they were all placed in the same room and forced into close proximity to one another.

## IMMEDIATE RELEASE FOR THE SUBCLASS OF MEDICALLY VULNERABLE INDIVIDUALS IS THE ONLY RESPONSE THAT ENSURES THEIR SAFETY

76.    Immediate release of medically vulnerable Plaintiffs, as well as the subclass of medically vulnerable people they represent, is a necessary public health intervention.[94]

77.    Dr. Ranit Mishori, Senior Medical Consultant for Physicians for Human Rights and an expert in correctional health issues, has concluded that "[r]eleasing people from incarceration is the best and safest way to . . . reduce the threat to the most vulnerable incarcerated people," and that "[i]mmediate release is crucial for individuals with chronic illnesses or other preexisting

---

[94] *See* Meyer Decl., *supra* note 37 at ¶¶ 37–38 (noting that population reduction in jails will be "crucially important to reducing the level of risk both for those within [jail] facilities and for the community at large," and that stemming the flow of intakes is a part of the necessary intervention); Greifinger Decl., *supra* note 51 at ¶ 13 ("In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage."); Stern Decl., *supra* note 51 ¶¶ 9–10 (noting that release is "a critically important way to meaningfully mitigate" the risks of harm to persons who are at high risk of serious illness or death, as well as to support the broader community health infrastructure).

conditions."[95]  Release of these vulnerable individuals is "both necessary and urgent" given that "[t]he window of opportunity is rapidly narrowing for mitigation of COVID-19."[96]

78.     Dr. Jonathan Giftos, the former Medical Director for Correctional Health Services at Riker's Island, has urged "releasing as many people as possible with a focus on those at highest risk of complication."[97]

79.     Other correctional medical and public health experts have also urged the release of medically vulnerable people from incarceration given the heightened risk of transmission and infection, including Dr. Marc Stern (the former Assistant Secretary for Health Care at the Washington State Department of Corrections),[98] Dr. Robert B. Greifinger (former manager of medical care for people incarcerated in the New York State prison system and current monitor of medical care in three large county jails for federal courts),[99] and a group of doctors who work in New York City's jails, hospitals and shelters,[100] as well as a group of more than 200 Johns Hopkins faculty in public health, bioethics, medicine, and nursing.[101]

80.     The unprecedented coronavirus pandemic unquestionably requires release of at-risk individuals, as multiple health experts have opined that no other measures would be a sufficient or appropriate response to protect their health.

---

[95] Mishori Decl. ¶ 46, *supra* note 51.

[96] *Id*.

[97] *Recipe for disaster:  The spread of corona virus among detained populations*, MSNBC (Mar. 18, 2020), https://www.msnbc.com/all-in/watch/-recipe-for-disaster-the-spread-of-coronavirus-among-detained-populations-80947781758.

[98] Stern Decl. ¶¶ 9-10, *supra* note 51.

[99] Greifinger Decl. ¶ 13, *supra* note 51.

[100] NYC Doctors Open Letter, *supra* note 51.

[101] Johns Hopkins Faculty Letter, *supra* note 51.

## CLASS ACTION ALLEGATIONS

81.     The named Petitioners/Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(2).

82.     The class that Petitioners/Plaintiffs seek to represent is defined as all current and future persons detained at Metro West during the course of the COVID-19 pandemic ("Metro West Class"). The class allegations and law are set forth in more detail in the accompanying motion for class certification.

83.     Petitioners/Plaintiffs also seek to represent a subclass of all persons in pretrial custody at Metro West who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass").

84.     The "Medically-Vulnerable Subclass" is defined as all current and future persons held at Metro West over the age of fifty, as well as all current and future persons held at Metro West of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure or coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; (l) a current or recent (within the last two weeks) pregnancy; and/or (m) any other condition identified either now or in the future as being a particular risk for severe illness and/or death caused by COVID-

19.

85.     This action is brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

86.     On April 3, 2020, Metro West confined 1,820 people, all of whom are eligible members of this class. The class meets the numerosity requirement of Federal Rule of Civil Procedure 23(a).

