**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

ANTHONY SWAIN; ALEN BLANCO;
BAYARDO CRUZ; RONNIEL FLORES;
WINFRED HILL; DEONDRE WILLIS;
PETER BERNAL, individually and on
behalf of all others similarly situated,

      Plaintiffs,

            v.

DANIEL JUNIOR, in his official capacity
as Director of the Miami-Dade Corrections
and Rehabilitation Department; MIAMI-
DADE COUNTY, FLORIDA,

      Defendants.

Case No. 1:20-cv-21457

**Emergency Motion**

## EMERGENCY MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

An outbreak of the novel coronavirus is imminent in Miami-Dade County's Metro West Detention Center ("Metro West"), where Defendants are confining over 1,800 human beings in conditions that threaten their lives.

Plaintiffs have limited access to soap, have no safe way to dry their hands, sleep within one to two feet of one another, must wait days to seek medical attention, and are denied basic hygiene supplies such as laundry detergent, cleaning supplies, and tissues. Many human beings confined in Metro West are medically vulnerable to the COVID-19 disease, and they fear for their lives. And as of the filing of this motion, multiple staff members in the jail have tested positive for the virus.

As the reach of COVID-19 grows inside and outside the jail, time is running out to save

1

Plaintiffs' lives and to prevent the jail from becoming an epicenter of community infection.  Absent intervention from this Court, the jail will become a site of widespread contagion wholly unable to cope with the deadly outbreak because of Defendants' flagrant and deliberate indifference to basic medical and scientific consensus. Rather than complying with federal, state, and medical requirements, Defendants are largely ignoring the problem. Plaintiffs are "treat[ed] . . . like [they] are the scum of the earth, like [they] don't deserve protection." Ex. 1, Swain Decl. ¶ 3. In this case, they ask to be "acknowledged as people" in the face of a potentially fatal pandemic. Ex. 2, Hill Decl. ¶ 11.

In violation of the Eighth and Fourteenth Amendments, the people jailed at Metro West are forced to suffer conditions that deny them the precautions and protections necessary to mitigate the severe threat of COVID-19. Plaintiffs seek class-wide relief[1] requiring Defendants to take basic steps to safeguard the health of people who, due to the nature of their confinement, are at heightened risk of infection and death in a global pandemic. Plaintiffs also seek relief for a subclass of all people who, because of age or preexisting medical conditions, are at particularly grave risk of death from COVID-19 (the "Medically Vulnerable Subclass"), and who therefore request immediate *habeas corpus* release.

This extraordinary moment requires the Court's immediate intervention[2]—outbreaks are

---

[1] Plaintiffs' Motion for Class Certification is pending. Plaintiffs file this motion on behalf of the putative class members, but for ease of reference, describes them as "class members" throughout this brief. Although this is a prototypical case for which the class action vehicle was created, the Court need not rule on the Plaintiffs' class certification motion or formally certify a class in order to issue the requested relief. *See, e.g.*, Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit.").

[2] Because of the grave risk to health and life at stake, Plaintiffs request that this Court consider this motion on an emergency basis and that the Court grant a temporary restraining order requiring the release of subclass members pending briefing and argument. Plaintiffs' counsel is contacting

measured "in a matter of days, not weeks," with this type of novel virus. Compl. ¶ 38.

## BACKGROUND

**A.    COVID-19 presents a lethal threat and requires an emergency response.**

We are in the midst of an unprecedented public health emergency. Compl. ¶ 18. On January 1, 2020, the first confirmed COVID-19 case was diagnosed in the United States. *Id*. ¶ 19. The number of people infected by COVID-19 grew exponentially in the months following. *Id*. By March 13, 2020, the World Health Organization defined the outbreak of COVID-19 as a global pandemic, and leaders over the world—as well as the President of the United States,[3] the Governor of Florida, and the Mayor of Miami-Dade County—declared a state of emergency. *Id*. ¶ 46. As of April 4, 2020, 277,205 people have been diagnosed with COVID-19 in the United States, with 6,593 deaths confirmed. *Id*. ¶ 19. Without effective public health intervention, the Centers for Disease Control and Prevention ("CDC") projects that as many as 2.2 million American people will die from the coronavirus. *Id*.

The sensation of severe illness caused by COVID-19 has been compared to "drowning in your own blood." *Id*. ¶ 24. COVID-19 is a highly contagious virus that can severely damage lung tissue, affect cardiac functions (including the possibility of heart failure), and cause widespread damage or permanent harm to other organs. *Id*. ¶ 20. Complications manifest at an alarming pace, and the required levels of medical support—which include highly specialized equipment like

---

counsel for the Defendants contemporaneously with this filing to alert them that an emergency filing is forthcoming and providing defense counsel with copies of this motion, Plaintiffs' complaint, and Plaintiffs' motion for class certification. Plaintiffs' counsel is prepared to appear by telephone immediately. Each day that passes risks Plaintiffs' lives. This case cannot wait.

[3] *'Two Very Big Words': Trump Announces National Emergency for Coronavirus*, N.Y. Times (Mar. 13, 2020), https://www.nytimes.com/video/us/politics/100000007032704/trump-coronavirus-live.html.

ventilators as well as an entire team of care providers—will quickly exceed local health care resources. *Id.* ¶ 25. Approximately 20% of people infected experience life-threatening complications, and between 1% and 3.4% die. *Id.* ¶ 26. The fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in countries with highly effective health care systems. *Id.* ¶ 26.

Although everyone is at risk of contracting the novel coronavirus disease, certain populations are at higher risk for severe illness. *Id.* ¶ 22. Certain underlying medical conditions increase the risk of serious COVID-19 disease for individuals of any age, including lung disease or other respiratory conditions like asthma, chronic liver or kidney disease, diabetes, epilepsy, hypertension, compromised immune systems, blood disorders, inherited metabolic disorders, strokes, and pregnancy. *Id.* People over the age of fifty also face greater chances of serious illness or death. *Id.* There is neither a vaccine nor any medication to prevent or cure infection, and the only known effective measure to mitigate against the risk of severe illness or death is to prevent infection in the first instance. *Id.* ¶¶ 27, 28.

Accordingly, medical experts, officials, and the CDC urge "social distancing"—isolating oneself from other people at a minimum distance of six feet—as well as frequent hand-washing, a minimum of 60% alcohol-based hand sanitizers, and frequent cleaning and disinfecting of high-touch surfaces and objects. *Id.* ¶ 28. These measures are particularly important in carceral settings like local jails, which become "ticking time bombs" in the midst of a public health crisis as "[m]any people crowded together, often suffering from diseases that weaken their immune systems, form a potential breeding ground and reservoir for diseases." *Id.* ¶ 29.

**B.    A COVID-19 outbreak in Metro West is an extreme threat to public health and safety.**

People incarcerated in Metro West are at heightened risk of infection and death from

COVID-19. According to Dr. Jaimie Meyer, an expert in public health in jails and prisons: "the risk posed by COVID-19 in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." *Id*. ¶ 30; *see also* Greer Decl. ¶¶ 10-11. This is due to a number of factors, including forced close proximity of individuals in those facilities, their reduced ability to protect themselves through social distancing, lack of necessary medical and hygiene supplies,  heavy reliance on outside hospitals for serious medical care, forced labor of incarcerated people in cleaning their own facilities with insufficient supplies, constant cycling of people through the jails, and inadequate medical care within the jail itself. Compl. ¶¶ 30-31; Greer Decl. ¶¶ 10-16.

