## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 20-Civ-21457-WILLIAMS

ANTHONY SWAIN, *et al.*,

      Plaintiffs,

v.

DANIEL JUNIOR, in his official capacity
as Director of the Miami-Dade Corrections
and Rehabilitation Department; MIAMI-
DADE COUNTY, FLORIDA,

      Defendants.

_____/

## DECLARATION OF DIRECTOR DANIEL J. JUNIOR

Pursuant to 28 U.S.C. §1746, Daniel J. Junior, declares under penalty of perjury as follows:

1.     My name is Daniel J. Junior and I am over   the age of eighteen. I have reviewed the Complaint and Emergency Motion in this case, and have read the Declarations of the seven plaintiffs.

2.     I am currently the Director of the Miami-Dade Corrections and Rehabilitation Department ("MDCR"), a position I've held since my appointment by Miami-Dade County Mayor Carlos Gimenez on February 12, 2018.  I serve at the pleasure of the Mayor and report directly to the Mayor's office via the Deputy Mayor for Public Safety.

3.     MDCR is the County department responsible for the safety, care, custody, and control of persons incarcerated while awaiting trial in its detention facilities.  MDCR also holds adjudicated inmates sentenced to less than one year imprisonment.

4.     I have worked for MDCR for over 24 years, beginning in January 1996, working my way up the ranks from when I was hired as a Correctional Officer. I was the Interim Director

of MDCR from June, 2016 through February 12, 2018, and before that held every position in the department, including Acting Assistant Director, Division Chief, Captain, Lieutenant, Sergeant, Corporal, and Officer.

5.      I received my Bachelor of Arts degree from Saint Thomas University in 2009, a Jail Manager Certification from the American Jail Association in 2010, as well as a graduate certification from the 2008 National Jail Leadership Command Academy Inaugural Class.

6.      I graduated from the National Academy Session 263 of the Federal Bureau of Investigations and the Jail Executive Development Program, a collaboration of the American Jail Association and the Correctional Management Institute of Texas at Sam Houston State University.

7.      I am a member of the American Jail Association, American Correctional Association, International Association of Chiefs of Police, National Institute of Correction's Large Jail Network, Florida Police Chiefs Association, Florida Sheriffs Association, Police Officers Assistance Trust, and the National Organization of Black Law Enforcement Executives.

8.      I am the first member of MDCR to be appointed to the Executive Board of the Miami Dade County Association of Chiefs of Police, where I served as Secretary in 2016, and am currently serving as President since my appointment in December 2018.

9.      I am also currently serving as Chairperson of the Dade Miami Criminal Justice Council, having been selected by its members who serve as agency head or designees for various local criminal justice agencies and community organizations. In that capacity, in 2019, I created an *ad hoc* committee to look into cashless bail systems, given the many studies regarding the disproportionate rate and length of incarceration of poor and impoverished minorities. I, along with this committee, am expected to provide a status reports to the Miami-Dade County Board of County Commissioners this summer.

10.     I have also been selected to serve on the U.S. President's Commission on Law Enforcement and Administration of Justice's Reentry Programs and Initiatives Work Group.

11.     As Director, I am responsible for one of largest jails in the United States, and the largest in Florida. In that capacity, I am responsible for the oversight of four detention facilities: Metro West Detention Center ("MWDC" or "the Facility"), Turner Guilford Knight Correctional Center ("TGK"), Boot Camp Program ("BCP"), and Pre-Trial Detention Center ("PTDC"). I am also responsible for the Mental Health Treatment Center, the Centralized Intake Center, and alternative-to-incarceration programs such as the Boot Camp Program, Pretrial Services Program, and the Monitored Release (House Arrest) Program.

12.     MDCR currently has approximately 2,800 employees and, as of today, is responsible for the custody, care and control of approximately 3,300 inmates who are housed in our system. Last year, the average daily system-wide inmate population was 4,329; today, it is approximately 3,300. And the total number of individuals who went through our intake process in 2019 was approximately 57,000 persons.

13.     Of the four facilities in which MDCR houses inmates, the largest is MWDC, which is the largest direct-supervision facility (i.e., large dormitory-style housing supervised by an imbedded officer 24 hours a day) in Florida. MWDC only houses pretrial and County-sentenced detainees, and detainees with holds from other law enforcement agencies.

