UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No.: 20-Civ-21457-WILLIAMS

ANTHONY SWAIN; *et al.*,

    Plaintiffs,

v.

DANIEL JUNIOR, in his official capacity
as Director of the Miami-Dade Corrections
and Rehabilitation Department; MIAMI-
DADE COUNTY, FLORIDA,

    Defendants.

_____/

## DECLARATION OF EDITH WRIGHT

Pursuant to 28 U.S.C. §1746, Edith Wright declares under penalty of perjury as follows:

1. My name is Edith Wright and I am over the age of eighteen.

2. I am a Registered Nurse, and obtained a Bachelor's Degree in Nursing Science from Western Governor's University, and previously obtained a Bachelor's Degree in Health Services Administration from Florida Atlantic University in Boca Raton, Florida.

3. I am currently the Corporate Director of Corrections Health Services ("CHS"), which is a Department of the Public Health Trust. The Public Health Trust operates Jackson Health Systems. I have held this position since April, 2018.

4. Prior to my appointment as the Corporate Director of CHS, I held the Chief Nursing Officer position at CHS. Before that, I worked as the Associate Director of Nursing for GeoCare/Correct Care Solutions for approximately 1.5 years. In that role, I managed the nursing staff of a 238 bed forensic psychiatric hospital and was also responsible for accreditation preparation, policy review/implementation and quality improvement initiatives. Prior to that, I worked for Armor Correctional Health Services ("Armor") for approximately six (6) years. At

1

Armor, I initially served as the Director of Nursing/Health Services Administrator and was responsible for supervising medical and mental health staff, implementation of new detoxification units in two facilities, accreditation management, and infection control initiatives. Thereafter, I was promoted to a Clinical Operations Specialist at Armor performing audit reviews and preparing corrective action plans. My professional work history prior to these positions includes various correctional and mental healthcare services roles.

5. As the Corporate Director of CHS, I am responsible for the oversight of all operations, of a 5000 bed Pre-Trial Jail (approximately 420 employees) which includes Nursing staff, Medical clinicians, Mental/Behavioral health staff, and Dental staff.

6. CHS provides medical and mental health care to the correctional patients of Metro West Detention Center ("MWDC"), Turner Guilford Knight Correctional Center ("TGK") and Pre-Trial Detention Center ("PTDC") ("detention facilities"). Additionally, CHS provides medical and mental health care to the correctional patients of the Training and Treatment Center ("TTC"), with such care being provided at the adjacent TGK detention facility. There is nursing staff on site at the detention facilities twenty-four (24) hours a day, seven (7) days a week, each day of the year. In addition to CHS' nursing staff, there is a physician on call for the detention facilities, twenty-four (24) hours a day, seven (7) days a week, each day of the year.

7. In response to the COVID-19 pandemic, CHS has in collaboration with MDCR pursued measures to protect the health and safety of our correctional patients. The measures pursued were developed with the most vulnerable in mind, and the goal has been to treat all inmates as high risk in order to mitigate the risk to the actual high risk population. Some of these measures are described below.

8. In an effort to mitigate against the entry of COVID-19, and to identify arrestees in need of care, we have implemented enhanced screenings of new arrestees ("arrestees"). These new screenings for COVID-19 symptoms are in addition to the standard intake health screening process described in paragraph ten (10) below. Now, when arrestees present to TGK for initial intake and booking (prior to a housing assignment), the following enhanced measures apply: (i) there is a screening for COVID-19 symptoms outside of TGK, before an arrestee, or **any,** individual can even enter the law enforcement officer lobby; (ii) an additional, second screening of new arrestees specifically for COVID-19 symptoms occurs upon entering the law enforcement officer lobby and before receiving the standard intake health screening at TGK; and (iii) there is a transfer to the hospital of any new arrestee(s) exhibiting COVID-19 symptoms.

9. Therefore, if an arrestee exhibits symptoms of COVID-19 at intake, the process is for such individual to be transferred to the hospital for testing and evaluation. Thereafter, upon return to TGK, such arrestees are to be assessed for their vitals and temperature and placed in medical isolation at TGK for monitoring pending receipt of test results. If the results are positive, the correctional patient is to be monitored and treated for symptoms until he or she can be released into general population per CDC recommendations. If the test is negative, the correctional patient is to be kept in medical isolation until his or her symptoms have resolved and then they will be released to general population.

