UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No.: 20-Civ-21457-WILLIAMS

ANTHONY SWAIN; *et al.*,

    Plaintiffs,

v.

DANIEL JUNIOR, in his official capacity
as Director of the Miami-Dade Corrections
and Rehabilitation Department; MIAMI-
DADE COUNTY, FLORIDA,

    Defendants.
_____/

## DECLARATION OF DR. OTIS R. EGINS

Pursuant to 28 U.S.C. §1746, Otis R. Egins declares under penalty of perjury as follows:

1. My name is Otis R. Egins and I am over the age of eighteen.

2. I am a Medical Doctor, having obtained my Doctorate of Medicine from the University of Texas Medical Branch in Galveston, Texas. I completed my family medicine residency at Medstar Franklin Square Hospital Center Family Medicine Residency Program.

3. I am currently the Chief Medical Officer ("CMO") of Corrections Health Services ("CHS"), which is a Department of the Public Health Trust. The Public Health Trust operates Jackson Health Systems. I have held this position since May 21, 2018.

4. Prior to my appointment as CMO of CHS, I was the Medical Director of Correctional Health for Unity Health Care ("UHC"), in the District of Columbia from September, 2014 to May, 2018. In my role as Medical Director of Correctional Health, I oversaw and coordinated the clinical care provided by UHC's providers to patients in the DC Department of Corrections. Additionally, some of my other activities included participation in quality of care initiatives, development of operational procedures to ensure continuity of care, development of

1

policies, and coordination and oversight of referrals for correctional patients to outside medical specialists. While serving as the Medical Director of Correctional Health, I also personally provided care to inmates in the DC Department of Corrections. Prior to my appointment as the Medical Director of Correctional Health, I served from January, 2012 to September, 2014 as a Medical Director of one of UHC's community health centers. In this capacity, I also provided direct patient care, including to correctional patients in need of chronic care or common acute services, and also provided oversight of allied health staff, including nurse practitioners, physician assistants, medical students and residents.

5. As the CMO of CHS, I am responsible for the oversight of medical and behavioral health care, quality assurance related to patient care, management of medical providers and writing policies and procedures related to patient care and medical procedures.

6. CHS provides medical and mental health care to the correctional patients of Metro West Detention Center ("MWDC"), Turner Guilford Knight Correctional Center ("TGK"), Pre-Trial Detention Center ("PTDC") ("detention facilities"). Additionally, CHS provides medical and mental health care to the correctional patients of the Training and Treatment Center ("TTC"), with such care being provided at the adjacent TGK detention facility. A CHS physician is on call at all times.

7. In response to the COVID-19 pandemic, CHS has in collaboration with MDCR pursued measures to protect the health and safety of our correctional patients. The measures pursued were developed with the most vulnerable in mind, and the goal has been to treat all inmates as high risk in order to mitigate the risk to the actual high risk population. Some of these measures are described below.

8. Additional processes have been developed for enhanced screenings of new arrestees. These new measures are in addition to the standard intake health screening process described in paragraph ten (10) below and currently include: (i) screening for COVID-19 symptoms outside of TGK, before an arrestee, or **any,** individual can even enter the law enforcement officer lobby; (ii) an additional, second screening of new arrestees specifically for COVID-19 symptoms occurs upon entering the law enforcement officer lobby and before receiving the standard intake health screening at TGK; and (iii) transfer to the hospital of any new arrestee(s) exhibiting COVID-19 symptoms for testing and evaluation.

9. Arrestees transferred to a hospital due to suspected COVID-19, are upon return to TGK assessed for their vitals and temperature and are to be placed in medical isolation at TGK and receive monitoring pending receipt of test results. If the results are positive, the correctional patient is to be monitored and treated for symptoms until he or she can be released into general population per CDC recommendations. If the test is negative, the correctional patient is to be kept in medical isolation until his or her symptoms have resolved and then they will be released to general population.

