# Exhibit 19

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| COREAS, et al., <br><br> *Petitioners-Plaintiffs*, <br><br> v. <br><br> BOUNDS, et al, <br><br> *Respondents-Defendants*. | Civil Action No.: |

## DECLARATION OF Ranit Mishori, MD, MHS, FAAFP

I, Ranit Mishori, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

**I.  Background**

1. I am Dr. Ranit Mishori. I am a senior medical advisor at Physicians for Human Rights (PHR), and Professor of Family Medicine at the Georgetown University School of Medicine, where I am the director of the department's Global Health Initiatives, Health Policy fellowship and our practice-based research network. A fellow of the American Academy of Family Physicians and Diplomate of the American Board of Family Medicine, I did my residency training at the Georgetown University/Providence Hospital Family Medicine Residency program. I received my medical degree from Georgetown University School of Medicine and a master's degree in International Health from the Johns Hopkins Bloomberg School of Public Health, in the Disease Control and Prevention Track (focusing on the science of how to halt the spread of infectious disease).

1

2. I am the faculty leader for Georgetown University School of Medicine's Correctional Health Interest group, where I supervise medical students placed at various area jails, prisons and detention centers. In addition, I am the director of Georgetown University's Asylum program which focuses on the care and medico-legal issues of asylum seekers, including immigration detention. I have written extensively and given talks and lectures about such issues nationally and internationally. In my role as senior medical advisor at PHR (and prior to that, as a consultant for PHR), I have reviewed and analyzed dozens of cases related to health outcomes of individuals in correctional facilities, and advised the organization and other partners (civil society, legal aid organizations and the media) about issues related to incarceration, including hunger strikes, medical care quality, communicable disease management, violence, and care of pregnant women in such settings.[1]

3. As an attending physician at the Georgetown University/Washington Hospital Center Family Medicine Residency Program, I work with urban underserved populations, including the homeless, formerly incarcerated individuals, immigrants and refugees. I routinely come in contact with victims of abuse, trauma and poverty where I regularly assess their medical as well as psycho-social needs in the context of their social-determinants of health (such as housing and incarceration).

---

[1] *See, e.g.*, Ranit Mishori, *Risk Behind Bars: Coronavirus and Immigration Detention*, The Hill (Mar. 17, 2020), https://thehill.com/opinion/immigration/487986-risk-behind-bars-coronavirus-and-immigration-detention; Amanda Holpuch, *Coronavirus Inevitable in Prison-Like US Immigration Centers, Doctors Say*, The Guardian (Mar. 11, 2020), https://www.theguardian.com/world/2020/mar/11/coronavirus-outbreak-us-immigration-centers; Abigail Hauslohner, et al., *Coronavirus Could Pose Serious Concern in ICE Jails, Immigration Courts*, The Washington Post (Mar. 12, 2020), https://www.washingtonpost.com/immigration/coronavirus-immigration jails/2020/03/12/44b5e56a-646a-11ea-845d-e35b0234b136_story.html; Silvia Foster-Frau, *Coronavirus Cases in Migrant Detention Facilities Called 'Inevitable'*, Express News (Mar. 15, 2020) https://www.expressnews.com/news/us-world/border-mexico/article/Whether-in-detention-or-in-Mexico-U-S-15129447.php.

4. For four years I was an elected member of the American Academy of Family Physicians' Commission on the Health of the Public and Science, where I chaired the Public Health Issues sub-committee. During that time, I was a one of the lead authors of the Academy's comprehensive position paper on Incarceration and Health.

5. My CV is attached as Exhibit A.

## II. COVID-19

6. The novel coronavirus, officially known as SARS-CoV-2 (Coronavirus), causes a disease known as COVID-19. COVID-19 has now reached pandemic status. As of March 24, 2020, according to the World Health Organization (WHO), more than 334,000 people have been diagnosed with COVID-19 around the world and 14,652 have died.[2] In the United States, about 31,537 people have been diagnosed and more than 400 people have died as of the same date.[3] The numbers of infection and death in the United States are likely underestimated due to the lack of test kits available.

7. The transmission of Coronavirus is expected to grow exponentially. Nationally, projections by the Centers for Disease Control and Prevention (CDC) indicate that over 200 million people in the United States could be infected with Coronavirus over the course of the pandemic without effective public health intervention, with as many as 1.5 million deaths in certain projections.

---

[2] *See* Novel Coronavirus (COVID-19) Situation, World Health Organization, https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed Mar. 18, 2020 (at noon EDT).

[3] *See* Mitch Smith, et al., *U.S. Coronavirus Map: Cases Now Reported in All 50 States*, The New York Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed Mar. 18, 2020 (at noon EDT).