87.     The subclass is also too numerous for joinder of all members to be practicable. Demographic data regarding the health of correctional populations indicates that the subclass is likely to contain hundreds of people.[102]

| Health condition | Prevalence of health condition by population | | | |
| | Jails | State prisons | Federal prisons | United States |
| --- | --- | --- | --- | --- |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

88.     Joinder is impracticable because the class members are numerous; the class includes future, unknown members; and the class is fluid due to the inherently transitory nature of pretrial incarceration. Certifying this class supports judicial economy.

---

[102] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), www.prisonpolicy.org/blog/2020/03/06/pandemic/.

89.     Common questions of law and fact exist as to all members of the class and subclass respectively.   The named Petitioners/Plaintiffs seek common declarative and injunctive relief concerning whether Defendants' policies, practices, and procedures violate the constitutional rights of the class members.  These common questions of fact and law include, but are not limited to:

1) Whether COVID-19 presents a substantial risk of harm to people detained in Metro West;

2) Whether the conditions of confinement at Metro West during the COVID-19 pandemic amount to constitutional violations;

3) What measures Defendants implemented in Metro West in response to the COVID-19 crisis and what the conditions of confinement are;

4) Whether Defendants' practices during the COVID-19 pandemic exposed people jailed at Metro West to a substantial risk of serious harm;

5) Whether Defendants knew of and disregarded a substantial risk of serious harm to the safety and health of the class; and

6) Whether medically vulnerable individuals are at a particularly grave risk of serious illness or death that cannot be mitigated while confined in Metro-West under current conditions.

90.     Additionally, members of the subclass share the common question of their particular vulnerability to the COVID-19 pandemic.

91.     Plaintiffs' claims are typical of the class members' claims.  That typicality stems from their claim that Defendants have placed them at significant risk of harm by failing to take appropriate steps to address the risk of COVID-19 throughout the Metro West Detention Facility.

Every person at the Jail faces a heightened risk of contracting COVID-19 if they are not adequately protected by Defendants.  All class members seek the same declaratory and injunctive relief.

92.     The claims of Petitioners/Plaintiffs are also typical of the subclass members. The claims of Plaintiffs are typical as each member is subject to increased risk as a result of their existing age or medical conditions. All members of the subclass seek the same relief in the form of immediate release through *habeas corpus*.

93.     The Petitioners/Plaintiffs are adequate representatives of the class and subclass because their interests in the vindication of the legal claims they raise are entirely aligned with the interests of the other class members, each of whom has the same constitutional claims.  There are no known conflicts of interest among members of the proposed class or subclass, and the interests of the named Petitioners/Plaintiffs do not conflict with those of the other class or subclass members.

94.     Petitioners/Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters in federal court.  The interests of the members of the class will be fairly and adequately protected by the named Petitioners/Plaintiffs and their attorneys.

95.     Because the putative class challenges Defendants' system as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the class, certification under Rule 23(b)(2) is appropriate and necessary.

96.     A class action is a superior means, and the only practicable means, by which the named Petitioners/Plaintiffs and class members can challenge the Defendants' unconstitutional actions and obtain the necessary immediate declaratory and injunctive relief sought for themselves and all other members of the class.

**DEFENDANTS' FAILURE TO ADEQUATELY MITIGATE AGAINST THE SPREAD OF COVID-19 CONSTITUTES DELIBERATE INDIFFERENCE TO THE SERIOUS**

## MEDICAL NEEDS OF PETITIONERS/PLAINTIFFS AND CLASS MEMBERS

97.     Defendants violate Plaintiffs' Eighth and Fourteenth Amendment rights by incarcerating them in conditions that fail to adequately mitigate against the spread of a potentially fatal virus in the midst of a growing pandemic in spite of their knowledge and ability to do so.