The CDC's own guidance for correctional and detention facilities acknowledges that incarcerated people live in conditions "heightening the potential for COVID-19 to spread." Compl. ¶ 33. The growing devastation in other jails around the country is a harbinger for what awaits Miami-Dade County. In New York City, the COVID-19 infection rate in the city's jails is eight times higher than the rest of the city, which already sits at one of the highest rates in the world. *Id*. ¶ 37. The first case of COVID-19 on Rikers Island was confirmed on March 18, 2020. *Id*. By Thursday, April 2, 2020, 231 people incarcerated at Rikers, 223 jail staff had tested positive; two jail officers have died; and more than 800 incarcerated people were held in isolation or quarantined. *Id*. Urgent action is required if Metro West is to avoid the fate of Rikers Island.

Concerns for people trapped inside these "ticking time bombs" extend to all people who cycle through these facilities, including correctional and medical staff, who are also at heightened risk of transmission and infection. *Id*. ¶¶ 1, 37, 52; Greer Decl. ¶ 10. An outbreak of COVID-19 in the jail will further increase the contagion rates for their families and the broader community. *See* Compl. ¶ 29, 39; Greer Decl. ¶ 11. Moreover, an outbreak in a jail will overwhelm the regional

health care facility, and resources will be unavailable to treat anyone, whether incarcerated or not, suffering severe illness from COVID-19. Compl. ¶ 39; Greer Decl. ¶¶ 16-18. As Leann Bertsch the Director of the North Dakota Department of Corrections and Rehabilitation concluded, "ignoring the health of those living and working inside the walls of our nation's correctional facilities poses a grave threat to us all," and "putting public health first is the best, and only, way to effectively achieve [a department of correction's] public safety mission during the COVID-19 pandemic." *Id*. ¶ 34.

**C.     Metro West is not taking sufficient precautions to prevent an outbreak among those detained.**

This novel coronavirus has already reached the Miami-Dade County jails. Following the March 27th report of a Metro West jail employee and two others testing positive for COVID-19, Miami-Dade County Corrections and Rehabilitation (MDCR) released a list of preventive measures it claimed to "[be] taking" during the pandemic, some of which conformed to CDC recommendations. Compl. Ex. 14, MDCR Mar. 27, 2020 News Release. As of the time this Motion was filed, Defendants have failed to implement any of the precautionary measures listed in their press release at Metro West, and they have instead forced Plaintiffs to endure unconstitutional conditions that raise serious threats of harm to their bodies and lives. *See infra*.

**1.     Defendants have failed to achieve necessary social distancing.**

Each cell at Metro West is "a petri dish for disease." Swain Decl. ¶ 13. Even during this pandemic, people detained at Metro West are "packed into a cell" with over sixty other people. Ex. 3, Blanco Decl. ¶¶ 8, 15. Bunk beds are positioned close together, and Plaintiffs are only one to two feet away from the person lying in the bed next to them and from the person lying in the bed above or below. Ex. 4, Willis Decl. ¶ 7; Ex. 5, Cruz Decl. ¶ 5; Hill Decl. ¶ 5. Even if people slept head to foot instead of head to head, they would remain within six feet of another person. Ex.

6, Flores Decl. ¶ 6. Given that Plaintiffs are forced into a cell that becomes "so crowded . . . it feels like a health hazard," Flores Decl. ¶ 6, it is "impossible" to "stay away from people" and practice the CDC recommendations of social distancing, no matter how hard people do try. Blanco Decl. ¶ 8; Willis Decl. ¶ 7. "In order to maintain the proper distance of six feet, there would have to be a maximum of 15 people in our cell at a time." Ex. 7, Bernal Decl. ¶ 12.

Social distancing is also virtually impossible in the medical clinic. Plaintiffs express fear of going to the clinic for necessary medicine because everyone "is crowded into the same small room as [they] wait," MDCR staff do not instruct people to be six feet apart, and Plaintiffs "can't get far enough away from people to stay safe." Flores Decl. ¶ 3; Blanco Decl. ¶ 6.

And although Defendants suggested that they needed to reduce the jail population to facilitate social distancing, they have not done so. Despite community advocacy and public pressure, State Attorney General Katherine Fernandez Rundle has only identified eighteen individuals for whom she supported release. Compl. ¶ 50. On February 25, 2020, before states of emergency were declared in Florida or Miami-Dade County, there were 2,061 people in custody at Metro West. Ex. 8, Feb. 25, 2020 Daily Jail Population Statistics. On April 3, 2020, over a month later, 1,820 people remained in custody at Metro West. Ex. 9, Apr. 3, 2020 Daily Jail Population Statistics. This means that an average cell that contained 60 people in February still holds 54 people—far too many for them to practice meaningful social distancing.

As the declarations demonstrate, the experiences of those who remain incarcerated at Metro West reveal the dangerous conditions they will endure if they are not allowed to practice social distancing. This crisis has laid bare the existing failures of Metro West in mitigating the spread of infectious diseases, *see* Swain Decl. ¶¶ 8-9 (describing the spread of other infectious diseases in his cell at Metro West), but the current pandemic has precipitated an unprecedented emergency

that requires urgent action.

### 2. Defendants do not provide immediate health care, including testing, for medically vulnerable or COVID-19 symptomatic people jailed in Metro West.

Metro West is "under-equipped and ill-prepared to prevent and manage a COVID19 outbreak." Greer Decl. ¶ 28. Even before COVID-19 reached Miami-Dade County, medical care was often delayed or unreliable. *See* Blanco Decl. ¶ 4 (received an inhaler to help manage his severe asthma nearly three months after his request); Swain Decl. ¶ 17 (taken to the hospital a year and a half after he fell and injured his wrist). To request medical attention, people were required to fill out a medical request slip, also known as a "sick card," and wait approximately three days to see a nurse. Willis Decl. ¶ 6.

Now, even when Plaintiffs experience symptoms of COVID-19 (including difficulties breathing), they are still required to submit a medical request slip and are forced to wait three days to a week before seeing a nurse. *See, e.g.,* Blanco Decl. ¶¶ 5, 7; Flores Decl. ¶ 4; Hill Decl. ¶ 10. Even an elderly man with multiple respiratory issues who expressed a need for a breathing machine has made three requests to see a doctor but has only been granted access to the nurse. Ebert Decl. ¶ 17. Nurses and MDCR staff have denied Plaintiffs' requests for a test, even when they physically demonstrate and verbally confirm their COVID-19 symptoms. Blanco Decl. ¶ 6; Cruz Decl. ¶ 2. People are told there are no tests available in the jail, Blanco Decl. ¶ 6, and those who exhibit COVID-19 symptoms are denied even the minimal step of having their temperature taken, Willis Decl. ¶¶ 6-7; Cruz Decl. ¶ 2; Flores Decl. ¶ 4; Hill Decl. ¶ 9; Bernal Decl. ¶ 5. Those who are coughing and are refused a test for COVID-19 are instead given a Tylenol pill, and nothing more. Bernal Decl. ¶¶ 7-8; Blanco Decl. ¶ 6. "There are no measures taken to protect" even the people housed in the medical unit, where the "medically vulnerable people" are assigned to live. Swain

Decl. ¶¶ 4, 12.