14.     Recognized best practices in the correctional field teach that inmates should be housed based on an objective jail classification system to ensure inmates with similar custody levels are housed together. -This is a tool to ensure the overall safety of inmates and minimize the likelihood of inmate incidents. -In other words, an inmate with a history of aggravated battery would not be housed with an inmate incarcerated for petty theft.

3

15.     Inmates are assessed using an objective classification system, pursuant to national corrections industry standards, during the intake process to determine their custody level. The assessment includes various factors such as severity of the current offense, severity of prior offenses, known past or present serious institutional behavior, age, known or past institutional behavior problems, gang membership, and legal status (whether sentenced or not).

16.     MDCR has 9 custody levels to ensure that inmates with the appropriate custody levels are housed together. For example, an inmate with a Maximum custody level will not be housed with an inmate with a Medium custody level.

17.     The rated inmate capacity at MWDC is 2,234 inmates. The current MWDC inmate population is 1,644, which is a decrease from the past few months (MWDC inmate population on February 5, 2020 was 1,972), and is now more than 25% under capacity.

18.     MWDC is comprised of 9 wings, consisting of 4 large dormitory-style housing units each (e.g., 1D1, 1D2, 1D3, and 1D4), 2 medical clinics (North and South), and 2 Special Management Units (SMU).

19.     The inmates at MWDC are housed in 36 dormitory-style units based on the objective jail classification system explained above.

20.     Each housing unit holds up to 64 inmates (with the exception of 1D4, which is the MWDC medical housing unit and holds less), each of which contains 32 bunk beds. The overall square footage of a housing unit is 4,723, excluding the bathrooms.

21.     Each housing unit at MWDC is supervised by an MDCR officer stationed inside the unit, 24 hours a day, and 7 days a week. In addition to providing security and supervision for the entire housing unit, these MDCR officers are available to address and respond to various inmates' needs and concerns 24 hours a day. Corporals are assigned to each "wing" and are

responsible for supervising the four housing units. They are required to visit each unit, at a minimum, three times during each shift.

22.    Plaintiff Swain is assigned to unit 1D2; Plaintiffs Hill and Bernal are assigned to 1D3; and Plaintiffs Blanco, Willis, Cruz, and Flores are in unit 2C2.

23.    MDCR is inspected yearly by outside auditors to ensure compliance with Florida Model Jail Standards (FMJS). FMJS requires dormitory housing units (such as those used at MWDC) to have a minimum of 75 square feet of floor space per inmate, including both sleeping and day room areas.  FMJS also requires that inmate beds allow for 6 feet of space between inmates' heads.  MWDC has always been found in compliance with these FMJS requirements. In connection with our ongoing efforts to minimize the risk of COVID-19 spread within our facilities, MDCR has been inspecting the housing units to ensure inmates have not moved bunks too close together.  Inmates at MWDC are instructed to sleep in staggered formation, head-to-toe, which helps further ensure social distancing of more than six feet between heads.  Bunks have also been staggered to allow for additional spacing.

24.    Each housing unit is equipped with showers, bathrooms, sinks, sleeping areas, telephones, televisions, laundry facilities, equipment for video visitation, and a recreational/activity area (commonly referred to as the dayroom).  All inmate meals are served inside the housing unit, three times a day; there are tables and chairs inside the units for inmate meals.

25.    The inmates' bed sheets and set of towels are sent to an outside vendor to be laundered on a weekly basis; inmates' uniforms are sent to this vendor to be laundered weekly, and inmates are issued 2 clean uniforms, 2 sheets, and 2 towels weekly.

26.     There are operating washing/dryer machines in each unit, allowing inmates to wash their towels, underwear, t-shirts and socks as often as they wish, with the laundry detergent supplied inside the housing unit and provided through an automatic dispenser that is refilled, at a minimum, every two weeks and more often if needed.

27.     Inmates are encouraged and provided the opportunity to shower inside their housing units daily, but are only required by FMJS, which are incorporated into our Inmate Handbook, to shower twice weekly.

28.     Regular soap and water are sufficient to kill COVID-19 and antibacterial soap is unnecessary according to guidance from the CDC and FDA. Inmates are provided bars of body soap for personal use and additional soap is available in each housing unit for replacement. Inmates are not limited in the number of bars of soap they can request; soap is free to the inmates.

29.     Liquid soap and paper towels have been placed in all inmate housing units in the facility for inmates' use.

30.     Hand sanitizer dispensers have been installed at the ingress and egress area of MWDC and staff are permitted to bring personal hand sanitizers for use throughout their shift.