10. CHS' standard intake health screening process occurs at TGK and commences with a nursing assessment. Arrestees are evaluated for chronic medical conditions upon intake. Those arrestees that do not present with a medical condition are scheduled for a follow-up fourteen (14) day assessment. The nurse performing the assessment is to refer any arrestees presenting with medical symptoms, or with medical concerns or conditions, to the physician intake screening

3

where an assessment with a physician occurs to determine the presence of symptoms, acute concerns, and/or chronic conditions. Any arrestees exhibiting or reporting mental health needs or concerns, are to be directed to an advanced practical registered nurse ("APRN") specializing in psychiatry, who will perform a screening and assign a mental health level of care, with Level 1 being the highest level of need, and Level IV being the lowest. At the time of intake, correctional patients are offered a flu vaccination and are scheduled to be tested for tuberculosis and sexually transmitted diseases. Follow-up appointments are also scheduled at the outset so that correctional patients with chronic ailments are seen approximately thirty (30) days after the initial intake screening. Correctional patients with mental health diagnoses are automatically scheduled to see a psychiatrist and social worker in follow-up. Correctional patients with a diagnosis of developmental disability receive rounding by social workers.

11.     In further attempts to mitigate against the entry of COVID-19, those arrestees who proceed through the aforementioned screening processes without exhibiting COVID-19 symptoms are quarantined at TGK with other non-symptomatic arrestees arriving to the detention facility on the same date. Arrestees assessed as in need of Level I or Level II mental health services are quarantined in a separate area from arrestees that do not have such needs. This fourteen (14) day quarantine protocol was put into place so that should an arrestee be non-symptomatic at the time of intake but develop symptoms after intake, there would be an opportunity for such symptoms to be observed and addressed before such arrestee was placed in a housing unit. During this fourteen (14) day quarantine period, arrestees' temperatures are checked daily by nursing staff. Additionally, arrestees diagnosed as in need of Level I mental health services receive rounding with nurses every eight (8) hours and are seen once a day by psychiatrists. Arrestees diagnosed as in need of Level II mental health services receive rounding with nurses once a day. If any arrestee

4

shows symptoms of COVID-19, they will be separated from the other arrestees, medically evaluated in an isolated medical area, tested for COVID-19 and placed in medical isolation. All arrestees who had close contact with a symptomatic arrestee will restart a fourteen (14) day quarantine. Additionally, any arrestee who has been in close contact with another arrestee that tests positive for COVID-19, will also be tested for COVID-19. Arrestees showing no symptoms during and after the fourteen (14) days of quarantine are released to their housing assignment or into general population.

12. Additional measures to mitigate against the entry of COVID-19 have been taken, as it relates to screening of individuals other than arrestees entering the detention facilities. CHS participated in the development of an approach to: (i) administer a three-part questionnaire screening for potential COVID-19 symptoms to all MDCR and CHS staff; and (ii) administer temperature screenings to anyone, including law enforcement officers, corrections officers, civilian employees, vendors, and medical personnel seeking entry into any of the detention facilities. All staff have been advised to wear the appropriate masks at all times to further prevent the spread of the virus. Should any CHS staff member exhibit symptoms of COVID-19, they will be directed to the Jackson Health System Employee Health Office and will not be eligible to return to work until clearance is received from the Health Office. Jackson Health System currently has four (4) testing sites for its employees, including CHS employees, and of course, CHS employees may opt to obtain testing in the community as well.

13. In response to the COVID-19 pandemic, CHS has also pursued measures to monitor inmates already residing in the detention facilities. CHS has: (i) effective April 11, 2020, been conducting daily temperature checks of all inmates system-wide who meet the following risk criteria: are sixty (60) years of age or older, have chronic respiratory disease including lung

disease, moderate to severe asthma, or chronic obstructive pulmonary disease (i.e. bronchitis or emphysema), have heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease, have chronic liver or kidney disease (including hepatitis and conditions requiring dialysis), have diabetes, have epilepsy, have diagnosed hypertension, have a compromised immune system (such as due to cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease), have sickle cell disease and/or are or have been pregnant within the last two weeks; (ii) on April 17, April 18, and April 19, 2020, conducted temperature checks of all inmates residing at MWDC, TGK, and PTDC, regardless of risk status; and (iii) developed a plan, which will be implemented commencing on April 21, 2020, to conduct daily temperature checks at MWDC, TGK, PTDC, and TTC of all inmates regardless of risk status.