10. CHS' standard intake health screening process, which occurs at TGK, commences with a nursing assessment. If an arrestee presents with medical symptoms, or reports medical concerns or conditions, the nurse performing the initial intake screening is to direct the correctional patient to physician intake screening where an assessment with a physician is to occur to determine the presence of symptoms, acute concerns, and/or chronic conditions. If an arrestee presents with mental health needs or concerns, then such correctional patient is to be directed to an advanced practical registered nurse ("APRN") specializing in psychiatry, who is to perform a screening and assign a mental health level of care, with Level I being the highest level of need, and Level IV

being the lowest. At the time of intake, correctional patients are offered a flu vaccination, and are scheduled to be tested for tuberculosis and sexually transmitted diseases. Follow-up appointments are also scheduled at the outset so that correctional patients with chronic ailments are seen approximately thirty (30) days after the initial intake screening. Correctional patients with mental health diagnoses are automatically scheduled to see a psychiatrist and social worker in follow-up. Correctional patients with a diagnosis of developmental disability receive weekly rounding by social workers to ensure the patient is receiving any ordered services.

11. Subsequent to the aforementioned screening processes, all arrestees lacking COVID-19 symptoms are quarantined at TGK with other non-symptomatic arrestees arriving to the detention facility on the same date. Arrestees determined to be in need of Level I or Level II mental health services are quarantined in a separate area from arrestees that do not have such needs. A mandatory fourteen (14) day quarantine of non-symptomatic arrestees is a measure which has been implemented in response to the COVID-19 pandemic, in an effort to both provide monitoring to the new arrestees and to mitigate against COVID-19 exposure to correctional patients already residing at the detention facilities. During this fourteen (14) day quarantine period, arrestees receive temperature checks daily. Additionally, arrestees diagnosed as in need of Level I or Level II mental health services receive rounding with nurses every eight (8) hours and once a day, respectively. A psychiatrist rounds on the Level I correctional patients daily. If any arrestees show symptoms of COVID-19, they will be separated from other inmates, medically evaluated in an isolated medical area, tested for COVID-19 and placed in medical isolation. All inmates who had close contact with a symptomatic arrestee will restart a fourteen (14) day quarantine. Additionally, any arrestee who has been in close contact with another arrestee that tests positive for COVID-19,

4

will also be tested for COVID-19. Arrestees showing no symptoms during and after the fourteen (14) days of quarantine are released to their housing assignment or into general population.

12. I have participated in the development of additional screening measures designed to protect our correctional patients from COVID-19, including review of individuals other than arrestees entering the detention facilities. I participated in the development of an approach to: (i) administer a three-part questionnaire screening for potential COVID-19 symptoms to all MDCR and CHS staff; and (ii) administer temperature screenings to anyone, including law enforcement officers, corrections officers, civilian employees, vendors, and medical personnel seeking entry into any of the detention facilities. All staff have been advised to wear the appropriate masks at all times to further prevent the spread of the virus. Should any CHS staff member exhibit symptoms of COVID-19, they will be directed to the Jackson Health System Employee Health Office and will not be eligible to return to work until clearance is received from the Health Office. Jackson Health System currently has four (4) testing sites for its employees, including CHS employees, and of course, CHS employees may opt to obtain testing in the community as well.

13. In addition to new entry screening measures, CHS has also participated in the development of new measures to monitor correctional patients already residing in the facilities, including a new approach to the sick call process which began in approximately mid-March whereby any reports of possible fever, cold, respiratory or flu-like symptoms are expedited. The standard process has included that a medical emergency request can be initiated by an inmate at any time by verbally notifying any staff member. Medical staff are on call for immediate follow-up. If a medical emergency exists, the correctional patient will be immediately transferred to receive a higher level of medical care either onsite or at an acute care facility. Additional measures which CHS has pursued to monitor inmates already residing in the detention facilities include: (i)