3

8.      The novel coronavirus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but it also survives on surfaces for some period of time. The virus can cause severe damage to lung tissue, requiring an extensive period of rehabilitation, and in some cases, a permanent loss of respiratory capacity. The virus also targets the heart muscle, leading to myocarditis, or inflammation of the heart muscle.  It is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where Coronavirus originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet.  The "contagiousness" of this novel coronavirus—its R0 (the number of people who can get infected from a single infected person)—is twice that of the flu.  Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. For this reason, only with aggressive testing for the virus can we track the disease, isolate those affected, and stop its spread.

9.      COVID-19 is a serious disease, which can lead to respiratory failure, kidney failure, and death. Older patients and patients with chronic underlying conditions are at a  particularly high risk for severe cases and complications. [4]  The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza.  According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.

---

[4] Fei Zhou, et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China*, The Lancet (published online Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

4

Case 1:20-cv-21457-KMW Document 1-10 Entered on FLSD Docket 04/03/2020 Page 6 of 16

According to preliminary data from China, serious illness, sometimes resulting in death, occurs in up to 16% of cases, with a higher rate among those older and high-risk individuals. [5]

10. The CDC previously identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age, including: blood disorders, chronic kidney or liver disease, immunosuppression, endocrine disorders (including diabetes), metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

11. Those in high-risk categories who do not die may have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that are likely to soon be in very short supply, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities. Patients who do not die from serious cases of COVID-19 may also face prolonged recovery periods, including extensive rehabilitation from neurological damage and loss of respiratory capacity.

12. Complications from COVID-19, including severe damage to lung, heart, liver, or other organs, can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.

13. There is no vaccine to prevent COVID-19. There is no known cure or antiviral treatment for COVID-19 at this time.

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention, accessed Mar. 14, 2020, https://www.cdc.gov/coronavirus/2019-ncov/summary.html.

14. COVID-19 prevention strategies include containment and mitigation. Containment requires identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment. Unfortunately, due to the lack of testing availability, most public health experts agree that it is too late to effectively implement a containment strategy in the United States at-large.

15. As the infectious disease spreads in a community, public health demands mitigation strategies, which include scrupulous hand hygiene and social distancing. For that reason, public health officials have recommended extraordinary measures to combat the rapid spread of coronavirus. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of this risk mitigation strategy.

### III. Detention Centers, Jails, & Prisons

16. The risk posed by infectious diseases in immigration detention facilities, including jails and prisons, is significantly higher than in the community, both in terms of risk of exposure and transmission and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

17. Globally, outbreaks of contagious diseases are all too common in confined detention settings and are more common than in the community at large. Though they contain a captive population, these settings are not isolated from exposure. ICE has temporarily suspended social visitation in all detention facilities.[6] However, staff arrive and leave on a shift basis; there is no ability to adequately screen staff for new, asymptomatic infection. Contractors and vendors

---

[6] *ICE Guidance on Covid-19*, U.S. Immigration and Customs Enforcement, accessed Mar. 18, 2020 (at 1:00 p.m. EDT), https://www.ice.gov/covid19.

6

also pass between communities and facilities and can bring infectious diseases into facilities. People are often transported to, from, and between facilities.

18. Jails, prisons and detention centers often do not have access to vital community health resources that can be crucial in identifying infectious diseases, including sufficient testing equipment and laboratories. This is especially true when, as now, there is a shortage in available test kits.

19. During an infectious disease outbreak, a containment strategy requires people who are ill to be isolated and that caregivers have adequate personal protective equipment (PPE). Jails and prisons are often under-resourced and ill-equipped to provide sufficient PPE for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak. Moreover, efforts to mitigate disease spread in jails, prisons and detention centers will help limit its transmission in the community, since staff members are able to come and go, and return to their family members at the end of their shifts. This is especially true when, as now, facemasks are already in short supply.

20. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people live in close, crowded quarters and must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. Toilets, sinks, and showers are shared, without disinfection between use. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Detainees often have a small number of telephones that they share, and which form their only contact with the outside world—including

7

their family and lawyers. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

21. Additionally, jails and prisons are often unable to adequately provide the mitigation recommendations described above. During an infectious disease outbreak, people can protect themselves by washing hands. Detention centers, jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons.

22. People incarcerated in detention centers, jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[7] This is because people in detention centers, jails and prisons, for a variety of reasons, have higher rates of chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and suppressed immune systems from HIV or other conditions, than people in the community.