98.     All people held in Metro West, whether detained pre-trial or incarcerated post-trial, are entitled to be protected from conditions of confinement that create a substantial risk of serious harm.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional officer violated Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("deliberate indifference" to serious medical needs violates the Eighth Amendment).   Corrections officials have a constitutional obligation to provide for detainees' reasonable safety and to address their serious medical needs. *See DeShaney v. Winnebago County Dept. of Soc. Services*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." ); *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons); *Wilson v. Seiter*, 501 U.S. 294, 300 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493, 531-32 (2011);

99.     "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments."  *Keith v. DeKalb County, Georgia*, 749 F.3d 1034, 1044 n.35 (11th Cir. 2014).  *See also City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least

as great as the Eighth Amendment protections available to a convicted prisoner.").

100.    Exposure to an infectious disease like COVID-19 without adequate preventive measures constitutes deliberate indifference to a serious risk to health and safety, thereby violating the Eighth and Fourteenth Amendments.  *Helling*, 509 U.S. at 33-34 ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect [forcibly confined] inmates from infectious disease."); *Powell v. Lennon,* 914 F.2d 1459, 1463 (11th Cir.1990) (plaintiff's allegations that "the defendants forced him to remain in a dormitory [whose] atmosphere was filled with friable asbestos" and that "defendants knew of the health danger and yet refused to move the plaintiff to an asbestos-free environment" stated a claim for "deliberate indifference to the plaintiff's serious medical needs."); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

101.    Jail officials violate this affirmative obligation by showing "deliberate indifference" to the substantial risk of serious harm. *Wilson*, 501 U.S. at 303. With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "*states a cause of action . . .* by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health") (emphasis added); *see also Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (citing *Farmer,* 511 U.S. at 842) (court "may

infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious").

102.    This Court need not "await a tragic event" to find that Defendants are maintaining unconstitutional conditions of confinement in the midst of a global pandemic.  *See Helling*, 509 U.S. at 33.  So long as the risk of serious harm is "likely," as it is here, the Eighth Amendment is violated even if "the complaining inmate shows no serious current symptoms," it is "not alleged that the likely harm would occur immediately," and "the possible infection might not affect all of those exposed."  *Id.*

103.    As established above, Petitioners/Plaintiffs face a significant risk of exposure to the novel coronavirus, which poses a serious threat of severe illness or death given their known vulnerable health conditions.  Defendants were well aware of these serious risks to their health and safety, and their failure to provide constitutionally adequate conditions of confinement during this growing global pandemic constitutes deliberate indifference.

104.    Defendants' deliberate indifference to the health and safety of people incarcerated in the jails satisfies both objective and subjective standards.  As alleged in detail above, the heightened risk of COVID-19 transmission in jails and other carceral facilities have been widely reported, and the need for risk mitigation—including testing, physical distancing, and sanitation— has been well established locally and nationwide. Advocates, including a coalition of civil rights organizations and candidate for State Attorney Melba Pearson, have called for decarceration, the release of people from the jails, and changes to the conditions of the County jails in light of the threats posed by COVID-19.  State Attorney Katherine Rundle has highlighted the need for release for people who are at heightened risk of infection and death while incarcerated, and MDCR has been made aware of the need for urgent steps—including release and changes to its conditions— to respond to the growing COVID-19 crisis.  MDCR has acknowledged receipt and understanding

of the CDC guidelines for correctional facilities published on March 23, 2020, and MDCR itself has repeatedly communicated—but failed to implement—the types of changes required to its conditions to adequately protect against COVID-19 transmission and infection within its walls.

105.    To file a grievance in Metro West, people are first required to obtain a grievance form from a jail guard, and they are limited to identifying one issue per form. Petitioners/Plaintiffs repeatedly asked for grievance forms to challenge the various conditions in the jail that made (and continue to make) it difficult for them to protect themselves against COVID-19. Jail employees denied their requests by explaining that paper grievance forms were unavailable. To the extent a small amount of forms became available on the day before this filing, many Petitioners/Plaintiffs were not able to access them, and no one was able to access enough of them to submit a grievance on each issue relating to Defendants' failure to provide basic protective measures. Moreover, even for those Petitioners/Plaintiffs who were able to file a grievance on April 3, 2020, the typical grievance procedure would take too long to result in any changes to Plaintiffs' confinement that could protect them from imminent bodily injury and death.  Accordingly, administrative remedies were unavailable at the time of this suit's filing.