### 3. Defendants maintain dangerous conditions and fail to provide even basic hygiene supplies to the people jailed in Metro West.

Everyone who is jailed at Metro West receives one "hygiene pack" per month, which includes "a small soap that doesn't sanitize, one pen, one envelope, one stamp, one deodorant that doesn't work, and one comb." Cruz Decl. ¶ 8. This single "small," "thin bar of soap" is insufficient to handle frequent daily hand-washing, *see* Willis Decl. ¶ 11, and even if more were provided, it remains non-antibacterial, Cruz Decl. ¶ 8. To access hygienic anti-bacterial soap during this public health crisis, people are required to have sufficient funds to purchase it through the commissary. Cruz Decl. ¶ 8.

MDCR largely does not provide Plaintiffs with "anything to protect [themselves]" during this pandemic, such as gloves, face masks, or hand sanitizer. Cruz Decl. ¶ 8; Willis Decl. ¶ 11; Hill Decl. ¶ 7. None of these items are available for purchase in the commissary. Cruz Decl. ¶ 8. MDCR fails to provide even the most basic hygiene products – they do not provide toilet paper, paper towels, or tissues to the people jailed in Metro West. Willis Decl. ¶ 11; Blanco Decl. ¶ 12; Flores Decl. ¶ 8. Laundry detergent is often unavailable, and the laundry machines are often broken, so Plaintiffs are either unable to wash their clothes or are forced to hand-wash their clothing with purchased soap. Blanco Decl. ¶ 13; Cruz Decl. ¶ 11; Flores Decl. ¶ 8.

Nor is the situation safe for the guards, who are forced to bring their own protective gear into the jail to safeguard against the virus. Blanco Decl. ¶ 16. It is rare to see guards wearing gloves, Swain Decl. ¶ 7; Ex. 10, Ebert Decl. ¶¶ 14, MDCR staff do not change gloves or wash their hands between physical interactions with incarcerated people. Cruz Decl. ¶ 13. Even for guards, "[t]here aren't enough masks to go around." Swain Decl. ¶ 7.

MDCR does not hire janitorial staff to clean or sanitize the facility; instead, certain

incarcerated people are assigned as "trustees" to help clean each cell, and incarcerated people are told they "have to clean [their] cells by [themselves]." Cruz Decl. ¶ 7. Trustees are "scared" and are "trying to find the best way to protect [themselves] and the people who [they] live with," *id.*, but MDCR does not provide sufficient protective gear or sanitation supplies to protect them from the virus. MDCR does not provide trustees with bleach or face masks, and the only cleaning supply that is available is a "really watered down" liquid that "do[es]n't sanitize" any surfaces. *Id.*; Flores Decl. ¶ 7; Hill Decl. ¶ 6. One Plaintiff has "seen blood" remain on the floor, even after cleaning attempts, "because the supposed cleaning products [MDCR] gives [them] can't even clean that up." Swain Decl. ¶ 15. Even trustees are not provided with enough gloves to keep them safe from the virus, and they are often forced to reuse gloves so that "all [they]'re doing is carrying bacteria around." Bernal Decl. ¶ 9; *see also* Ebert Decl. ¶ 9. Trustees who also serve food are told the jail has no more gloves but that they needed to use their bare hands to continue preparing the food trays. Bernal Decl. ¶ 10.

There is a "shift change" once every eight hours, which is when trustees make their best attempt at cleaning the cells with diluted and insufficient supplies. Willis Decl. ¶ 10. But because MDCR has not provided sanitation or hygiene products during this pandemic, people are rendered unable to properly sanitize high-touch items or areas between use. *See supra*.

In each cell, Plaintiffs are forced to "share everything," heightening the likelihood of transmission. Blanco Decl. ¶ 10; Flores Decl. ¶ 7. Everyone shares a single "little water cooler" where used bottles often touch the spigots. Blanco Decl. ¶ 10. Everyone must touch the same button to release the water, and people avoid touching this button with their hands wherever possible given that it is "always dirty." Cruz Decl. ¶ 10; Willis Decl. ¶ 11.

Every person in each cell must also share the bathrooms, where multiple sinks, showers,

and toilets are often broken. Blanco Decl. ¶ 11; Cruz Decl. ¶ 9. At times, there are only three showers and six toilets for over 65 people in the same cell to share. Willis Decl. ¶ 9. The bathroom floor is "filled with standing water," bathrooms and sinks are "really dirty," and the showers are "disgusting." Willis Decl. ¶ 9; Blanco Decl. ¶ 11.

People in each cell also share approximately six phones, Willis Decl. ¶ 8, which cannot be "sanitized between uses" even though these phones touch people's faces and mouths. Blanco Decl. ¶ 11. As noted above, Defendants have provided no supplies to clean these frequently used surfaces. In an attempt to protect themselves from the virus, people have wrapped a sock or shirt around the phone when speaking into it. Blanco Decl. ¶ 11; Flores Decl. ¶ 7; Willis Decl. ¶ 10. There are similarly no sanitation supplies to disinfect other high-touch objects that must be shared in the cell, including the television remotes, furniture, cards, and dominoes. Willis Decl. ¶ 8.

### 4. Defendants fail to implement proper screening protocols and house newly arrested and symptomatic people together with the general population.

New people, including newly incarcerated people and jail staff, are "coming in and out constantly" of Metro West. Cruz Decl. ¶ 6; Blanco Decl. ¶ 9; Willis Decl. ¶ 4. Plaintiffs feel "trapped in [their] cells" with new people arriving daily, Blanco Decl. ¶ 9, Willis Decl. ¶ 4, including many who exhibit COVID-19 symptoms such as dry coughs, Flores Decl. ¶ 5; Blanco Decl. ¶ 7. Plaintiffs who exhibit COVID-19 symptoms (such as trouble breathing, dry coughs, and throat or chest pain) and request medical attention remain in general population for days as they wait to see the nurse. Blanco Decl. ¶ 5; Flores Decl. ¶ 4. Plaintiffs observe that many people in their cells are coughing "all the time" and appear "really sick," though no efforts are made to treat or move symptomatic people. Cruz Decl. ¶ 2; Blanco Decl. ¶ 7; Swain Decl. ¶¶ 5-6.

Plaintiffs feel unsafe and "vulnerable" to others infecting them with COVID-19 given that "there's nothing [they] can do to protect against" this infectious disease while inside Metro West.

Blanco Decl. ¶ 9; Willis Decl. ¶ 4; Flores Decl. ¶ 5. Newly booked individuals do not have their temperatures taken and are not tested for COVID-19 before they enter the jail, even when they exhibit potential symptoms, and when screening does occur it consists solely of asking verbal questions about symptoms. Flores Decl. ¶ 5.