31.     Inmates are provided individual rolls of toilet paper for personal use. If inmates use up their roll, they can request a new roll at any time. Additional rolls are kept in the housing unit and are available at any time upon request.

32.     Each housing unit is supplied with sufficient cleaning materials for the bathroom and general areas. Bathrooms and showers are cleaned twice daily with industrial grade disinfectants by inmate workers assigned to each housing unit. Cleaning supplies are located in the housing units during all three shifts, providing inmates continual access to these supplies. All inmates have access to cleaning supplies (not just inmate workers) and can use them on a more

frequent basis, if desired. These cleaning supplies, which are industrial grade and are peroxide/bleach based, are refreshed on each shift.

33.     Utility gloves and industrial-grade disinfectants are provided to inmate workers who clean the Facility and are available to all other inmates in the unit upon request.

34.     MWDC utilizes 6 utility fogging machines, which were purchased in mid-March, 2020, to sanitize housing units one time a week. This is done in addition to the general cleaning that is done twice a week by MDCR staff and the cleanings that are done on each shift; there are three shifts every 24 hour period. High-touch areas that are cleaned on each shift include: dayrooms, tables, chairs, sinks, telephones, and door handles.

35.     As of April 3, 2020, personal protective masks were provided to all inmates and are currently mandated for inmate use. Additionally, all MDCR staff are required to wear their issued personal protective masks throughout their entire shift. MDCR currently has sufficient supplies of masks, hand sanitizers for staff, and gloves. Emergency supplies were reordered due to concerns over COVID-19 as early as February 20, 2020. MDCR maintains an inventory of necessary equipment and supplies such as hand soap, sanitizer, and disinfecting products; staff is allowed to bring their own small personal hand sanitizer and disinfecting wipes to clean their hands and disinfects commonly touched objects and surfaces during their shifts. As of April 17, 2020 an inventory review indicated that MDCR has over 1.2 million gloves, 185,000 masks to equip staff and inmates with protective equipment, as well as 1,944 bottles of liquid soaps, and 35,604 packs of multifold paper towels. Additionally, various orders of such mission-essential supplies have been made over time to ensure sufficient inventory.

36.     All new arrestees are screened outside of TGK even prior to being allowed entry to MDCR facilities. Anyone exhibiting symptoms of COVID-19 is diverted to the nearest hospital

for evaluation and care. Testing is conducted by the hospital for those meeting the criteria for testing as per CDC guidelines. Corrections Health Services (CHS) collects the specimens from inmates already in custody and meeting criteria and sends the specimens out to a laboratory for COVID-19 testing.

37.     Arrestees exhibiting symptoms, but who are not seriously ill and have not been admitted by a hospital, are returned to MDCR following their testing for COVID-19 and the remainder of the screening process is completed at TGK. These arrestees are kept in the medical isolation unit at TGK in a negative airflow room. There are presently 50 beds in this unit in single or double rooms; however, all new arrestees returning from the hospital after being tested are placed in a room alone. They are then monitored for signs and symptoms of COVID-19 as further described in paragraph forty-one (41) below.

38.     In an effort to mitigate the potential for introduction of the virus to the existing population, and in an abundance of caution, even new arrestees with no symptoms are quarantined immediately after intake and monitored for 14 days with other individuals arrested on the same day before being released into the general population,. If any new arrestees show symptoms of COVID-19 after intake, they are separated from other inmates, medically evaluated in an isolated medical area, and tested for COVID-19. Any inmates who had contact with a symptomatic arrestee will restart a fourteen (14) day medical isolation. CDC refers to this as "Intake Quarantine". Additionally, any arrestee who has been in close contact with another arrestee that tests positive for COVID-19, will also be tested for COVID-19.

39.     The process of screening and isolating new arrestees from the general population began in March 2020. A new Department Standard Operating Procedure "S.O.P. NO. 090" was adopted on April 3, 2020, memorializing portions of this screening and isolation process. Ex. 2.

40.     Prior to entering into MWDC, all new arrestees (who have now already been isolated for at least 14 days) are screened prior to going to their housing unit, which includes additional health screenings.  Upon entry to the jail, inmates are advised about how to access medical care and report symptoms.

41.     All arrestees returning to the Facility from a hospital are re-screened upon entry.  If an arrestee is transferred to a hospital as a result of exhibiting COVID-19 symptoms, and is tested, such individual will be placed in medical isolation at TGK and receive monitoring by the medical staff until test results are received. If the results are positive, the inmate will be monitored and treated for his or her symptoms until they can be released into general population per CDC recommendations. If the test is negative, the inmate will be kept in medical isolation until his or her symptoms have resolved and then they will be released to general population.