14. CHS now has the ability to perform swab specimen collection for possible COVID-19 onsite at the detention facilities, with collected specimens being sent out to a laboratory for testing and results. Therefore, inmates already residing in the detention facilities no longer need to be transferred to a hospital solely for purposes of obtaining a COVID-19 test.

15. In and around the middle of March, 2020 CHS modified the sick call process to allow for an expedited review of all complaints or reports of possible fever, cold, respiratory or flu-like symptoms. Correctional patients with these complaints or reports are seen right away to assess for possible symptoms of COVID-19, so as to promptly diagnose, provide care, and avoid the spread of disease. No charges are to be billed for such sick call visits. No charges are ever billed for medical grievances. The standard sick call process, which is in place twenty-four (24) hours a day, seven (7) days a week, each day of the year, can be initiated any time as follows: (i) sick call requests can be submitted when nurses come to make their daily rounds in each unit.

Nurses round in each unit at least two (2) times and up to four (4) times daily to deliver medications. The inmates can be seen by the nurses during these visits. Inmates can request to be seen individually and can also report items of concern, whether pertaining to themselves or others (i.e. their symptoms or symptoms of other inmates); and (ii) a medical emergency request can be initiated by an inmate at any time by verbally notifying any staff member. Nursing staff is present onsite at the detention facilities and physicians are on call at all times. If a medical emergency exists, the correctional patient will be immediately transferred to receive a higher level of medical care either onsite or at an acute care facility.

16.     A process has also been instituted regarding follow-up if an inmate exhibits symptoms of COVID-19. They will be provided an on-site clinical evaluation to include collection of swab specimens for both COVID-19 and flu testing (with specimens for both sent to a laboratory for testing and results), and then subsequently transferred to the medical isolation unit at TGK if clinically stable. Should the patient present in acute distress or be unstable, they are transferred to the nearest hospital for care and the swab specimen for COVID-19 testing will be sent out to a laboratory for review and results. Upon transfer to the hospital, the hospital is provided with a transfer summary with the inmate's clinical diagnoses, including any chronic care conditions, and a copy of the Medication Administration Record is also provided. Upon return from the hospital, the patient is placed in a Medical Isolation Unit at TGK for monitoring and care. Any inmate placed in the Medical Isolation Unit will of course be restricted from group activities and movement outside of such unit (unless necessary to do so for medical care) and will receive meals and other items directly in their unit. An inmate receiving a negative test result, and whose symptoms have resolved, will return to their housing unit. To the extent that an inmate tests positive, such inmate will remain in the Medical Isolation Unit for monitoring and care (unless

transferred out again to a hospital for medical care), and will not return to their housing unit until: (i) they have not had a fever for at least seventy-two (72) hours (and without relying on fever reducer medication); (ii) their symptoms have all subsided; and (iii) a minimum of seven (7) days have passed since the first symptoms appeared or they have been re-tested and have tested negative. The Medical Isolation Unit has negative air pressure and other features designed to protect against the spread of disease.

17.  A process has also been developed regarding follow-up for any inmate who is a close contact of a confirmed COVID-19 case, but who is not themselves exhibiting symptoms. In this situation, the non-symptomatic inmate who has been in close contact with a confirmed COVID-19 positive case, will also be tested for COVID-19, will quarantine in place for a minimum of fourteen (14) days, and will receive daily temperature checks and monitoring by the medical staff. Should the inmate test positive or develop symptoms, then upon the earliest of either occurrence, the processes described in paragraph sixteen (16) above shall apply. Jackson Health System has continued to provide additional resources and infectious disease expertise to assist with the measures being taken, including for example those related to on-site swab specimen collection efforts. From April 19, 2020 to end of day April 20, 2020, approximately six-hundred (600) swab specimens have been collected from inmates who were identified as being in close contact with a positive COVID-19 case.

18.  As of the date of my signature below, and to my knowledge, none of the named Plaintiffs have exhibited COVID-19 symptoms, and none have been in a medical isolation unit.

19.  Together with the CHS and MDCR teams, I continue to review processes and measures in an effort to mitigate against COVID-19, and to protect the correctional patients in the

detention facilities. With this in mind, measures and modifications to the aforementioned processes may be pursued in follow-up.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this \_\_\_\_21\_\_\_\_ day of April, 2020.

_____  04/21/2020
**Director Edith Wright**