effective April 11, 2020, CHS has been conducting daily temperature checks of all inmates system-wide who meet the following risk criteria: are sixty (60) years of age or older, have chronic respiratory disease including lung disease, moderate to severe asthma, or chronic obstructive pulmonary disease (i.e. bronchitis or emphysema), have heart disease, such as congenital heart disease, congestive heart failure, or coronary artery disease, have chronic liver or kidney disease (including hepatitis and conditions requiring dialysis), have diabetes, have epilepsy, have diagnosed hypertension, have a compromised immune system (such as due to cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease), have sickle cell disease and/or are or have been pregnant within the last two weeks; (ii) on April 17, April 18, and April 19, 2020, conducted temperature checks of all inmates residing at MWDC, TGK, and PTDC, regardless of risk status; and (iii) developed a plan, which will be implemented commencing on April 21, 2020, to conduct daily temperature checks at MWDCC, TGK, PTDC, and TTC of all inmates regardless of risk status.

14. CHS has also acquired the ability to perform swab specimen collection for possible COVID-19 onsite at the detention facilities, with collected specimens being sent to a laboratory for testing and results. Therefore, inmates already residing in the detention facilities no longer need to be transferred to a hospital solely for purposes of obtaining a COVID-19 test.

15. If an inmate exhibits symptoms of COVID-19, they will be provided an on-site clinical evaluation to include collection of swab specimens for both COVID-19 and the flu (with specimens for both sent to a laboratory for testing and results), and then subsequently transferred to the medical isolation unit at TGK if clinically stable. Should the patient present in acute distress or be unstable, they are transferred to the nearest hospital for care and the swab specimen for COVID-19 testing will be sent out to a laboratory for testing and results. Upon transfer to the

hospital, the hospital is provided with a transfer summary with the inmate's clinical diagnoses, including any chronic care conditions, and a copy of the Medication Administration Record is also provided. Upon return from the hospital, the patient is placed in a medical isolation unit at TGK for monitoring and care. Any inmate placed in the medical isolation unit will of course be restricted from group activities and movement outside of such unit (unless necessary to do so for medical care) and will receive meals and other items directly in their unit. An inmate receiving a negative test result, and whose symptoms have resolved, will return to their housing unit. To the extent that an inmate tests positive, such inmate will remain in the medical isolation unit for monitoring and care (unless transferred out again to a hospital for medical care), and will not return to their housing unit until: (i) they have not had a fever for at least seventy-two (72) hours (and without relying on fever reducer medication); (ii) their symptoms have all subsided; and (iii) a minimum of seven (7) days have passed since the first symptoms appeared or they have been re-tested and have tested negative. The medical isolation unit has negative air pressure and other features designed to protect against the spread of disease.

16.     A process has also been developed regarding follow-up for any inmate who is a close contact of a confirmed COVID-19 case, but who is not themselves exhibiting symptoms. In this situation, the non-symptomatic inmate who has been in close contact with a confirmed COVID-19 positive case, will also be tested for COVID-19, will quarantine in place for a minimum of fourteen (14) days and will receive daily temperature checks and monitoring. Should the inmate test positive or develop symptoms, then upon the earliest of either occurrence, the processes described in paragraph fifteen (15) above shall apply. Jackson Health System has continued to provide additional resources and infectious disease expertise to assist with the measures being taken, including for example those related to on-site swab specimen collection efforts. From April

7

19, 2020 to end of day April 20, 2020, approximately six-hundred (600) swab specimens have been collected from inmates who were identified as being in close contact with a positive COVID-19 case. As of my signature below, one-hundred percent (100%) of all inmates in quarantine have been tested for COVID-19.

17. As of the date of my signature below, and to my knowledge, none of the named Plaintiffs have exhibited COVID-19 symptoms, and none have been in a medical isolation unit.

18. Together with the CHS and MDCR teams, I continue to review processes and measures in an effort to mitigate against COVID-19, and to protect the correctional patients in the detention facilities. With this in mind, measures and modifications to aforementioned processes may be pursued in follow-up.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of April, 2020.

_____
**Dr. Otis R. Egins**