23. Detention centers, jails and prisons are often poorly equipped to manage infectious disease outbreaks. Some detention centers, jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at detention centers, jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of

---

[7] *Active Case Finding For Communicable Diseases in Prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

8

Case 1:20-cv-21457-KMW Document 1-10 Entered on FLSD Docket 04/05/2020 Page 10 of 16

droplet-borne infectious diseases, people who are infected and symptomatic need to be isolated in specialized negative pressure rooms. Most detention centers, jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). ICE has admitted that not all of the detention centers it oversees have even one.[8] In the course of an infectious disease outbreak, resources will become exhausted rapidly and any beds available will soon be at capacity.

24. Even assuming adequate space, solitary confinement is not an effective disease containment strategy. Isolation of people who are ill using solitary confinement is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms, air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and the staff. This makes both containing the illness and caring for those who have become infected much more difficult.

25. Infectious disease outbreaks, such as COVID-19, may exacerbate existing mental health conditions and contribute to the development of new mental health conditions.[9] Mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation. Moreover, failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by an infectious

---

[8] Brittny Mejia, *ICE Says No Confirmed Coronavirus Among Detainees After 4 Test Negative*, Los Angeles Times, accessed Mar. 18, 2020, https://www.latimes.com/california/story/2020-03-10/ice-says-no-detainees-have-coronavirus-four-being-tested

[9] Brian Honermann, *An "Epidemic Within an Outbreak:" The Mental Health Consequences of Infectious Disease Epidemics*, O'Neill Institute for National and Global Health Law (Feb. 26, 2015), accessed Mar. 19, 2020, https://oneill.law.georgetown.edu/epidemic-within-outbreak-mental-health-consequences-infectious-disease-epidemics/; Müller N, *Infectious Diseases and Mental Health*, Comorbidity of Mental and Physical Disorders; Shultz JM, *Mental Health Consequences of Infectious Disease Outbreaks*, accessed Mar. 19, 2020, https://www.urmc.rochester.edu/MediaLibraries/URMCMedia/flrtc/documents/Slides-MH-CONSEQUENCES-OF-ID-OUTBREAKSV2.pdf.

9

disease outbreak such as COVID-19, may result in poor health outcomes and even death. The scientific evidence points to a bi-directional relationship between mental health conditions and infectious diseases. Not only are individuals with mental health conditions more at risk for communicable diseases, they are also harder to treat, once infected, due to the nature of their underlying mental health disorder. For individuals in these facilities, especially those with chronic mental health conditions, the experience of an epidemic and the lack of care while confined to small, crowded quarters can itself be traumatizing, compounding the trauma of incarceration.

26. A coronavirus brought into a detention facility can quickly spread among the dense detainee cohort. Soon many are sick—including high-risk groups such as those with chronic conditions—quickly overwhelming the already strained health infrastructure within the facility. This can also lead to a strain on the surrounding hospitals to which these individuals may be transferred.

27. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[10] Subsequent CDC investigation of 995 inmates and 235 staff members across the two facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[11] H1N1 is far less contagious than coronavirus. These scenarios occurred in the "best case" of influenza, a viral infection for which

---

[10] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention, Apr. 6, 2020, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.

[11] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.

10

there was an effective and available vaccine and antiviral medications, unlike the coronavirus COVID-19, for which there is currently neither.

28. In recent years in immigration detention facilities, overcrowding, poor hygiene measures, medical negligence, and poor access to resources and medical care have led to outbreaks of other infectious diseases as well, including mumps and chickenpox.

29. Additionally, as health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these conditions.

30. We have ample basis to conclude that detention settings are equally unprepared for the rapid spread of Coronavirus. Not surprisingly, Chinese prison officials report that over 500 COVID-19 cases in the current outbreak stemmed from the Hubei province prisons. In Israel, an entire prison was quarantined. Recognizing that the release of those incarcerated is the only solution, US jails in at least a dozen states have begun releasing inmates. In Iran, over 80,000 prisoners were released as a means of preventing death in government prisons. Major human rights organizations such as Human Rights Watch, Physicians for Human Rights and Amnesty International have issued calls to release those detained in immigration facilities to prevent the spread of coronavirus.

31. In my professional opinion, it is inevitable that SARS-CoV-2, the virus that causes COVID-19, will infect prisons, jails, and/or other immigration detention centers in the United States. This is consistent with the prediction of other experts that all detention centers, prisons and jails should anticipate. Given the shortage of COVID-19 tests in the United States, it is likely that detention facilities are unable to conduct aggressive, widespread testing to identify all positive

11

coronavirus cases. The ability to identify cases is crucial in order to be able to determine whether there is a risk for coronavirus transmission in an institution.