106.    Given that Plaintiffs were informed that grievance forms were unavailable and were denied the opportunity to engage in the administrative relief process, as well as the imminent danger of serious injury or death posed by COVID-19 and the urgency required to safeguard the health and safety of people jailed at Metro West, administrative remedies "offer[ed] no possible relief in time to prevent the imminent danger from becoming an action harm" and were therefore unavailable. *See Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1173 (7th Cir. 2010); *see also Fuqua v. Ryan*, 890 F.3d 838, 848 (9th Cir. 2018) (holding that administrative procedure was "unavailable" when it required 30-day notice but unconstitutional requirement would occur

in 72 hours).

107.    Section 2241(c)(3) allows this court to order the release of inmates like Plaintiffs who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of ss 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself).

108.    While this circuit has indicated that "conditions of confinement" claims do not sound in Section 2241 because such cases do not typically seek or require *release*,[103] it has not addressed how Section 2241 would apply where, as in the current context, release is the *only* medically sound relief to protect a person's life in a deadly pandemic. *See Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (preferring Section 1983 to Section 2241 where outcome of challenge is not inevitable) (citing *Heck*); *see also Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (Habeas "is not now and never has been a static, narrow, formalistic remedy."); Eve Brensike Primus, *A Structural Vision of Habeas Corpus*, 98 Cal. L. Rev. 1, 12-14 (an original purpose of habeas was to rectify systemic violations by state actors).

109.    Federal courts apply a judge-made exhaustion doctrine in § 2241 cases. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 490 (1973).[104] Unlike the statutory

---

[103] *Vaz v. Skinner*, 634 Fed. Appx. 778, 780 (11th Cir. 2015) (unpublished) ("Claims challenging the fact or duration of a sentence fall within the 'core' of habeas corpus, while claims challenging the conditions of confinement fall outside of habeas corpus law.").

[104] *Cf. Deere v. Superior Court of Cal.*, No. 07-56109, 2009 WL 2386677, at *1 (9th Cir. Aug. 5, 2009) (declining to decide the question of whether a § 2241 petitioner must first exhaust his state

exhaustion requirement in § 2254, though, the judge-made exhaustion requirement for § 2241 petitions is prudential, flexible, and non-jurisdictional. *See, e.g. Santiago-Lugo v. Warden*, 785 F.3d 467, 474 (11th Cir. 2015). The Supreme Court has described the exhaustion doctrine in § 2241 cases as a "judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or confinement.'" *Braden*, 410 U.S. at 490 (citation omitted). Courts, accordingly, apply it with those dual purposes in mind. *See, e.g.*, *Park v. Thompson*, 356 F. Supp. 783, 788 (D. Haw. 1973) ("It is the legal issues that are to be exhausted, not the petitioner.").

110.    Courts have also recognized that exhaustion is excused where it would be futile. *See, e.g.*, *Davis v. Cline*, 525 Fed. Appx. 658, 659 (10th Cir. 2013) (unpublished) ("We will not excuse a failure to exhaust state remedies unless it is affirmatively shown that resort to them would be useless.") (state prisoner seeking federal 2241 habeas); *Lowe v. Duckworth*, 663 F.2d 42, 43 (7th Cir. 1981) (finding that the district court's dismissal of petitioner's habeas petition was erroneous because, where a state court delay is inordinate and unjustifiable, the court must hear the petition on its merits); *Schandelmeier v. Cunningham*, 819 F.2d 52, 53 (3d Cir. 1986) (applying futility doctrine to state prisoner seeking Section 2241 habeas relief); *Sanchez v. United States*, No. 1201540 (CBA), 2012 WL 5987858, at *1 (E.D.N.Y. Nov. 29, 2012) (quoting *Beharry v. Aschcroft,* 329 F.3d 51, 62 (2d Cir. 2003).