### 5. Defendants fail to provide proper medical care to people infected with or exposed to COVID-19.

At least one cell in Metro West has been "quarantined" as a result of a suspected case of COVID-19, but rather than quarantining each potentially exposed person (as recommended), all sixty people inside the cell are forced to remain together in close proximity with little protection. Swain Decl. ¶ 10. Approximately 22-25 people in the cell are currently sick and coughing. *Id*. Officers and nurses do not want to enter the cell, and they argue in the hall or try to encourage the younger officers to enter. *Id*. It is clear that the officers, too, "are in fear for their lives and don't want to take the virus home to their families." *Id*. The medical unit assigned to medically vulnerable people shares the same bathroom and air vents with the quarantined cell, with no protective measures in place to mitigate against the spread of the virus. *Id*. ¶¶ 4, 11.

### 6. Defendants fail to provide sufficient information concerning COVID-19.

MDCR chooses to leave Plaintiffs "[i]n the dark" about COVID-19 and its necessary preventive measures. Blanco Decl. ¶ 17. MDCR has provided almost no instruction, information, or announcements concerning the coronavirus. Willis Decl. ¶ 3, Cruz Decl. ¶ 3. All that MDCR has done is place a memo on the wall explaining that court was canceled and that yard time is mandatory, but many people cannot read and therefore cannot understand the written memo. Cruz Decl. ¶ 3. Reports from family and friends or the news are the only sources of information available to people jailed in Metro West. Blanco Decl. ¶ 17; Hill Decl. ¶ 4; Willis Decl. ¶ 3. People are "scar[ed] because [they] don't know what's going on" or "how to protect [them]selves." Hill Decl.

¶ 4.

**D.    COVID-19 is exceedingly dangerous for medically vulnerable Plaintiffs.**

Plaintiffs suffer from moderate asthma and bronchitis, severe or chronic asthma, epilepsy, type 1 diabetes, HIV, as well as paraplegia and a spinal condition called cystic myelomalacia with a failing respiratory system. Cruz Decl. ¶ 2; Blanco Decl. ¶ 3; Willis Decl. ¶ 2; Flores Decl. ¶ 2; Hill Decl. ¶ 2; Swain Decl. ¶ 2; Bernal Decl. ¶ 2. They suffer underlying health conditions recognized by the CDC and medical experts as medically vulnerable, and possible exposure to COVID-19 is exceedingly dangerous, even fatal, for Plaintiffs. Compl. ¶ 22. Older people and those with these underlying conditions are more likely to develop serious illness if they contract COVID-19.[4] Individuals with these conditions face a fatality rate of approximately 15% if they contract COVID-19.[5]

**ARGUMENT**

In this case, Plaintiffs seek two forms of immediate relief. First, Plaintiffs, and the class as a whole, seek an order requiring the Defendants to follow several procedures, recommended by medical professionals and the CDC Guidance on the management of COVID-19 in jails and correctional settings, that ensure those detained at Metro West: 1) are informed about the existence of COVID-19; 2) can practice social distancing; 3) can maintain necessary hygiene; and 4) have access to adequate and timely medical treatment to screen, test, and treat symptoms.

Second, the Medically Vulnerable Subclass, composed of the elderly and those with certain preexisting medical conditions, seek immediate release from the chaotic, infectious jail

---

[4]   World Health Organization, *Q&A on coronaviruses (COVID-19)* (Mar. 9, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

[5]  Compl. Exhibit 15, Declaration of Dr. Carlos Franco Paredes, *Fraihat v. U.S. ICE*, No. 19-cv-1546, ECF No. 81-12 (C.D. Cal. Mar. 24, 2020).

environment through a writ of habeas corpus. Their lives depend on how quickly they are released from that environment.

I. **Plaintiffs are entitled to a temporary restraining order and preliminary injunction requiring Defendants to change their practices at Metro West to conform to medically accepted means of preventing and mitigating the spread of COVID-19.**

To obtain either a temporary injunction or a preliminary injunction, a party must demonstrate that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). That standard is met here.

A. **Plaintiffs are likely to succeed on the merits because Defendants are deliberately indifferent to the serious, possibly fatal threat of COVID-19.**

Plaintiffs and Class members are currently at imminent risk of death or serious injury from exposure to the coronavirus. If this litigation is decided in the ordinary course, many Class members may become seriously ill and die before final judgment is entered, and countless others will suffer severe pain or permanent organ damage. Class members are highly likely to succeed on their claims because Defendants are deliberately indifferent to the risk that Plaintiffs will contract COVID-19 within the current conditions of Metro West in violation of the Eighth Amendment and Fourteenth Amendment's Due Process Clause.

The Defendants' failure to implement the basic steps recommended by both health experts and the CDC—including access to information about COVID-19, soap and water so that those detained can wash their hands after touching objects or other people, giving people sufficient space to stay at least six feet away from others at all times, the ability to clean and disinfect all surfaces touched by multiple people at least once per day, and access to basic medical screening and

14

treatment protocols for infectious disease—constitutes deliberate indifference in violation of the Fourteenth Amendment.

The government has a constitutional duty to protect those it detains from conditions of confinement that create "a substantial risk of serious harm" to detained individuals. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The right to be free from exposure to serious harm arises under the Eighth Amendment for people convicted of a crime. *Id.*; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This right and arises with equal force under the Fourteenth Amendment's Due Process Clause for those detained pre-trial. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Keith v. DeKalb County, Georgia*, 749 F.3d 1034, 1044 n.35 (11th Cir. 2014). Under these Amendments, an official is liable if she displays "deliberate indifference" to "a condition of confinement that is sure or very likely to cause serious illness and needless suffering" to someone detained, which includes "exposure of inmates to a serious, communicable disease." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Truss v. Warden*, 684 F. App'x 794, 796 (11th Cir. 2017) (recognizing that exposure to tuberculosis can constitute a substantial risk of serious harm).

To demonstrate a violation of the Eighth and Fourteenth Amendments, a plaintiff must show "'(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *Lane v. Philbin*, 835 F.3d 13012, 1307 (11th Cir. 2016). Plaintiffs easily satisfy these requirements.