42.     All individuals entering MWDC, including inmates, correctional officers, civilian employees, vendors and medical personnel, are screened, including temperature checks, prior to entering the Facility.  Masks are provided to the arrestees at the time of intake.  If a police officer's temperature is elevated, he/she will not be allowed entry into the law enforcement officer lobby. The inmate will be processed by MDCR staff with the police officer waiting outside until the inmate is accepted into MDCR custody.

43.     Staff are screened prior to beginning their shift and are identified with bright green wristbands to indicate they have been successfully screened.  Anyone not feeling well or exhibiting a fever or other symptoms is prohibited from entering detention facilities and such individuals are directed to seek medical attention.

44.     To help curb the possible spread of the virus, inmate movement has been limited since March 12, 2020.  The only exception (other than when immediate medical care is needed) is

for inmate recreation time, which is extremely important in an environment where inmate visitation has been cancelled to allow for benefit of physical activity by the inmates. During recreation time, inmates are allowed to visit the recreation area, which is located outside the building, three times a week, for one hour. The recreational yards offer plenty of open space to practice social distancing while providing an opportunity for inmates to enjoy their recreational time. Mindful of social distancing, and to help curb the possible spread of COVID-19, all inmates from a particular housing unit go to the recreation area together, and no other housing units are allowed to visit that area at the same time. After the recreation time has elapsed, areas that are touched by inmates (e.g., pull-up bar) are cleaned and wiped down with EPA-approved disinfectant solutions by MDCR staff before another housing unit begins its recreational time.

45.     MDCR has increased recreational activities such as board games, dominoes, and movies inside the housing units. With the indefinite suspension of family visitation, it is important to provide leisure activities to the inmates. It was with this in mind that we sought free phone calls for inmates during this difficult time.

46.     Correctional Counselors have increased their rounding in Housing Units to assist with addressing inmate needs and requests, including being available to discuss issues related to COVID-19 and to process inmate grievances.

47.     Corrections Health Services ("CHS"), a department of The Public Health Trust (also known as Jackson Health System), works within all MDCR facilities and provides medical and mental health care to all inmates within the system.

48.     In response to the COVID-19 pandemic MDCR, in collaboration with CHS, has continually pursued measures to protect the health and safety of the inmates.  MDCR's response

to the pandemic, like the rest of society's, has been ongoing and is constantly changing and improving as we gain more information and guidance how to combat the spread of COVID-19.

49.     On or about March 10, 2020, I learned of the first confirmed case of COVID-19 in Miami-Dade County. Once it became apparent that COVID-19 posed a danger to the Miami-Dade County community, as well as the inherent danger to the inmates and staff at all MDCR facilities, the following procedures and precautionary steps were taken, most of which are described or summarized above and below.

50.     On March 10, 2020, I issued a directive to Command Staff reissuing the Janitorial Process Manual that comprehensively delineates the cleaning process, materials/products, and instructions on how to properly clean/sanitize detention facilities.  Ex. 10.

51.     On March 11, 2020, I held an emergency meeting was held with senior MDCR management to discuss the first COVID-19 case in Miami-Dade County, to begin development of a response plan inside all facilities to deal with COVID-19.

52.     On March 12, 2020, a series of steps and actions were taken in light of the COVID-19 situation.  A memorandum was emailed to all staff advising of the cancellation of inmate visitation, implementation of the screening of professional visitors, implementation of inmate screening, use of personal protective equipment, and sanitation practices. This memorandum reiterated universal/general precautions; process for staff illnesses; and screening of arrestees for possible exposure to COVID-19.  A memorandum was emailed to all staff to initiate personal preparedness regarding possible COVID-19, the possibility of Alpha/Bravo Mobilization (12-hour shifts), and no approval of leave requests beyond 10% of the assigned workforce.  Volunteer and religious programs were cancelled until further notice, and persons sentenced to weekend confinement were contacted and informed not to report to facilities until further notice.  Staff was

given directives regarding personal preparedness on several issues, including reduction of leave requests so as to assure continued staffing preparedness, use of personal protective equipment, and enhanced sanitization practices. Ex. 5A.

53.     Inmate visitation was cancelled and MWDC was closed to non-essential visitors. But professional visitation (e.g., attorney visits and consultations) was arranged and made permissible in a room with protective glass to ensure social distancing. Attorneys wishing to speak with their clients can do so through video conference call, and as of April 15, 2020, attorneys can access their clients remotely, using the new video visiting system that MDCR began developing in 2019. Ex. 3.