IV.   **The Maryland Detention Facilities**

32.   Based on the description of the Maryland facilities contained in the Lopez Declaration, it is my professional opinion that the Maryland facilities are particularly susceptible to rapid spread of the virus and are not equipped to handle a coronavirus outbreak.

33.   The living conditions described in the Lopez Declaration are not amenable to the necessary social distancing and hygiene measures that would be necessary to contain or minimize spread of the virus.

34.   In particular, the fact that persons detained in those facilities share dorms, cells, living spaces, and bathroom space that is not disinfected between each use, and regularly interact with each other in narrow hallways and other areas where maintaining distance is not possible makes it all but inevitable that the virus would spread rapidly within the facility.

35.   Because routine testing is not being undertaken at the facility, it is impossible to tell how many asymptomatic carriers of the disease may already be at the facility or to screen for new instances of the virus before an individual with COVID-19 becomes symptomatic. Since testing is not widely available, it is highly unlikely that the facility would even be able to keep up with the need to test individuals exhibiting symptoms for the virus. Rapid spread of the virus within the facility is therefore extremely likely.

36.   The fact that medical units are shared spaces exacerbates this problem, as there appears to be no way to isolate individuals infected with the virus when this becomes necessary. The fact that there is only a small amount of space available in the medical unit makes it highly

unlikely that the facility could accommodate expanded need for services as a result of a coronavirus outbreak.

37. Moreover, the absence of 24-hour onsite medical facilities, the minimal and part-time nature of medical staffing, and that detainees appear to have had difficulties accessing routine medical care in the past renders it highly unlikely that the facility would be able to provide appropriate screening or treatment should that become necessary.

38. Based on the description of the facilities I have reviewed, it is my professional opinion that an outbreak is highly likely and that the consequences of rampant COVID-19 infection in the facility would be disastrous, especially for high-risk individuals like the plaintiffs in this case.

### V. **Specific Cases.**

39. The two plaintiffs in this lawsuit present with personal health characteristics that put them at high risk for complications from COVID-19 should they be exposed to the virus in detention.

40. Mr. Coreas, who suffers from Diabetes is also at a higher risk for complications due to this chronic medical condition. According to the CDC and the American Diabetes Association, those with diabetes are at a higher risk for COVID-19 complications, but also to deadly conditions resulting from the viral infection itself overwhelming the body, such as DKA – or diabetic ketoacidosis.

41. Mr. Cedillo suffers from hypertension. Early research has shown that those with a diagnosis of hypertension have worse symptoms and are more likely to die from COVID-19.

### VI. **Conclusion and Recommendations**

42. For the reasons above, it is my professional judgment that the plaintiffs, currently in ICE's immigration detention centers, are at a significantly higher risk of infection with Coronavirus as compared to the population in the community, and that they are at a significantly higher risk of complications and poor outcomes if they do become infected. These outcomes include severe illness (including respiratory, cardiac and kidney failure) and even death.

43. Given that the only viable public health strategy available in the United States currently is risk mitigation, reducing the size of the population in detention centers, jails and prisons is crucially important to reducing the level of risk both for those within those facilities and for the community at large. Not doing so is not only inadvisable but also reckless given the public health realities we now face in the United States.

44. Even with the best-laid plans to address the spread of Coronavirus in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my professional opinion, the only viable public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of an effective vaccine for prevention or effective treatment for the disease at this stage. My professional opinion is consistent with the view of the medical profession as a whole that there are no conditions of confinement in carceral settings that can adequately manage the serious risk of harm for high-risk individuals during the COVID-19 pandemic.

45. Immediate release is crucial for the above-mentioned individuals.

46. Releasing people from incarceration is the best and safest way to prevent the spread of disease and reduce the threat to the most vulnerable incarcerated people. It is my professional opinion that this step is both necessary and urgent. The window of opportunity is rapidly narrowing

for mitigation of COVID-19 in these facilities. It is a matter of days, not weeks. Once a case of Coronavirus is identified in a facility, it will likely be too late to prevent a widespread outbreak.

47. Release of the most vulnerable people also reduces the burden on these facilities' limited health care infrastructure, as it lessens the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

48. Release of the most vulnerable people – such as the plaintiffs in this case -- also reduces the burden on regional hospitals and health centers, which will otherwise bear the brunt of having to treat these individuals when infected, thus reducing the number of hospital beds and equipment available for the general population.

**VII.    Expert Disclosures**

49. None.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of March, 2020 in Washington, D.C.

Ranit Mishori, M.D, MHS, FAAFP

*Ranit Mishori* (signature)