111.    It would be not only futile, but dangerous to force Petitioners/Plaintiffs and Class

---

remedies "to the extent this question has not been decided."); *U.S. v. Castor*, 937 F.2d 293, 296-297 (7th Cir. 1991) ("While these applicants [defendants awaiting trial] are not subject to the statutory requirement of exhaustion remedies, 28 U.S.C. § 2254(b)(1988) … federal courts nevertheless may require, as a matter of comity, that such detainees exhaust all avenues….").

Members to exhaust state remedies when their risk of COVID-19 contraction is increasing by the minute. Further, traditional exhaustion remedies are less available in the face of reduced court function as a response to the COVID-19 outbreak. *Henderson*, 568 F.2d 830, 840 (2d Cir. 1977) ("It may further be that even where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted."). Finally, exhaustion is futile for proposed class members, because requiring each member to individually petition the court would burden the limited judicial resources during this emergency and cause further delay. The risk of irreparable harm to Petitioners/Plaintiffs and Class Members is too high to require exhaustion here: their lives depend on immediate relief.

## CLAIMS FOR RELIEF

### COUNT I: Declaratory and Injunctive Relief for Violation of the Eighth and Fourteenth Amendments (42 U.S.C. § 1983)
*Metro West Class versus All Defendants*

112.    Petitioners/Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

113.    Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody. *Youngberg v. Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty to provide adequate . . . medical care" for detained persons).

114.    Under the Eighth Amendment, post-convicted persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. *See, e.g., Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200.

115.   "[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments."  *Keith v. DeKalb County, Georgia*, 749 F.3d 1034, 1044 n.35 (11th Cir. 2014).  *See also City of Revere v. Mass. Gen. Hosp*., 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.")

116.   As part of this right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail.  Deliberate indifference to the serious risk COVID-19 poses to members of the Pretrial Class, and particularly members of the Medically-Vulnerable Subclass, violates this right.

117.   Plaintiffs, and the class they represent, suffer a substantial risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19.

118.   Defendants knew of and disregarded the serious risks that COVID-19 poses to Plaintiffs, including severe illness, permanent physical damage, and death.  These risks were well-established and obvious to Defendants.

119.   Metro West has neither the capacity nor the ability to comply with public health guidelines to prevent an outbreak of COVID-19 and cannot provide for the safety of the Pretrial Class. Defendants' actions and inactions result in the confinement of members of the Metro West Class in a jail where they do not have the capacity to test for, treat, or prevent COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

120.   Defendants have subjected Petitioners/Plaintiffs to conditions of confinement that increased their risk of contracting COVID-19, for which there is no known vaccine, treatment, or care. Due to the conditions at Metro West, Petitioners/Plaintiffs are unable to take steps to protect themselves—such as social distancing, accessing medical attention or testing, or washing their

hands regularly—and Defendants have failed to provide adequate protections or mitigation measures. Defendants acted with deliberate indifference towards Petitioners/Plaintiffs by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease.

121.    As a result of Defendants' unconstitutional actions, Petitioners/Plaintiffs are suffering irreparable injury.

122.    Accordingly, Defendants, as supervisors, direct participants, and policy makers for Miami-Dade County, have violated the rights of the Metro West Class under the Eighth and Fourteenth Amendments.

**Count II: Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 (on behalf of Medically Vulnerable Subclass)**

123.    Petitioners/Plaintiffs repeat and re-allege paragraphs 1 through 111 as if fully set forth in this Count.

124.    Petitioners/Plaintiffs are not in custody pursuant to a judgment of conviction of a state court.

125.    Petitioners/Plaintiffs should be deemed to have exhausted state court remedies. Because they seek release in light of the immediate and urgent risks to their health and lives, there is no remedy that could be pursued in the courts of the State of Florida that would protect their rights. Exhaustion of any such remedy would be futile.