### 1.    *Risk of Serious Harm*

People detained at Metro West are at a substantial risk of serious harm from COVID-19. A plaintiff satisfies this requirement when conditions are "extreme and pose[] an unreasonable risk of serious injury to his future health or safety." *Lane*, 835 F.3d at 1307. COVID-19 is just such a threat of serious injury. It is a novel disease with no vaccine, effective treatment, or cure. The

disease can cause severe pain in even mild and moderate cases. It has been described as feeling like "having glass in your lungs" or "drowning in your own blood" and leaves patients choking and struggling to breathe.[6] And it can cause permanent damage to a person's lungs.[7] In critical and severe cases, COVID-19 can cause pneumonia and inflammation of the lungs that can require days or weeks attached to a ventilator and blood oxygenation machines.[8] Finally, in the most severe causes, COVID-19 results in death of between 1% and 3.4% of patients—a rate 10 times higher than the risk of death from influenza.[9]

And the risk of contracting COVID-19 is extreme and unreasonable. Across the country, cities, states, and the federal government have issued "shelter in place" orders closing public schools until further notice, shutting down all non-essential businesses, banning people from eating in restaurants or otherwise congregating in groups of more than 10 people, and requiring individuals to stay in their homes unless it is absolutely necessary to leave. Even when they leave, people are advised to stay at least six feet from other individuals, wear masks to prevent the risk of transmission through the air, avoid touching their faces while outside, and washing their hands immediately after returning home. These measures are unprecedented in the United States, and the message is clear: any risk of contracting COVID-19 is unacceptable for the American public. So too for Plaintiffs who are detained, where the risk of contracting the virus is even greater than in the general population.[10]

---

[6] Compl. ¶ 25; *Virus feels like 'glass in lungs': Fit mum's chilling video*, Chronicle (Mar. 21, 2020), https://www.thechronicle.com.au/news/glass-in-lungs-fit-mums-chilling-video/3977749/.

[7] Compl. ¶ 25.

[8] Ex. 11, Greer Decl. ¶¶ 23-24; Compl. ¶ 24.

[9] Compl. ¶ 25.

[10] Greer Decl. ¶¶ 10-11; Compl. ¶ 36.

Recognizing that COVID-19 presents a particularly serious threat to people who are detained, other federal courts have acted quickly in recent days to grant extraordinary relief to release people from detention, including in the form of granting petitions for writ of habeas corpus, reversing decisions to detain individuals before trial because they were found to be a safety risk, and ordering compassionate release.[11] These myriad opinions reflect the emerging consensus of the federal courts: people cannot be detained if they are exposed to a serious risk of contracting COVID-19. And COVID-19 is already in Metro West. Every possible step must be taken to ameliorate the risk to those who remain detained.

---

[11] *See, e.g.*, *United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020); *United States v. Perez*, 17-cr-513-3 (AT) (S.D.N.Y. Apr. 1, 2020); *United States v. Underwood*, No. 8:18-cr-201-TDC, Dkt. No. 179 (D. Md. Mar. 31, 2020); *Thakker v. Doll*, 20-cv-480 (M.D. Pa. Mar. 31, 2020), ECF No. 47; *Castillo et al. v. Barr*, 5:20-cv-00605, ECF Doc. 32 (C.D. Cal. Mar. 27, 2020); *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21, 2020 WL 1529158 (D. Md. Mar. 30, 2020); *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020); *United States v. Bolston*, No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020); *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No 98 (D.D.C. Mar. 28, 2020); *United States v. Hector*, No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020); United States v. Kennedy, 18-cr-20315 (JEL), Dkt. No. 77 (E.D. Mich. Mar. 27, 2020); *United States v. Hector*, 18-cr-3, Dkt. No. 17 (4th Cir. Mar. 27, 2020); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020); *United States v. Jaffee*, No. 19-cr-88 (RDM) (D.D.C. Mar. 26, 2020); *United States v. Harris*, No. 19-cr-356 (RDM), 2020 WL 1503444 (D.D.C. Mar. 26, 2020); *USA v. Garlock.*, No. 18 Cr 00418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020); *Xochihua-Jaimes v. Barr*, No. 18-71460 (9th Cir. Mar. 24, 2020); *U.S. v. Stephens,* 15 Cr. 95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020); *In re. Extradition of Alejandro Toledo Manrique*, 2020 WL 1307109, (N.D. Cal. March 19, 2020); *Committeefor Public Counsel Servs. v. Chief Justice*, No. SJC-12926 (Mass. Apr. 3, 2020), https://www.mass.gov/files/documents/2020/04/03/12926.pdf; Press Release, Legal Aid Society, Legal Aid Secures Release of 106 Incarcerated New Yorkers at a high risk of COVID-19 from Technical Parole Violation Holds on Rikers Island (Mar. 27, 2020), https://legalaidnyc.org/wp-content/uploads/2020/03/03-27-20-Secures-Release-of-106-Incarcerated-New-Yorkers-at-a-high-risk-of-COVID-19-from-Technical-Parole-Violation-Holds-on-Rikers-Island.docx.pdf?fbclid=IwAR3IvbeyQ1BdlVdnwjsZjVd_S71X06pp-uQAyGK2vUj7n2XpOa5URMPyZfQ.

## 2. *Defendants' Deliberate Indifference*

The second prong of the deliberate indifference inquiry "has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003). All three requirements are met here.

First, it cannot be seriously disputed that any government official, including Defendants, are subjectively unaware of the risk posed by the coronavirus both in general and particularly within detention environments. Whether the source is government orders,[12] CDC guidance aimed particularly at jails and prisons,[13] advocacy letters sent to Defendants,[14] or articles written in nationwide publications,[15] the Defendants have been made well aware of the risks to those who reside at Metro West.  Their own communications and announcements emphasize this awareness.

---

[12] Compl. ¶ 55; President's Coronavirus Guidelines for America, Whitehouse.gov (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

[13] CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[14] Compl. ¶ 47.

[15] David Mills & Emily Galvin-Almanza, *As many as 100,000 incarcerated people in our prisons will die from the coronavirus, unless the US acts now*, Bus. Insider (Apr. 2, 2020), https://www.businessinsider.com/failure-to-release-prisoners-is-condemning-thousands-to-death-2020-4; Anna Flagg & Joseph Neff, *Why Jails Are So Important in the Fight Against Coronavirus*, N.Y. Times (Mar. 31, 2020), https://nyti.ms/3aIBHjv; Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://nyti.ms/2Jmnf4z; Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons; Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons; Weihua Li & Nicole Lewis, *This Chart Shows Why the Prison Population Is So Vulnerable to COVID-19*, Marshall Proj. (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19; German Lopez, *A coronavirus outbreak in jails or*

Second, Defendants have disregarded that risk by failing to implement the steps urged by health experts, including the CDC, to stop the spread of the virus. An official demonstrates disregard of a risk by "failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Here, the list of reasonable measures to prevent the spread of COVID-19 is well delineated and publicized: "[s]ocial distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19." Memo. & Order at 21, *Thakkar v. Doll*, No. 20-cv-480 (Mar. 31, 2020), ECF No. 47. As health professionals have explained to the general public, COVID-19 is best avoided by (1) "[w]ash[ing] your hands for at least 20 seconds with soap and water or hand sanitizer that contains at least 60% alcohol often (especially after touching common surface areas . . . and other social interactions)," (2) avoiding crowded places "and maintain[ing] at least 6 feet of distance between yourself and others," and (3) "[d]isinfect[ing] surfaces that are used regularly, using household sprays or wipes."[16] The CDC has also recommended these same measures within jails and prisons, calling social distancing of at least six feet at all times the "cornerstone of reducing transmission" of COVID-19 within detention facilities, pushing facilities to "[p]rovide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent

---

*prisons could turn into a nightmare*, Vox (Mar. 17, 2020), https://www.vox.com/policy-and-politics/2020/3/17/21181515/coronavirus-covid-19-jails-prisons-mass-incarceration.