54.     MDCR increased the use of videoconferencing throughout all of its facilities for court proceedings, attorney visits, and court-ordered physician interviews to limit the amount of inmate and unnecessary staff movement between our facilities. Use of videoconferencing has also increased for internal Departmental meetings.

55.     MDCR requested and arranged for the inmate telephone vendor to allow all inmates two (2) free weekly telephone calls to their families and/or friends so that they can maintain communications and contact during these difficult times and while on-site visiting is suspended. Notification to inmates of twice (2) weekly free telephone calls was made on March 16, 2020. Ex. 4.

56.     On March 13, 2020, the MDCR webpage was updated, notifying the public that inmate visitation was cancelled.

57.     On March 14, 2020, MDCR staff was notified about a new arrest with possible COVID-19. The inmate was taken to a hospital for testing and was isolated in medical housing

and closely monitored. The next day, staff was notified of this inmate's release and ordered to self-monitor. The test result was negative so no follow-up care or communication was necessary.

58.     From March 16, 2020 through March 20, 2020, I personally, along with other members of the MDCR leadership team, conducted "town hall" meetings—on all three shifts at the main facilities, including MWDC—to address staff concerns and communicate information relative to all precautionary measures being taken to protect staff and inmates.

59.     On March 16, 2020, a memorandum was sent to all staff via email advising of Mandatory Employee Wellness Screening for all MDCR and CHS staff, beginning on March 17, 2020, to mitigate the transmission of COVID-19 into MDCR facilities.  Ex. 6.

60.     Mandatory wellness screenings of MDCR and CHS staff system-wide were initiated on March 17, 2020. The screenings include a three-question assessment developed in conjunction with medical staff and include: 1) Do you have a fever and/or respiratory symptoms (e.g., cough, shortness of breath, fever) 2) Did you travel to any CDC Level 3 country in the past 14 days? 3) Did you have contact with someone with possible Coronavirus Disease (COVID-19) in the past 14 days?  In addition to these wellness screenings, both MDCR and CHS employees are also administered daily temperature screenings before entering MDCR detention facilities.  Ex. 6.

61.     MDCR conducted meetings with inmate unit/cell representatives from MWDC inmate housing units on March 18, 2020 to discuss COVID-19 related concerns. Inmate cell representatives were provided information about COVID-19 including symptomology, importance of handwashing and social distancing; there was a healthy exchange of information.  Ex. 27.

62.     On March 18, 2020, sick call fees were discontinued for anyone showing flu-like symptoms.

63.     Posters have been posted in all housing units in English, Creole and Spanish that encourage social distancing and proper hygiene. Posters have pictures for those with literacy issues. Information about COVID-19 has also been provided directly to inmates verbally by MDCR and CHS staff. Ex. 26.

64.     To assist in the reduction of inmate population, MDCR collaborated with its criminal justice partners, and on March 19, 2020, MDCR began sharing multiple population reports with both the Miami-Dade State Attorney's Office (SAO) and the Public Defender's Office (PD) for review and consideration for early release via early sentence release, pretrial release, or monitored release (house arrest), based on an established criteria (e.g., over the age of 60, chronically ill, non-violent, low bail, or scheduled for release in 2020). Exs. 14A/B.

65.     Since March 19, 2020, there is a video continuously playing at TGK's central booking lobby on a loop for all new inmates to watch that communicates safety measures necessary to mitigate risks of COVID-19. Ex. 9.

66.     On March 20, 2020, a letter was sent to the Miami-Dade Association of Chiefs of Police, to inform all law enforcement agency heads of the required Temperature Screening of Law Enforcement Personnel, advising of: 1) daily temperature screening of all arresting/transporting officers arriving to the TGK prior to being allowed entry into the law enforcement officer (LEO) lobby; and if an officer's temperature is elevated, they will not be allowed entry into the LEO lobby. The inmate will be processed by MDCR staff with the officer waiting outside until the inmate is accepted into MDCR custody. Ex. 7.