126.    Respondents/Defendants are holding Petitioners/Plaintiffs in custody in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. Due Process forbids exposing Petitioners/Plaintiffs to a severe risk of death, pain, or permanent severe injury, and at this time no options available to Respondents/Defendants will adequately mitigate that risk other than immediate release from custody.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners/Plaintiffs and the Class Members respectfully request that the Court:

A. Certify the proposed class;

B. Enter a declaratory judgment that Defendants violated Named Plaintiffs' and Class Members' constitutional rights by failing to adequately safeguard their health and safety in the midst of a potential outbreak of a contagious, infectious disease;

C. Grant a writ of habeas corpus for members of the Medically Vulnerable Subclass, as defined in paragraph 84;

D. Enter a temporary restraining order, preliminary injunction, and permanent injunction requiring Defendants, at Metro West during the COVID-19 pandemic, to:

    a. Effectively communicate to all incarcerated people, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

    b. Provide adequate spacing of six feet or more between incarcerated people so that social distancing can be accomplished;

    c. Ensure that each incarcerated person receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day; and (2) an adequate supply of disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

    d. Ensure that all incarcerated people have access to hand sanitizer containing at least

60% alcohol;

e.  Provide access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

f.  Require that all MDCR staff wear personal protective equipment, including CDC-recommended surgical masks, when interacting with any person or when touching surfaces in cells or common areas;

g.  Require that all MDCR staff wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after interacting with any person or touching surfaces in cells or common areas;

h.  Take each incarcerated person's temperature daily (with a functioning and properly operated thermometer) to identify potential COVID-19 infections;

i.  Assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections;

j.  Conduct immediate testing for anyone displaying known symptoms of COVID-19;

k.  Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video calling with loved ones, communications with counsel, and personal property;

l.  Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

m.  Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and

headphones) between each use;

n.  Waive all medical co-pays for those experiencing COVID-19-related symptoms; and

o.  Waive all charges for medical grievances during this health crisis;

E.  If immediate release is not granted to the medically vulnerable on the basis of this habeas Petition alone, then expedited review of the Petition, including oral argument, via telephonic or videoconference if necessary;

F.  Enter an order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

G.  Order such other and further relief as this Court deems just, proper, and equitable.

DATED: April 4, 2020                    Respectfully submitted,

*/s/ Quinn Smith*
R. Quinn Smith, Fla. Bar No. 59523
e-mail: quinn.smith@gstllp.com
Katherine Alena Sanoja, Fla. Bar No. 99137
e-mail: katherine.sanoja@gstllp.com
**GST LLP**
1111 Brickell Avenue, Suite 2715
Miami, Florida 33131
Telephone: (305) 856-7723

*/s/ Meena Jagannath*
Meena Jagannath, Fla. Bar No. 102684
meena@communityjusticeproject.com
**COMMUNITY JUSTICE PROJECT**
3000 Biscayne Blvd. Ste 106
Miami, Florida 33137
Telephone: (305) 907-7697

*/s/ Maya Ragsdale*
Maya Ragsdale, Fla. Bar No.: 1015395
maya@dreamdefenders.org
**DREAM DEFENDERS**

6161 NW 9th Ave.
Miami, Florida 33127
Tel: 786-309-2217

/s/ Alexandria Twinem
Alexandria Twinem, D.C. Bar No. 1644851
*Pro Hac Vice Admission Pending*
alexandria@civilrightscorps.org
Katherine Hubbard, DC Bar No. 1500503
*Pro Hac Vice Admission Pending*
katherine@civilrightscorps.org
**CIVIL RIGHTS CORPS**
1601 Connecticut Ave. NW, Ste. 800
Washington, DC 2009
Telephone: (202) 894-6126

/s/ Tiffany Yang
Tiffany Yang, DC Bar. No. 230836
tyang@advancementproject.org
*Pro Hac Vice Admission Pending*
Thomas B. Harvey, MO Bar. No. 61734
*Pro Hac Vice Admission Pending*
tharvey@advacementproject.org
**ADVANCEMENT PROJECT**
1220 L Street NW, Ste 850
Washington, DC 20005
Telephone: (202) 728-9557

**Attorneys for Plaintiffs**