[16] Angel N. Desai & Rayal Patel, Am. Medical Ass'n, *Stopping the Spread of COVID-19* (Mar. 20, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763533; *see also* CDC, *How to Protect Yourself* (last updated Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html (same).

hand washing,"[17] and advising that facilities must, "[s]everal times a day, *clean and disinfect* surfaces and objects that are frequently touched, especially in common areas."[18]

Despite these clear directives, Defendants have failed to provide the people jailed at Metro West with the space, soap, sanitizer, and cleaning supplies necessary to allow staff and inmates to remain safe. Nor have they provided timely and adequate medical care to identify, isolate, and treat people who develop symptoms. And as noted above, Defendants deny Plaintiffs basic preventive measures such as personal protective equipment, enough space to sleep or exist more than six feet away from another person, access to medical attention, or paper towels. As a result, Plaintiffs and the class they represent are at a substantial risk of contracting COVID-19.[19] And Defendants' failure to act puts them out of step with the action being taken by other jails and prisons around the country, who are implementing the steps urged by the medical community and federal government.[20]

---

[17] The CDC likewise recommends that corrections officers be provided soap at no cost so that they can avoid contracting or transmitting the coronavirus when they touch surfaces or persons within the facility. *Interim Guidance on Management of Coronavirus Disease 2019*, at 10.

[18] Interim Guidance on Management of Coronavirus Disease 2019, at 4, 8-9.

[19] Greer Decl. ¶¶ 10-21.

[20] *See* Gov. Gretchen Whitmer, Executive Order No. 2020-29 (COVID-19), https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523422--,00.html; Megan Harris et al., *With In-Person Visits Eliminated, PA Prisons Get More Phone & Video Privileges*, WESA (Mar. 19, 2020), https://www.wesa.fm/post/person-visits-eliminated-pa-prisons-get-more-phone-video-privileges#stream/0; Arizona Dep't of Corrections, Media Advisory, COVID-19 Management Strategy Update (Mar. 18 2020);Joe Szydlowski, *Sheriff's Office: Hunger strike ends at Monterey County Jail*, Californian (Mar. 27, 2020), https://www.thecalifornian.com/story/news/2020/03/27/sheriffs-office-hunger-strike-ends-monterey-county-jail/2929726001/; Mela Seyoum, *Santa Rita Jail adjusts as organizations call for action amid COVID-19*, Daily Californian (Apr. 2, 2020), https://www.dailycal.org/2020/04/02/santa-rita-jail-adjusts-as-organizations-call-for-action-amid-covid-19/;

In the typical deliberate indifference case, courts often given latitude to jail and prison officials to decide what actions are "reasonable" to deal with safety within facilities. But COVID-19 is an altogether different threat, and its spread within Metro West poses a danger not only to those confined and employed there, but to the entire surrounding community. There are currently few, if any, tests available, and symptom checks fail because of the virus's long latency and ability to live in asymptomatic people.[21] Moreover, no vaccine or prophylactics yet exist, and the morality rate is much higher than other diseases.[22] At this moment, there is only one way to minimize the risk of COVID-19: prevent its spread.[23] This means allowing people to keep six feet of distance, wash their hands frequently, disinfect regularly used surfaces, and identify, isolate, and medically treat those who develop symptoms.[24] By failing to do these things, or allow detainees to do them, Defendants are knowingly exposing Plaintiffs, guards, and other jail staff to a risk of a painful and lethal disease. That risk is unacceptable.

### 3.    *Causation*

Plaintiffs are only exposed to an unacceptably high risk of contracting COVID-19 because Defendants are denying them access to sufficient space, information, personal cleaning supplies, cleaning supplies for the surfaces they touch, and medical care for those who may be infected. An injunction requiring these steps would minimize the risk of exposure to the virus and thus satisfy the requirements of the Eighth and Fourteenth Amendments.

---

[21] Compl. ¶¶ 20-21, 26.

[22] Compl. ¶¶26-27, 22 n.17.

[23] Compl. ¶ 28.

[24] Compl. ¶¶ 28, 33.

**B.      Plaintiffs will suffer irreparable harm without a preliminary injunction.**

Plaintiffs allege injuries that are irreparable and, therefore, are not suitable for resolution in the ordinary course of litigation. There is no injury that is more irreparable than death, and Plaintiffs face a heightened risk of contracting a deadly virus. This risk is not speculative: in one Louisiana prison where COVID-19 has been allowed to spread, five people have been killed by the disease in less than a week.[25]

In addition to the risk of death, people who contract COVID-19 may develop symptoms that are acutely painful and may result in permanent, irreparable lung damage.[26] An injunction here is appropriate to prevent a substantial risk of permanent, debilitating injury. *See Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) ("[I]njunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994))); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1304 (N.D. Fla. 2017) (finding prisoners would "undoubtedly suffer irreparable injury" if not treated properly for Hepatitis C virus because, left untreated, the virus causes liver damage).

Moreover, as discussed above, Plaintiffs are likely to succeed on the merits of their argument that the conditions in the jail violate their constitutional rights, and "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Laube v. Haley*, 234

---

[25] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harms Way" of Coronavirus*, Marshall Proj. (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus; Sarah N. Lynch, *Death toll from COVID-19 at Oakdale prison in Louisiana continues to climb*, Reuters (Apr. 2, 2020) https://www.reuters.com/article/us-health-coronavirus-prisons/death-toll-from-covid-19-at-oakdale-prison-in-louisiana-continues-to-climb-idUSKBN21K2D4.

[26] Erin Schumaker, What we know about coronavirus' long-term effects, ABC News (Mar. 28, 2020).

F. Supp. 2d 1227, 1251 (M.D. Ala. 2002) (finding irreparable harm prong of preliminary-injunction test satisfied where plaintiffs made showing that prisoners were living in overcrowded and understaffed conditions in violation of Eighth Amendment).

These significant harms have led courts across the country to recognize that risk of exposure to the coronavirus constitutes an irreparable harm. See *supra* note 12 (collecting cases granting emergency release to people who are exposed to coronavirus). Plaintiffs easily meet the requirement of showing irreparable harm.

> **C.     The harm Plaintiffs are suffering outweighs any potential harm to defendants caused by a preliminary injunction.**

The substantial risk to Plaintiffs of contracting a deadly disease considerably outweighs any potential harm to Defendants. As discussed above, Plaintiffs will suffer significant harm, including possibly death, if forced to remain in the conditions currently prevailing in Metro West.