67.     A new intake quarantine protocol for new arrestees was initiated on March 20, 2020. Pursuant to the new intake quarantine protocol, and in an effort to mitigate the potential for introduction of the virus to the existing population new arrestees remaining in MDCR custody

after First Appearance, with no symptoms or relevant travel history are nonetheless, in an abundance of caution, quarantined at TGK and monitored for fourteen (14) days with other individuals arrested on the same day before being released into the general population (i.e., individuals arrested 14 days ago are housed only with other inmates also arrested 14 days ago, individuals arrested 13 days ago are housed only with other inmates also arrested 13 days ago, etc.). This new intake quarantine practice, which began on March 20, 2020, was incorporated into Standard Operating Procedure on April 3, 2020. All inmates who had contact with a symptomatic arrestee will restart a 14-day medical isolation.

68. On March 20, 2020, an email to all staff was distributed, providing additional updates on COVID-19, and addressed universal precautions, frequent handwashing, use of hand sanitizers, and sanitizing of high-touch areas. Also, specific housing (TGK) was identified to quarantine inmates investigated for possible COVID-19 or who tested positive, as well as newly arrested persons from the general population inmates.

69. On March 23, 2020, the U.S. Centers for Disease Control and Prevention (CDC) issued *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, and MDCR updated its practices after review.

70. On March 23, 2020, staff was sent a memorandum updating the Mandatory Employee Wellness Screening Process to include the fever threshold of >100°F, the requirement of daily temperature checks, and providing an updated list of Level 3 countries.

71. On March 24, 2020, I sent an email to all staff regarding COVID-19, advising that 3 staff members tested positive for COVID-19 and that they were home in quarantine; I also explained the CDC's definition of "Close Contact"; reiterated cancellation of inmate visitation,

screening of newly arrested persons, and daily temperature screening of all persons entering facilities.

72.     On March 25, 2020, MDCR leadership held a mandatory meeting with Command Staff (50 high-ranking MDCR command staff level personnel) to review the recommendations of the CDC guidance and discuss implementation.

73.     On March 27, 2020, staff received an updated Mandatory Employee Wellness Screening Process, to include the mandatory wearing of green wristbands (signifying their clearance to enter facility after the daily temperature check), screening site locations, updated screening procedures, and the use of personal protective equipment (PPE). Ex. 6.

74.     On March 28, 2020, an email to all staff was distributed regarding Safety Precautions, emphasizing social distancing, staying home when sick, and use of PPE.

75.     On March 30, 2020, MDCR established the COVID-19 Incident Command Center and a Response Line, which became effective March 31, 2020. The COVID-19 Incident Command Center is responsible for: a) tracking employees tested for COVID-19 incidents; b) obtaining documentation for positive tests; c) tracking employees taking leave related to COVID-19; d) answering questions and concerns from MDCR staff; e) identifying close and community contacts; and f) evaluating inmates and housing units impacted by COVID-19 cases. A COVID-19 Database was developed to capture important information such as: Name, Assignment, Shift, Days Off, Testing Site, Date of Testing, Test Results, Close Contacts, Return to Work Date, and Leave Date.

76.     On March 31, 2020, I directed Facility Supervisors and Executive Officers to ensure that staff continually walk through their facility, enforce social distancing for all staff and inmates, address inmates concerns, and ensure inmate recreational activities are ongoing. Ex. 16.

77.     I filmed a video which has been made available to all staff to communicate the seriousness of the COVID-19 pandemic, the practices and measures MDCR is undertaking to keep staff and inmates safe, and what steps each employee must take to do the same.  Ex. 9.

78.     A social media campaign has been developed, *MDCR Cares and Stay Safe, Create Space*, to reiterate the importance of calling the COVID-19 Response Line, practicing social distancing, maintaining personal hygiene, staying home if sick, and cleanliness of the facilities.

79.     On April 3, 2020, MDCR mandated that all MDCR staff use personal protective masks during entire shift for the next 30 days.  Inmates likewise were made aware of the mandatory use of personal protective masks for a minimum 30 days, that inmates are required to wear surgical masks, and that all staff and inmates must practice social distancing and frequent handwashing. Exs. 5B, 15.

80.     On April 3, 2020, the Standard Operating Procedure #090, Communicable Disease/Temporary Housing Plan was implemented. This memorialized the practice of maintaining new arrestees in temporary 14-day quarantine cells that was implemented on March 20, 2020. Ex. 2.

81.     On April 3, 2020, non-essential civilian staff were ordered to work from home beginning April 6, 2020. Ex. 5B.

82.     On April 6, 2020, reports relating to those yet to be sentenced for misdemeanors and inmate over 60 were transmitted to the SAO and PD, respectively. Ex. 14A.