The only potential harm Defendants face if ordered to bring their jail into compliance with CDC guidelines is economic: MDCR staff may have to expend additional time, and the Department may have to expend additional money, to provide the information, hygiene products, cleaning agents, and medical treatment necessary to kill the virus. But the possibility that Defendants will have to spend money to reduce the substantial risk that Plaintiffs will be exposed to a deadly disease does not tip the balance in their favor because "[l]ack of funds for facilities cannot justify an unconstitutional lack of competent medical care and treatment for inmates." *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700, 705 (11th Cir. 1985); *see Hoffer*, 290 F. Supp. 3d at 1304 (finding balance of harms weighed in favor of plaintiffs seeking injunction against Florida Department of Corrections for inadequate treatment of Hepatitis C because "the only harm facing FDC is that it will have to spend more money than it wants to"); *Laube*, 234 F. Supp. 2d at

1252 ("The threat of harm to the plaintiffs cannot be outweighed by the risk of financial burden or administrative inconvenience to the defendants." (citing *Ancata*, 769 F.2d at 705)).[27]

In fact, the requested relief will benefit the jail staff employed by Defendants by decreasing their risk of contracting COVID. *See Laube*, 234 F. Supp. 2d at 1252 (finding harm to prisoners in overcrowded, understaffed prison outweighed harm to defendants in part because "the defendants will suffer no harm from providing sufficient staff and adequate facilities" and "[i]n fact, officers employed by the defendants face an extremely dangerous situation, and they, too, will benefit from injunctive relief"). Estimates show that if the infection spreads, a significant portion of jail staff are likely to contract the virus.[28] This could also cause economic harm to Defendants as the significant loss of manpower may require them to pay overtime to those who remain on the job. An injunction is therefore in Defendants' interest as well.

### D.    A preliminary injunction promotes the public interest.

"'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012). Accordingly, the public interest would be served by issuance of a preliminary injunction requiring Defendants to provide class members with constitutionally adequate measures to prevent the spread of COVID-19.

Moreover, it is in the public interest to prevent the spread of COVID-19 within Metro West. An outbreak in Metro West will have serious ramifications for people incarcerated within its walls,

---

[27] And as states and the federal government increasingly earmark funding specifically for COVID-19 relief, any economic harm may well be offset.

[28] *See* Greer Decl. ¶¶ 19-20; Letter from Employees of Cook County Jail to Toni Preckwinkle and Thomas Dart (Mar. 31, 2020), https://www.documentcloud.org/documents/6824768-Letter-to-Tom-Dart-and-Toni-Preckwinkle-3-31.html.

employees and medical staff that carry the infection into their homes and communities, and Miami-Dade County residents who will suffer from the ensuing rapid spread of this infectious disease. As Dr. Pedro Greer explains, "[a]s an outbreak spreads through jails," both medical personnel and prison guards become sick and cannot show up to work. Greer Decl. ¶¶ 19-20. This absenteeism creates "substantial safety and security risk[s] to both the people inside the facilities and the public." *Id.* ¶ 20. An outbreak in the jail will also place a heavy burden on regional health care institutions, which will be relied upon to manage and treat those experiencing complications or severe illness. *Id.* ¶¶ 18, 34. When this local medical institution is overwhelmed with a surge of patients, there will not be sufficient resources to treat everyone who requires medical attention. *Id.*

Hospitals in Miami-Dade County are already suffering. At least some people incarcerated in Metro West who require medical attention are sent to Jackson Memorial Hospital, *see* Swain Decl. ¶ 4, one of the largest hospitals in the United States and the largest hospital in the state of Florida. Jackson Hospital is already experiencing a shortage of supplies as its intensive care unit reaches capacity. A trauma physician who works there says they "are slowly descending into chaos."[29] An outbreak in Metro West will push nearby hospitals and communities into chaos, and an injunction requiring necessary safeguards in the midst of a pandemic will undoubtedly serve the public interest.

## II.    Immediate habeas corpus release is necessary for the medically vulnerable at Metro West.

The members of the Medically Vulnerable Subclass all have conditions that render them exceptionally vulnerable to death or serious harm if exposed to COVID-19. Because of their

---

[29] Paul Murphy, *Trauma physician at Florida's biggest hospital: 'We are slowly descending into chaos*,' CNN (Mar. 29, 2020), https://www.cnn.com/world/live-news/coronavirus-outbreak-03-29-20-intl-hnk/h_7375d7e4bc0904963554159cb3f2cfc0.

medical vulnerability, there is no practicable way to ensure that they can avoid infection and no practicable way to ensure that, if infected, they receive prompt and reasonable medical treatment within the jail. Therefore, their continued detention is a grave risk to their lives and violates the Constitution. They must be released pursuant to a writ of habeas corpus under 28 U.S.C. § 2241.[30]

The subclass members face a heightened risk of contracting a deadly virus merely because they are incarcerated under these unique circumstances, and additionally they face a heightened risk of dying if they do. Most people (80%) will develop a mild upper respiratory infection if they contract the coronavirus, but serious illness can occur in up to 16% of cases, and older people and those with underlying medical conditions, such as lung disease, heart disease, or diabetes, are more likely to develop serious illness.[31]

As a practical matter, there is no way to constitutionally confine Medically Vulnerable Subclass members in the jail. Greer Decl. ¶¶ 27-34, 38. The coronavirus is already present at the jail; multiple jail officers have tested positive for COVID-19, and that number is growing over time. For the Medically Vulnerable Subclass, every interaction with a staff member or other

---

[30] Medically Vulnerable Subclass members bring this action under 28 U.S.C. § 2241 and Article I, Section Nine of the United States Constitution. They, therefore, need not satisfy the heightened requirements of § 2254. Because they have not been convicted of a crime and are not in custody "pursuant to the judgment of a state court," they may bring this action under § 2241 and need not bring this action under § 2254, which governs habeas petitions challenging state criminal convictions. *See Medberry v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003) (finding a person in state pretrial detention whose detention violates the Constitution of the United States "would file an application for a writ of habeas corpus governed by § 2241 only"). Section 2254's heightened standards of review, therefore, do not apply to this case. *See id.*; *Phillips v. Court of Common Pleas, Hamilton County, Ohio*, 668 F.3d 804, 809 (6th Cir. 2012); *Martinez v. Caldwell*, 644 F.3d 238, 242 (5th Cir. 2011); *Walck v. Edmondson*, 472 F.3d 1227, 1234–35 (10th Cir. 2007); *Stow v. Murashige*, 389 F.3d 880, 888 (9th Cir. 2004).
[31] World Health Organization, *Q&A on coronaviruses (COVID-19)* (Mar. 9, 2020), https://www.who.int/news-room/q-a-detail/q-a-coronaviruses.

inmate, every breath they take, every meal spent in the communal facility, and even every surface they touch could bring them into contact with the coronavirus.

Although it is in theory possible for a jail to implement the social-distancing, sterilization, and other protective practices that the CDC requires in a jail, because subclass members are so vulnerable to death and serious injury from the disease, there is no time for those measures now at least as applied to them. And regardless, as explained below and in the Complaint, Defendants have failed to implement those procedures. Subclass members, then, are currently jailed in a facility that threatens their lives. They must be removed from those conditions.