83.     On April 7, 2020, Captain Summons issued a memorandum regarding the mandatory placement of paper towels in the housing units at MWDC. Ex. 23.

84.     On April 9, 2020, I emailed all staff, informing that an inmate tested positive for COVID-19 at MWDC, that the inmate's housing unit was thoroughly cleaned and sanitized,

reiterating the importance of PPEs and handwashing, and directing staff to continue practicing social distancing.

85.     On April 14, 2020, I sent an email updating and informing staff about the lesser-known symptoms of COVID-19 (e.g., digestive issues/diarrhea; conjunctivitis/pink eye; loss of small and taste; severe fatigue). I also explained the criteria to return to work as explained by the CDC (no fever for at least 72 hours (that is three full days of no fever without the use of medicine that reduces fevers); other symptoms have subsided (for example, when your cough or shortness of breath have subsided); and at least 7 days have passed since your symptoms first appeared. In addition, and in an abundance of caution, MDCR employees must obtain a negative COVID-19 test and the results provided to the COVID-19 Incident Command Center before returning to work.

86.     Symptomatic staff are isolated outside of the Facility pending test results. Staff with known contact with a COVID-19 positive person are isolated for 14 days.

87.     MDCR officers were informed that under Florida Department of Health testing criteria, first responders (which include all sworn corrections officers) are eligible for testing at various community testing sites/locations. As of April 15, 2020, the County notified all of its employees that it designated a community testing site for all County employees.

88.     Efforts have been made to successfully decrease overall inmate population and allow for increased social distancing (e.g., bed reassignment for housing units that are not fully populated,). Social distancing and proper hygiene are being emphasized throughout MWDC for both inmates and staff. Staff has been instructed to continually walk throughout the Facility to enforce social distancing by officers and inmates. Ex. 14B.

89.     MDCR does not have the legal authority to release an inmate in its custody without an order issued by a court changing the terms of pretrial release, the expiration of the inmate's

lawful sentence, or the SAO dropping charges. Even in these cases, we must sometimes still hold an inmate for additional time because of an out-of-state warrant or other hold.

90.     However, MDCR has assisted those responsible for making custody decisions in Miami-Dade County in their ongoing efforts to reduce the overall inmate population in Miami-Dade County. MDCR has provided lists to the SAO and the PD of inmates over the age of sixty (60), inmates with chronic medical conditions, inmates with release dates in 2020, and inmates with unsentenced misdemeanors so that additional inmates can be reconsidered for early release, thereby reducing overall population. This was as a result of the collaborative efforts of the SAO, PD, the state criminal courts, and MDCR to initiate a review of inmates meeting criteria for reconsideration for early sentence release, release to pretrial services, or house arrest. Exs. 14A/B.

91.     Pursuant to this collaborative effort, from March 12, 2020 through April 12, 2020, MDCR has released over 640 inmates to either house arrest, pretrial, or early sentence release  It is expected that more inmates will be released through this collaborative process. Ex. 14B.

92.     CHS has daily COVID-19 meetings, which are followed by a daily internal morning "huddle" during which information is shared and discussed. The morning huddle includes representatives from MDCR. CHS also has weekly senior command meetings regarding COVID-19 topics. The CHS Infection Preventionist is in contact with the MDCR Safety Officer regarding any updates and changes regarding COVID-19.

93.     On April 11, 2020, CHS began taking temperatures daily of inmates with chronic conditions or over the age of 60. That process has now been expanded. For example, now all inmates residing at MWDC, TGK and PTDC, regardless of medical history, receive temperature checks. Commencing today , all inmates, regardless of medical history, will receive daily

temperature checks as part of our ongoing strategy to protect at-risk inmates by treating all inmates as at-risk.

94.     In addition to quarantine of new arrestees, CHS and MDCR have developed a detailed process for addressing potential COVID-19 cases within the inmate population.

95.     Any inmate showing symptoms of COVID-19 is removed from his housing unit and placed in the medical isolation unit at TGK, where he is tended to medically and his temperature is taken twice daily. If serious symptoms develop, they are taken to a hospital. As of April 10, 2020, CHS now has the capability to collect swab specimens for COVID-19 onsite at all facilities. If an inmate tests positive, he will be evaluated and treated until he has not had a fever for at least seventy-two (72) hours (and without relying on fever reducer medication), his symptoms have all subsided, and a minimum of seven (7) days has passed since the first symptoms appeared.. If an inmate tests negative, he will be monitored until his symptoms resolve and then he will be sent back to MWDC.