For these reasons, in recent weeks, courts across the country have granted emergency habeas petitions ordering the release of medically vulnerable people from confinement. *See, e.g.*, *Francisco Hernandez v. Wolf*, 20-cv-617 (TJH), Dkt. No. 17 (C.D. Cal., Apr. 1, 2020); *Thakker v. Doll*, No. 20-cv-480 (JEJ), Dkt. No. 47 (M.D. Pa, Mar. 31, 2020) ("Social distancing and proper hygiene are the only effective means by which we can stop the spread of COVID-19. Petitioners have shown that, despite their best efforts, they cannot practice these effective preventative measures in the Facilities. Considering, therefore, the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk Petitioners in this case, we cannot countenance physical detention in such tightly-confined, unhygienic spaces."); *Fraihat v. Wolf*, 20-cv-590 (TJH), (C.D. Cal., Mar. 30, 2020) ("This is an unprecedented time in our nation's history, filled with uncertainty, fear, and anxiety. But in the time of a crisis, our response to those at particularly high risk must be with compassion and not apathy. The Government cannot act with a callous disregard for the safety of our fellow human beings."); *Castillo v. Barr*, 20-cv-605 (TJH)(AFM), Dkt. No. 32 (C.D. Cal. Mar. 27, 2020); *Coronel*, 2020 WL 1487274; *Basank v. Decker*, 20-cv-2518 (AT), Dkt. No. 11 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will

face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Ronal Umana Jovel v. Decker*, 12-cv-308 (GBD), Dkt. No. 27 (S.D.N.Y. Mar. 26, 2020).

And for all of the reasons previously explained, the Medically Vulnerable Subclass is entitled to this relief on an emergency basis. *See, e.g.*, *Hernandez*, No. 20-cv-617 (TJH), Dkt. No. 17 (issuing temporary restraining order granting habeas petition brought pursuant to section 2241). All of the arguments about why the class of all those detained at Metro West are entitled to a temporary restraining order and preliminary injunction apply all the more to the subclass. They are likely to succeed on the merits and demonstrate that the Defendants are deliberately indifferent to the serious risk of illness and death from the coronavirus. They face irreparable harm: they are far more likely than the average person to suffer complications and ultimately die from COVID-19. Their release will not harm Defendants. To the contrary, releasing medically vulnerable people will reduce the amount of soap and protective masks the jail will need to give out, reduce pressure on Metro West's limited medical resources, and provide staff and remaining inmates with more space to use for social distancing. Finally, it is in the public interest to release medically vulnerable inmates. These individuals are most likely to need advanced medical care at local hospitals, overwhelming the local public health system.

For all of these reasons, the medically vulnerable now bring an extraordinary request for their release.  They turn to this Court to save their lives.

## CONCLUSION

For the above-stated reasons, Plaintiffs request that the Court immediately:

1. Issue an order that a) requires Defendants to promptly provide Plaintiffs and the Court with a list of all individuals who are members of the Medically Vulnerable Subclass as defined in

paragraph 84 of Plaintiffs' Complaint, b) requires Defendants to promptly thereafter provide Plaintiffs and the Court with a list of any individuals in the Medically Vulnerable Subclass who Defendants object to releasing and the basis for that objection, and c) sets a time and date for a hearing in which the Court will resolve any disputes about whether certain listed individuals are entitled to relief; and

2. Issue a temporary restraining order requiring the Defendants to provide the following protections at Metro West Detention Center:

- Effectively communicate to all people incarcerated, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

- Provide adequate spacing of six feet or more between people incarcerated, to the maximum extent possible at Metro West Detention Center's current population level, so that social distancing can be accomplished;

- Ensure that each incarcerated person receives, free of charge: (1) an individual supply of liquid hand soap and paper towels sufficient to allow frequent hand washing and drying each day, and (2) an adequate supply of disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

- Ensure that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

- Provide access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

- Require that all MDCR staff wear personal protective equipment, including masks, when interacting with any person or when touching surfaces in cells or common areas;

- Require that all MDCR staff wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol both before and after touching any person or any surface in cells or common areas;

- Take each incarcerated person's temperature daily (with a functioning and properly operated thermometer) to identify potential COVID-19 infections;

- Assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections;

- Conduct immediate testing for anyone displaying known symptoms of COVID-19;

- Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video calling with loved ones, communications with counsel, and personal property;

- Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

- Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and headphones) between each use;

- Waive all medical co-pays for those experiencing COVID-19-related symptoms; and

- Waive all charges for medical grievances during this health crisis.

Plaintiffs further request that this Court issue an opinion as soon as is practicable that makes the findings required by 18 U.S.C. §3626(a)(2) and grans a preliminary injunction against Defendants. The required Emergency Certification is attached to this Motion.

### Request for Hearing

Under Local Rule 7.1(b)(2), Plaintiffs request a hearing on this motion. Plaintiffs submit that because the subject of this case, the protections due to individuals in jail during a pandemic, is novel, argument on this issue may assist the Court. Depending on the arguments Defendants raise in opposition to this motion, a hearing may be necessary to resolve factual disputes or to allow the Court to examine the full scope of the evidence. In the event that an evidentiary hearing is necessary, Plaintiffs seek leave to present testimony of witnesses, including experts, as may be appropriate. Depending on the scope of the evidence in dispute, Plaintiffs estimate that 2-3 hours will be necessary for the hearing.

Date: April 5, 2020                    Respectfully Submitted,

*/s/ Quinn Smith*
R. Quinn Smith, Fla. Bar No. 59523
e-mail: quinn.smith@gstllp.com
Katherine Alena Sanoja, Fla. Bar No. 99137
e-mail: katherine.sanoja@gstllp.com
**GST LLP**
1111 Brickell Avenue, Suite 2715
Miami, Florida 33131
Telephone: (305) 856-7723

*/s/ Meena Jagannath*
Meena Jagannath, Fla. Bar No. 102684
meena@communityjusticeproject.com
**COMMUNITY JUSTICE PROJECT**
3000 Biscayne Blvd. Ste 106
Miami, Florida 33137
Telephone: (305) 907-7697

*/s/ Maya Ragsdale*
Maya Ragsdale, Fla. Bar No.: 1015395
maya@dreamdefenders.org
**DREAM DEFENDERS**
6161 NW 9th Ave.
Miami, Florida 33127
Tel: 786-309-2217

*/s/ Alexandria Twinem*
Alexandria Twinem, D.C. Bar No. 1644851
*Pro Hac Vice Admission Pending*
alexandria@civilrightscorps.org
Katherine Hubbard, DC Bar No. 1500503
*Pro Hac Vice Admission Pending*
katherine@civilrightscorps.org
**CIVIL RIGHTS CORPS**
1601 Connecticut Ave. NW, Ste. 800
Washington, DC 2009
Telephone: (202) 894-6126

*/s/ Tiffany Yang*
Tiffany Yang, DC Bar. No. 230836
tyang@advancementproject.org
*Pro Hac Vice Admission Pending*
Thomas B. Harvey, MO Bar. No. 61734

*Pro Hac Vice Admission Pending*
tharvey@advacementproject.org
**ADVANCEMENT PROJECT**
1220 L Street NW, Ste 850
Washington, DC 20005
Telephone: (202) 728-9557

**Attorneys for Plaintiffs**

CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2020 I electronically filed the foregoing with the clerk of

the court for the U.S. District Court, Southern District of Florida, using the electronic case filing

system of the Court. This Motion will be served in accordance with the Federal Rules of Civil

Procedure.

*/s/ Katherine A. Sanoja*
Katherine A. Sanoja, Fla. Bar. 99137