96.     MDWC has clinics staffed by CHS medical personnel, and special management units, where safety-risk inmates are held.

97.     If there is a case of suspected COVID-19 in a housing unit at MWDC, the inmate is removed and placed in medical isolation and the entire housing unit will begin a 14-day quarantine period, be tested for COVID-19, and monitored daily by CHS medical staff.

98.     Miami-Dade County has also mandated a self-quarantine procedure for officers testing positive, who must self-quarantine for 14 days. They are placed on administrative leave and cannot return to work until MDCR receives negative results. MDCR is monitoring daily the number of staff and inmates tested and testing positive. MDCR has informed all officers of the availability of first responder testing and has created a COVID-19 Response Line where staff are

required to report COVID-19 related matters such as notification of test, COVID-19-related sick calls, test results, as well as serves as an informational resource for staff.

99.     I hold weekly Command Staff Meetings to address issues, concerns, and any developments associated with COVID-19.

100.    MDCR has redeployed members of its Compliance, Inspection, and Auditing Bureau (CIAB) staff to the facilities to serve as additional facility safety staff to help surveil and ensure the implementation and compliance of MDCR's various precautionary measures.

101.    Processes and measures employed in an effort to mitigate against COVID-19, and to protect the inmates in the Facility, are continually re-assessed with modifications identified and pursued, in consultation with CHS and Jackson Health System, and as new information related to COVID-19 becomes available.

102.    Effective April 16, 2020, MDCR, in consultation with CHS and the Jackson Health System's Infectious Control Team, MDCR took additional precautionary measures to mitigate the spread of COVID-19 throughout MDCR facilities. They include:

i)      continued suspension of all non-safety and/or security-related transfer of inmates between housing units or facilities for 30 days; these types of transfers will occur only when absolutely necessary to protect life, property, or the overall integrity of the correctional institution (e.g., to separate combatants following assault or battery, to prevent escape, or transfer to suicide watch);

ii)     suspension of all staff redeployments to other facilities for 30 days, and only staff assigned to their facility shall be allowed to work overtime within that facility;

iii)    restriction of any and all non-essential staff from congregating or visiting other areas of which they are not assigned unless such a visit is considered essential in nature. An

essential visit is defined as a visit for a specific operational function such as responding to calls for back-up, calls for assistance, medical emergencies, supervisory safety and security checks, or transfer of inmates for safety and/or security reasons by a staff person not assigned to that respective area;

iv)   restriction of all inmates from congregating at any time including recreational activities, medical clinic, meal times, etc., and staff are expected to ensure this does not occur; additionally, during this time inmate meals will be staggered, or inmates may be permitted to eat on their bunks or in their rooms to eliminate congregating during meal time;

v)   all staff, to include "floaters", shall be given a specific area of assignment for the next 30 days and shall be assigned to only that area, absent exigent circumstances;

vi)   recreation schedules for MWDC and PTDC were revised to allow for complete segregation of all housing units/cells during hours of recreation; recreation days, times, and duration will be adjusted and/or cancelled wherever necessary to prevent further spread of the virus during recreation;

vii)   recreational activities that require frequent personal or shared contact between inmates (e.g., basketball) have been discontinued until further notice; reiterating that any and all high-touch areas must be cleaned thoroughly and sanitized between recreation sessions (e.g. pull up bar, stairwell rails);

viii)   CIAB will complete random spot inspections on all shifts at all facilities to inspect the facilities' compliance with MDCR and CHS Infectious Control policies and practices. The results of the inspections will be provided to the Department Safety Officer and shared with me.   Additionally, the Facility Supervisor or designee will conduct

inspections on all shifts to ensure their compliance with these precautionary measures and remediate any issues identified immediately;

ix)     closure of all facility gyms used by staff for the next 30 days with no exception, and a thorough cleaning and sanitation of gym equipment before gym closures; and

x)      reiterating that all MDCR and CHS staff must ensure their compliance with the necessary precautions (e.g., mandatory wearing of the PPE by all staff and inmates, practicing strict social distancing, and proper hygiene like frequent hand washing; and, reminding MDCR and CHS staff to ensure the inmate population's compliance with these important precautions.

103.    MDCR's efforts to mitigate the spread of COVID-19 among inmates and staff is ongoing and will continue to improve and adjust as more information becomes available and as the situation warrants.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of April, 2020.

,

DANIEL J. JUNIOR
Director, Miami-Dade Corrections and
Rehabilitation Department