UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:20-cv-21457-KMW

ANTHONY SWAIN, *et al.*,

    Plaintiffs,

v.

DANIEL JUNIOR, *et al.*,

    Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' EMERGENCY MOTION FOR A PRELIMINARY INUNCTION

**THIS MATTER** is before the Court on Plaintiffs' emergency motion for a preliminary injunction. (DE 3). Defendant Daniel Junior, in his official capacity as Director of the Miami-Dade Corrections and Rehabilitation Department ("MDCR"), and Defendant Miami-Dade County (collectively, "Defendants") oppose the motion. (DE 67; DE 65). This Order follows the telephonic preliminary injunction hearing held on April 27-28, 2020, at which both Parties presented argument and evidence for the Court's consideration. (DE 96; DE 97).[1] For the reasons set forth below, Plaintiffs' motion for a preliminary injunction (DE 3) is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' motion for immediate release under Section 2241 is **DENIED**; Plaintiffs' motion for a preliminary injunction under Section 1983 is **GRANTED IN PART** for a period of 45 days.

---

[1] In their reply brief, Plaintiffs for the first time request that this Court convene a three-judge panel pursuant to 18 U.S.C. § 3626(a)(3)(B), which states that "[i]n any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court." (DE 85 at 18-19). Because this issue was raised for the first time in the reply, the Court has not considered that portion of the brief and will not do so until Defendants have had the opportunity to respond to that argument. *See United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) ("Arguments raised for the first time in a reply brief are not properly before the reviewing court."); *United States v. Benz*, 740 F.2d 903, 916 (11th Cir. 1984) (same). Defendants may file a response addressing *only* Plaintiffs' motion to convene a three-judge panel by **May 11, 2020**.

## I.    BACKGROUND

Plaintiffs Anthony Swain, Alen Blanco, Bayardo Cruz, Ronniel Flores, Deondre Willis, Peter Bernal and Winfred Hill,[2] who are all pretrial detainees currently being held at Metro West Detention Center ("Metro West") in Miami, Florida, filed their complaint, along with an emergency motion for a temporary restraining order and preliminary injunction, against Defendants, on April 5, 2020. (DE 1; DE 3).  Plaintiffs present two primary claims in their complaint and emergency motion.[3]  First, Plaintiffs seek a preliminary injunction requiring Defendants to "follow several procedures, recommended by medical professionals and the CDC Guidance on the management of COVID-19 in jails and correctional settings, that ensure those detained at Metro West: 1) are informed about the existence of COVID-19; 2) can practice social distancing; 3) can maintain necessary hygiene; and 4) have access to adequate and timely medical treatment to screen, test, and treat symptoms." (DE 3 at 13).  This relief is sought pursuant to their claim under 42 U.S.C. § 1983.  Plaintiffs argue that "Defendants are deliberately indifferent to the risk that Plaintiffs will contract COVID-19 within the current conditions of Metro West in violation of the Eighth Amendment and Fourteenth Amendment's Due Process Clause."  *Id.* at 14.  Second, Plaintiffs seek a writ of habeas corpus under 28 U.S.C. § 2241 requiring the immediate release of a class of all medically vulnerable pretrial detainees currently held at Metro West. *Id.* at 13-14.

---

[2] It appears to be undisputed that named Plaintiff Winfred Hill was released on April 21, 2020.  (DE 81-2). Accordingly, his claims against Defendants are dismissed as moot.

[3] Plaintiffs seek class-wide relief on behalf of "all current and future persons detained at Metro West during the course of the COVID-19 pandemic." (DE 1 at 30). Their motion for class certification (DE 5) remains pending.

## A. PROCEDURAL BACKGROUND

After holding three telephonic conferences with the Parties over the two days immediately after this case was filed, the Court granted in part Plaintiffs' emergency motion and entered a temporary restraining order ("TRO") against Defendants on April 7, 2020. (DE 25).  This TRO addressed the conditions of confinement challenged in Plaintiffs' emergency motion, but did not address Plaintiffs' 2241 claim because the Court found that further information and briefing was necessary before reaching a preliminary decision on that claim.

As an initial matter, the Court ordered Defendants to provide the following information by April 9, 2020: (1) a list of individuals who met various criteria related to medical issues (as outlined in the order), and (2) "a notice describing the particular measures being employed to protect these individuals from the risk of COVID-19."  (DE 25 at 2).  Defendants complied with the Court's order and provided this information in a timely manner.  (DE 29; DE 30).  On April 9, 2020, the Court entered a paperless order (DE 28) setting a telephonic hearing to discuss an expedited briefing scheduling on Plaintiffs' claim for habeas relief and allowing the Parties to file supplemental briefing as to that claim ahead of the scheduling conference, which both Parties did.  (DE 35; DE 36).  The paperless order also required Plaintiffs to submit "a notice containing the following information as to each named Plaintiff: (1) criminal case number(s) for current charges; (3) statement of the charge(s); and (3) bond and status of bond."  (DE 28).  Plaintiffs timely submitted this information on April 12, 2020.  (DE 36).

After holding two additional telephonic hearings with the Parties, the Court entered an amended briefing schedule regarding Plaintiffs' emergency motion on April 14, 2020.

(DE 52).  This order required Defendants to respond to Plaintiffs' emergency motion by April 21, 2020, and Plaintiffs to file a reply by April 25, 2020.  *Id.*  The order also designated two doctors—one from each of the lists of candidates proposed by the Parties—to conduct an inspection of Metro West by April 18, 2020 and required a report to be filed outlining their observations as to the conditions and other factors contained in the order.  *Id.*  That joint report was filed under seal on April 20, 2020, and, with the consent of the Parties, the written portion of the report was unsealed on April 21, 2020 (the "Report").  (DE 61; DE 65).  The April 14, 2020 order also required that "[o]n April 16, 2020, and every three days going forward, Defendants shall file a notice with the Court listing the number of inmates and staff tested for COVID-19 at Metro West Detention Center, including the number whose test results were positive as of that date.  Defendants shall also provide information as to the number of inmates who are being quarantined each day and shall specify the numbers of individuals who: (1) are being quarantined as a result of exhibiting COVID-19 symptoms, and (2) are being quarantined as a result of possible exposure to another individual who has COVID-19."  (DE 52 at 3).[4]  As of April 28, 2020, 163 inmates and 17 staff tested positive for COVID-19.  (DE 99).

### B.  THE COVID-19 PANDEMIC

When this case was filed on April 5, 2020, no inmate at Metro West had tested positive for COVID-19.  By April 28, 2020, 163 inmates had tested positive.  (DE 99).  As of the date of this Order, the United States is home to more than one million coronavirus

---

[4] As of April 19, 2020, 15 inmates and 9 staff had tested positive for COVID-19 and over 300 inmates were being quarantined, either because they were exhibiting symptoms of the virus or because they had been exposed to someone who has tested positive for or is exhibiting symptoms of the virus. (DE 59).  As of April 22, 2020, 31 inmates and 14 staff tested positive for COVID-19.  (DE 72).  As of April 25, 2020, 159 inmates and 16 staff tested positive for COVID-19. (DE 87).

cases. This number represents nearly one-third of the world's reported COVID-19 cases and includes at least 58,000 known deaths.[5] *See* Joe Fox, *et al.*, *58,132 people have died from coronavirus in the U.S.*, WASH. POST, (Mar. 27, 2020, updated Apr. 29, 2020), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/. The one fact that is beyond peradventure is the unprecedented contagion of this virus and its potentially fatal consequences to medically vulnerable people, especially those living in dense congregate environments, such as assisted living facilities, detention centers and prisons. These extraordinary circumstances place us at the crossroads of public health and public safety, science and law, and constitutional and carceral demands and has occasioned judicial review in state and federal courts.

The following landscape is drawn from other orders that have been issued by courts addressing similar issues to those presented here. "COVID-19 is a disease caused by a novel coronavirus that began infecting humans in late 2019." *Money v. Pritzker*, No. 20-CV-2093, 2020 WL 1820660, at *2 (N.D. Ill. Apr. 10, 2020). "Symptoms include fever, cough, shortness of breath, congestion, sneezing, fatigue, and diarrhea." *Id.* (internal citations omitted). "While some cases are mild, others require medical intervention, including hospitalization and intensive care." *Id.* "The virus spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects." *Id.* "It is highly contagious." *Id.*

---

[5] Experts say these figures are likely underestimated. *See, e.g.*, Brittany Shammas, *U.S. Coronavirus death toll surpasses 50,000*, WASH. POST, (Apr. 24, 2020) https://www.washingtonpost.com/nation/2020/04/24/us-coronavirus-death-toll-surpasses-50000/ ("Experts have warned that the number of reported fatalities probably underestimates the true toll of covid-19 . . . [because] methods have varied widely from state to state. And the Centers for Disease Control and Prevention initially included only those who tested positive for the virus, even with strict limitations on testing.").

"Currently, there is no vaccine to protect against infection by COVID-19." *Id.* at 3. "To prevent infection and mitigate the spread of the virus, the Center for Disease Control ("CDC") and other public health agencies have universally prescribed social distancing— every person should remain at a distance of at least six feet from every other person—and rigorous hygiene—including regular and thorough hand washing with soap and water, the use of alcohol-based hand sanitizer, proper sneeze and cough etiquette, and frequent cleaning of all surfaces." *Id.* "The CDC recommends avoiding gatherings of more than 10 people." *Id.* "Individuals in congregate environments—places where people live, eat, and sleep in close proximity—face increased danger of contracting COVID-19, as demonstrated by the rapid spread of the virus through cruise ships and nursing homes." *Id.* "Despite social distancing recommendations, the disease has continued to spread [and] [t]he World Health Organization has declared COVID-19 to be a global pandemic." *Id.*

On March 27, 2020, the CDC issued guidance directed at institutional facilities to combat the spread of COVID-19. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/ downloads/guidance-correctional-detention.pdf ("CDC Guidance"). These guidelines formed the basis of the TRO issued on April 7, 2020.

Medical experts agree that a reduction in the population of correctional facilities is the best way to prevent the spread of COVID-19. The unrebutted testimony of all the experts cited by Plaintiffs—Doctors Golob, Meyer, Stern, Mishori, Greifinger, Chiao,

Rottnek, Paredes and Greer—is the importance of either social distancing[6] or reducing the population of inmates to better achieve social distancing (many call for both). (DE 80-14; DE 80-15; DE 80-16; DE 80-17; DE 80-18; DE 80-19; DE 80-20; DE 80-33; DE 80-34; DE 80-35). Moreover, the two expert physicians chosen to conduct an inspection of Metro West—Dr. Dushyantha Jayaweera and Dr. Hansel Tookes—concluded after their inspection on April 18, 2020, that "an urgent reduction in the population in this facility and increased screening for COVID19 infection among the staff and inmates" is necessary "to mitigate the spread of this infection within the community." (DE 70-1 at 1).[7] The Report also states that "[i]n our professional opinion, the high census of Metro West Detention Center in addition to the dormitory style housing units, makes it impossible to follow CDC guidance for social distancing measures, placing staff and inmates at risk for COVID-19 infection. We recommend an urgent decrease in the population density of the housing units to allow for adequate social distancing for the prevention of COVID-19." *Id.* And as

---

[6] One of the declarations submitted by Defendants was sworn by Dr. Aileen Marty, MD, a "Fellow of Infectious Disease, Pathology, and an international expert on Infection Prevention, mass gathering medicine, and outbreak response." (DE 65-10 at 1). Dr. Marty states in her declaration that "[t]he CDC's prevention practices for incarcerated/detained persons includes implementing social distancing strategies to increase the physical space between incarcerated/detained persons, 'ideally 6 feet between all individuals, regardless of the presence of symptoms.'" *Id.* at 4 (quoting CDC Guidance).

And while Dr. Marty goes on to suggest that "the widespread use of masks ameliorates to a substantial extent the need to maintain strict social distancing of six feet to mitigate against the spread of COVID-19," the CDC wholly disagrees. *Id.* at 6; *see Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html ("We now know from recent studies that a significant portion of individuals with coronavirus lack symptoms . . . and that even those who eventually develop symptoms . . . can transmit the virus to others before showing symptoms . . . In light of this new evidence, CDC recommends wearing cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) especially in areas of significant community-based transmission. "***It is critical to emphasize that maintaining 6-feet social distancing remains important to slowing the spread of the virus.***" (emphasis added).

[7] Most, if not all, experts also agree that jails and other detention facilities were not designed or equipped to handle a large-scale pandemic that spreads rapidly through populations in close quarters.

the CDC has acknowledged, "[a]lthough social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19." *CDC Guidance*, at 4.

## II.   LEGAL STANDARD

### A. PRELIMINARY INUNCTION

To obtain either a temporary restraining order or a preliminary injunction, a party must demonstrate that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). The Eleventh Circuit has characterized a preliminary injunction as an "extraordinary and drastic" remedy. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Plaintiffs bear "the 'burden of persuasion' to clearly establish all four" elements. *Wreal, LLC*, 840 F.3d at 1247 (quoting *Siegel*, 234 F.3d at 1176).

Although Plaintiffs bear the burden to make a clear showing as to each of the four elements, "none of the four prerequisites has a fixed quantitative value. Rather a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *State of Tex. v. Seatrain Intern.*, S.A., 518 F.2d 175, 180 (5th Cir. 1975). Thus, "when 'the balance of the equities [identified in the other three factors] weighs heavily in favor of granting the stay,'" an injunction may be proper even absent overwhelming evidence demonstrating a likelihood of success on the merits. *Garcia-Mir v. Meese*, 781 F.2d 1450,

1453 (11th Cir. 1986). As the Eleventh Circuit has recognized, "[a] showing of irreparable injury is 'the *sine qua non* of injunctive relief.'" *See Siegel*, 234 F.3d at 1176 (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

## B. Section 1983 Claim

Plaintiffs bring Count I of this action pursuant to 42 U.S.C. § 1983, which provides a private right of action against anyone who subjects any citizen of the United States, or other person within the jurisdiction thereof, to the deprivation of any rights or privileges secured by the Constitution and laws of the United States. *See Rehberg v. Paulk*, 566 U.S. 356 (2012). To succeed on a 1983 claim under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978), Plaintiffs "must show: (1) the violation of a federal right occurred; (2) the existence of a municipal policy or custom; and (3) a causal connection between the violation and the municipal policy or custom." *Watts v. City of Hollywood, Fla.*, 146 F. Supp. 3d 1254, 1270 (S.D. Fla. 2015) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The plaintiff must also show that the constitutional violation occurred "under color of State law." *Monell*, 436 U.S. at 683. A plaintiff seeking to hold a municipality liable for a constitutional violation "must identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cty*., 335 F.3d 1326, 1329 (11th Cir. 2003) (*en banc*).

## C. Section 2241 Claim

"Section 2241 provides that a writ of habeas corpus may issue to a prisoner . . . [who is] in custody in violation of the Constitution or laws or treaties of the United States."

9

*Medberry v. Crosby*, 351 F.3d 1049, 1059 (11th Cir. 2003) ("State pre-trial detention, for example, might violate the Constitution or the laws or treaties of the United States. . . . Such a prisoner would file an application for a writ of habeas corpus governed by § 2241."). The Eleventh Circuit has held that "the petition for writ of habeas corpus is the sole remedy for prisoners challenging the fact or duration of their imprisonment." *Gomez v. United States*, 899 F.2d 1124, 1125-26 (11th Cir. 1990) (citing *Preiser v. Rodriguez,* 411 U.S. 475, 504 (1973)).

"Prior to filing a habeas petition in federal court, a petitioner seeking relief from state custody must exhaust available state remedies." *Money*, 2020 WL 1820660, at *20; *see also Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015) (holding that courts reviewing Section 2241 petitions may not "disregard a failure to exhaust and grant relief on the merits if the respondent properly asserts the defense"). "The crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015). According to the Supreme Court, exhaustion requires that, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

"In general, a habeas petitioner must bring suit against the warden of the facility in which he is detained." *Money*, 2020 WL 1820660, at *21 (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434-35 (2004)). "As the Supreme Court has explained, '[t]he federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is "the person who has custody over [the petitioner]"' and '[t]he consistent use of the definite

10

article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition.'" *Id.* (citing 28 U.S.C. § 2242).

## III.   DISCUSSION

### A.   Plaintiffs' Section 1983 Claim

Plaintiffs challenge their conditions of confinement at Metro West during this pandemic pursuant to Section 1983.   They argue that Defendants are violating their constitutional rights by failing, at first instance, to require and then appropriately implement adequate safeguards to prevent and control the spread of COVID-19 throughout Metro West. Specifically, Plaintiffs contend that six different aspects of their confinement violate the Eighth Amendment: (1) lack of social distancing; (2) failure to provide adequate access to healthcare; (3) failure to provide sufficient hygiene supplies; (4) failure to institute screening protocols for those entering the facility; (5) failure to provide proper medical care for those who have COVID-19; and (6) failure to provide adequate information regarding COVID-19 to inmates.

Plaintiffs maintain that "[m]edically required social distancing is not possible with the current jail population at Metro West given its dormitory-style housing units." (DE 85 at 1).   And the doctors who inspected Metro West on April 18, 2020 pursuant to the Court's order both agreed.   The doctors concluded in the Report that "the high census of Metro West Detention Center in addition to the dormitory style housing units, makes it impossible to follow CDC guidance for social distancing measures, placing staff and inmates at risk for COVID-19 infection."   (DE 70-1 at 3).   The Report also notes that "[a]lmost all of the units inspected (except medical housing) were too overcrowded to allow for adequate social distancing."   *Id.* at 2.

### B. Plaintiffs' Evidence

In support of their contention that Defendants are not taking adequate steps to ensure COVID-19 does not continue spreading throughout Metro West, Plaintiffs have submitted twenty-one declarations, many of which were "taken from detained individuals who largely do not know each other, live in different units of Metro West, and who over several weeks have detailed specific, consistent, and widespread ways in which CDC Guidelines are not being followed, putting them at serious risk" of contracting COVID-19. (DE 85 at 3).

First, the Court notes that several of the declarations support the Report's finding that social distancing—a benchmark that all medical experts agree is necessary to control the rapid spread of the virus[8]—is impossible to achieve given the current population at Metro West.  Below is an overview of the common issues raised in multiple, if not all, of Plaintiffs' declarations from current and former inmates, including many of the named Plaintiffs, as to circumstances surrounding social distancing in Metro West.

- *Bunk beds/sleeping arrangements*

  - "Our bunk beds are about 2 or 2.5 feet apart." (DE 81-1 at 27).

  - "About a week ago, some guards came in and spread out the bunks to try to create more space in between them, but that did not work.

---

[8] According to the CDC, "[l]imiting face-to-face contact with others is the best way to reduce the spread of coronavirus disease 2019 (COVID-19)." *Social Distancing, Quarantine, and Isolation: Keep Your Distance to Slow the Spread*, (Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html ("COVID-19 spreads mainly among people who are in close contact (within about 6 feet) for a prolonged period. Spread happens when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose are launched into the air and land in the mouths or noses of people nearby. The droplets can also be inhaled into the lungs. Recent studies indicate that people who are infected but do not have symptoms likely also play a role in the spread of COVID-19.").

Most of our bunks are only two or three feet apart. I am about two feet from my bunkmate." (DE 81-1 at 34).

- o "The bunk next to me is close enough that I can reach out and touch it." (DE 81-1 at 50).

- *Bathrooms and showers*

  - o "It is also impossible to practice social distancing in the morning in the bathroom. This is because many people are trying to use the urinals at the same time. Many people are also trying to brush their teeth and wash their face at the same time." (DE 81-1 at 12).

  - o "The showers are only a couple feet across from the toilets. The sinks are just a few inches apart from each other. Certain times of the day, the bathroom gets very busy." (DE 81-1 at 35).

  - o "The toilets are just a foot apart from each other and are separated by a short piece of wood, a partition about five feet tall. There are no doors on the toilet stalls. The showers are directly across from the toilets, less than five feet away." (DE 81-1 at 40).

  - o "The bathroom will get very crowded, because we have 60 guys sharing one bathroom." (DE 81-1 at 41).

- *Telephones*

  - o "It is also impossible to practice social distancing while using the telephones as the telephones are close together." (DE 81-1 at 12).

  - o "I still have to use a sock when I talk on the phone. I have no access to any kind of disinfectant to wipe down the phone, the remote, the

water cooler, or anything else that is shared between inmates in the cell on a constant basis. The best I can do is take a paper towel, dip it in water, and wipe off high-touch areas." (DE 81-1 at 15).

o "Phones in the dorm are just a foot apart, maybe the length of three or four hands apart. Sometimes a lot of people are using phones at the same time, like late at night before bed." (DE 81-1 at 27).

- *Daily headcount*

o "During count, we are all made to stand in front of the racks on our bunk beds. We are all standing only 2.5 or 3 feet apart from each other during count, and we stand shoulder-to-shoulder with our bunkmates." (DE 81-1 at 27).

o "Officers require us to participate in headcount three times a day. During count, we line up in front of our bunks shoulder to shoulder with each other." (DE 81-1 at 60).

- *Clinic/medication distribution*

o "When we line up to get our medications each day, some nurses make us stand six feet apart in the line. But other nurses don't enforce that, so the inmates will line up close together." (DE 81-1 at 27).

o "The guards take the inmates down to medical in groups of 8 or 10 people at a time. In the clinic, we are sitting in chairs while we wait to see the doctor, shoulder-to-shoulder." (DE 81-1 at 56).

o "When I'm in the clinic, I interact with people from other cells . . . there's often six or more people down there at the same time from

14

other cells." (DE 81-1 at 61).

- *Food distribution*

  o "At mealtime, we line up to get our trays of food. We stand in line close together while we wait for the food to be ready. Some people eat at their bunks and other people eat at the tables. Mostly we are all within a few feet of each other while we eat." (DE 81-1 at 34).

  o "During meal times, we can eat anywhere. A lot of people eat at their bunk because the tables get crowded. You are literally on top of other people during meals." (DE 81-1 at 41).

- *Mandatory outdoor recreation*

  o "When the guards line us up to go outside for rec, we are all close together against the wall while the guards pat us down. We are not even a foot apart from each other. And then we all walk out to the yard, through the hallway and down the stairs in the stairwell, all bunched together." (DE 81-1 at 56).

  o "I am also very concerned because we are being forced to go to mandatory rec time with people who are in quarantined cells. We usually go to the yard with one other cell, which is separated from us only by a chain-link fence." (DE 81-1 at 61).

  o "Corrections continues to do pat downs when we go to rec, and they aren't changing gloves between people." (DE 81-1 at 62).

- *Inmate and staff movement between units*

  o "I worked in the kitchen until recently. I was directed by jail staff to

enter a quarantined unit to retrieve trays, and I refused." (DE 81-1 at 19).

o  "A guy who was COVID-19 positive was in my cell, and I think I was exposed to the virus. On April 20, along with 6 other inmates, this inmate was moved out of his dorm in 2A3, tested for COVID-19, and brought into my cell before he had gotten his COVID-19 test results back. A day and a half later, late in the day on April 21, this inmate learned he was positive for COVID-19. The guards removed him from my dorm." (DE 81-1 at 57).

o  "Trustees bring in food trays and commissary from outside the cell, and officers constantly travel in and out of the cell. The hallways are narrow, and we pass closely by people from other cells, within a couple of feet. There are also metal benches near the elevators that are packed with prisoners from different cells, often handcuffed to the bench for hours. When I am waiting to go down to the clinic in an elevator, I wait in that area." (DE 81-1 at 61).

Despite Defendants' efforts, which are described below, these declarations by inmates across a variety of housing units at Metro West corroborate the Report's conclusion that the social distancing required to curb the spread of the virus is simply not possible at Metro West without a dramatic, immediate reduction in the facility's population. (DE 70-1 at 1) (recommending "an urgent reduction in the population in this facility and increased screening for COVID19 infection among the staff and inmates to mitigate the spread of this infection within the community").

Next, many of the declarations suggest that some of the measures Defendants are taking and that were ordered by the TRO are not being implemented in a way that furthers the stated goal of reducing the spread of COVID-19.  As the Court in *Mays* remarked "establishing appropriate policies does not fully discharge the [Defendants'] constitutional obligations; a policy is only as good as its execution."  *Mays v. Dart*, No. 20-CV-2134, 2020 WL 1812381, at *9 (N.D. Ill. Apr. 9, 2020).

For example, Defendants say they provide all inmates and staff with masks and that these masks must be worn at all times.  The evidence presented by Plaintiffs, however, suggests that adherence to this directive is problematic.  (DE 81-1 at 12) ("Inmates receive masks about every seven days. However, some people have masks that break in two to three days."); (DE 81-1 at 35) ("The masks are like disposable paper cloths and are probably supposed to be disposed of every day . . . The masks are soft and rip a lot, and they get really dirty.").  By the end of the week, the masks are "dirty," "filthy" and "broken."  (DE 81-1 at 15) ("My mask is filthy after wearing it for more than a week non-stop, and it collects a lot of dust.").  According to the declarations, inmates are not always provided a new mask if their current mask breaks and may be chastised or threatened if they request a new one. (DE 81-1 at 15) ("I have asked officers for a new [mask], but my requests have been denied and the officer I asked got angry at me and told me I just need to take care of my mask because I'm not getting another one."); (DE 81-1 at 19) ("The masks rip easily and people are having to repair the masks using the straps from other masks or pieces of the gloves used by trustees when passing out food."); (DE 81-1 at 42) ("When the guards replaced our masks for the first time, I was in the shower and missed the opportunity to get a second mask. I asked my unit officer and the corporal

multiple times for a new mask, because inmates are not allowed to go into the common area in our dorm or outside to recreation without a mask. Those guards told me that the captain instructed them not to pass out any extra masks."); (DE 81-1 at 50) ("I was threatened by an officer that if my newest mask breaks, that I may receive a disciplinary write-up.").

Defendants have also represented that inmates at Metro West have "continual" access to some cleaning supplies, including disinfectants, to clean their personal spaces or shared items like chairs, tables and remotes.  None of the declarations Plaintiffs submitted suggest that is the case, and many of them directly contradict that assertion: "I have not been given personal cleaning supplies.  I have no way to disinfect my belongings or the high-touch surfaces I use in the dorm, like the phones and the water cooler." (DE 81-1 at 6); "We have not been given hand sanitizer. We also have not been given cleaning materials to clean our own area or belongings." (DE 81-1 at 35); "Only the trustees are given access to cleaning materials and disinfectants. If you wanted to take the initiative to clean your own personal area, you could not do that." (DE 81-1 at 42); "We are not provided with any disinfectant to clean high-touch areas between uses. In the 'day room,' where the tables and TVs are, we still share phones that are not cleaned between uses. The only time that cleaning solution is available is during shift change, and even then, it is only available to trustees, not to the rest of us. We cannot clean the shower between uses, and still have no disinfecting supplies available to us to clean the water cooler." (DE 81-1 at 60).

Finally, many of the declarations contend that inmates are not being provided with the expedient medical treatment that reducing the spread of the virus demands.  (DE 81-

1 at 39) ("I have put in about ten medical requests since I have been incarcerated to see a nurse. It takes a few days for the medical clinic to respond to a medical request."); (DE 81-1 at 45) ("I put in about three requests for medical attention through sick calls while I was incarcerated. It would take about three days to get medical attention after placing the sick call.").

As to the availability of state court procedures for securing inmates' release in light of the unprecedented pandemic society is facing, Plaintiffs submit declarations from three different criminal defense attorneys who represent three of the named Plaintiffs in their underlying criminal cases. These lawyers testified that they have been unable to successfully petition for release on bond for their clients, having had their motions summarily denied without the opportunity for a hearing or to present additional evidence to the state court.[9] (DE 81-6; DE 81-7; DE 81-8).

### C. Defendants' Evidence

Defendants, relying on numerous declarations from Metro West officials, argue that

---

[9] Frank E. Gil represents named Plaintiff Ronniel Martinez-Flores in his state court criminal case. Mr. Gil testified that he has "filed three motions to modify conditions of bond; on February 3, 2020, February 21, 2020, and April 2, 2020 that were ordered for Mr. Martinez-Flores, specifically requesting that the House Arrest condition be removed and his monetary bond modified. This would allow Mr. Martinez-Flores's family to post bond to secure his release." (DE 81-8 at 2). He further stated each of his motions was "denied . . . [t]he last being summarily denied without a hearing, apparently due to procedures adopted by the Eleventh Judicial Circuit Court of Florida in light of the COVID-19 pandemic." *Id.*

Carlos Fleites represents named Plaintiff Alen Blanco in his state court criminal case. Mr. Fleites testified that he filed a "motion to set bond on March 16, 2020 in light of the COVID-19 pandemic, due to Mr. Blanco's increased susceptibility to the virus and the hardships that my client's pretrial incarceration places on him and his family." (DE 81-7 at 2). The motion was "denied without the opportunity to present evidence on the record." *Id.*

Theodore Mastos represents named Plaintiff Deondre Willis in his state court criminal cases. He testified that he has "filed multiple release motions including an 'Emergency Motion for Release from Custody' on April 7, 2020 in light of the COVID-19 pandemic. Because of the coronavirus pandemic and the conditions in Metro West Detention Center, my client and his family are deeply concerned about his wellbeing." (DE 81-6 at 2). According to Mr. Mastos, each of his motions was "summarily denied without a hearing." *Id.*

the measures they have implemented in response to the COVID-19 pandemic are more than sufficient to safeguard the health and safety of the inmates and staff at Metro West. Defendants' response in opposition contains numerous declarations from Metro West officials attesting to the measures implemented in the facility.[10]  These measures include, among other things (1) encouraging social distancing by all inmates and staff throughout Metro West; (2) requiring staff and inmates to wear face masks at all times (other than when sleeping); (3) conducting screening for all staff entering the facility; (4) conducting daily temperature screenings for all inmates; (5) suspending all outside visitation; and (6) providing disinfecting and hygiene supplies to all inmates.

In support of their arguments, Defendants submitted affidavits from Director Daniel Junior; Captain Safani Summons; Director Edith Wright, RN; Dr. Reggie Egins, MD; Dr. Aileen Marty, MD, FCAP; Corporals Bridgett Johnsons and Nicole Pieze; and Officers Patricia Delancy, Jasmine Mayo, and Beatrice Almonor. The various affidavits and accompanying exhibits describe Defendants' response to COVID-19 at Metro West as follows.

- *Provision of antibacterial and hygiene materials*
  - ○ "Inmates are provided bars of body soap for personal use and additional soap is available in each housing unit for replacement. Inmates are not limited in the number of bars of soap they can request; soap is free to the inmates." (DE 65-1 at 6).
  - ○ "Hand sanitizer dispensers have been installed at the ingress and egress area of MWDC and staff are permitted to bring personal hand

---

[10] As noted elsewhere in this Order, many of these measures were implemented after the lawsuit was filed.

sanitizers for use throughout their shift." (DE 65-1 at 6).

- o "There are operating washing/dryer machines in each unit . . . with the laundry detergent supplied inside the housing unit and provided through an automatic dispenser that is refilled, at a minimum, every two weeks and more often if needed." (DE 65-1 at 6).

- *Provision of cleaning materials*
  - o "Each housing unit is supplied with sufficient cleaning materials for the bathroom and general areas. Bathroom and showers are cleaned twice daily with industrial grade disinfectants by inmate workers assigned to each housing unit. Cleaning supplies are located in the housing units during all three shifts, providing inmates continual access to these supplies. All inmates have access to cleaning supplies (not just inmate workers) and can use them on a more frequent basis, if desired. These cleaning supplies, which are industrial grade and are peroxide/bleach based, are refreshed on each shift." (DE 65-1 at 6-7).
  - o "MWDC utilizes 6 utility fogging machines, which were purchased in mid-March, 2020, to sanitize housing units one time a week. This is done in addition to the general cleaning that is done twice a week by MDCR staff and the cleanings that are done on each shift; there are three shifts every 24 hour period. High-touch areas that are cleaned on each shift include: dayrooms, tables, chairs, sinks, telephones, and door handles." (DE 65-1 at 7).

- *Personal protective equipment*
  - "As of April 3, 2020, personal protective masks were provided to all inmates and are currently mandated for inmate use." (DE 65-1 at 7).
  - "MDCR staff have all been provided with N95 masks and gloves for use while on duty." (DE 65-5 at 2).
  - "[A]ll MDCR staff are required to wear their issued personal protective masks throughout their entire shift." (DE 65-1 at 7).

- *Bunk beds/sleeping arrangements*
  - "To allow for social distancing, bunk beds are staggered." (DE 65-2 at 4).
  - "Where inmates are sleeping in bunk beds, they are instructed to sleep in staggered formation, head to toe, which creates social distancing of more than six feet between heads." (DE 65-2 at 4).

- *Screening and tracking*
  - "On March 30, 2020, MDCR established the COVID-19 Incident Command Center and a Response Line." (DE 65-1 at 16).
  - "On April 11, 2020, CHS began taking temperatures of inmates with chronic conditions or over the age of 60. That process has now been expanded. . . . Commencing today, all inmates, regardless of medical history, will receive daily temperature checks . . . ." (DE 65-1 at 19-20).
  - "Any inmate showing symptoms of COVID-19 is removed from his housing unit and placed in the medical isolation unit at TGK, where

22

he is tended to medically and his temperature is taken twice daily. If serious symptoms develop, they are taken to a hospital." (DE 65-1 at 20).

o   "As of April 10, 2020, CHS now has the capability to collect swab specimens for COVID-19 onsite at all facilities. If an inmate tests positive, he will be evaluated and treated until he has not had a fever for at least seventy-two (72) hours (and without relying on fever reducer medication), his symptoms have all subsided, and a minimum of seven (7) days has passed since the first symptoms appeared. If an inmate tests negative, he will be monitored until his symptoms resolve and then he will be sent back to MWDC." (DE 65-1 at 20).

o   "If there is a case of suspected COVID-19 in a housing unit at MWDC, the inmate is removed and placed in medical isolation and the entire housing unit will begin a 14-day quarantine period, be tested for COVID-19, and monitored daily by CHS medical staff." (DE 65-1 at 20).

- *Access to information*
  o   "MDCR conducted meetings with inmate unit/cell representatives from MWDC inmate housing units on March 18, 2020 to discuss COVID-19 related concerns. Inmate cell representatives were provided information about COVID-19 including symptomology, importance of handwashing and social distancing." (DE 65-1 at 13).
  o   "Posters have been posted in all housing units in English, Creole and

23

Spanish that encourage social distancing and proper hygiene. Posters have pictures for those with literacy issues. Information about COVID-19 has also been provided directly to inmates verbally by MDCR and CHS staff." (DE 65-1 at 14).

- *Mandatory outdoor recreation*

  o "Mindful of social distancing, and to help curb the possible spread of COVID-19, all inmates from a particular housing unit go to the recreation area together, and no other housing units are allowed to visit that area at the same time." (DE 65-1 at 10).

  o "After the recreation time has elapsed, areas that are touched by inmates (e.g., pull-up bar) are cleaned and wiped down with EPA-approved disinfectant solutions by MDCR staff before another housing unit begins its recreational time." (DE 65-1 at 10).

  o "Effective April 16, 2020, . . . recreational activities that require frequent personal or shared contact between inmates (e.g., basketball) have been discontinued until further notice." (DE 65-1 at 22).

- *Inmate and staff movement*

  o "All individuals entering MWDC, including inmates, correctional officers, civilian employees, vendors and medical personnel, are screened, including temperature checks, prior to entering the Facility. Masks are provided to the arrestees at the time of intake." (DE 65-1 at 9).

○ "Staff are screened prior to beginning their shift and are identified with bright green wristbands to indicate they have been successfully screened. Anyone not feeling well or exhibiting a fever or other symptoms is prohibited from entering detention facilities and such individuals are directed to seek medical attention." (DE 65-1 at 9).

○ "[I]nmate movement has been limited since March 12, 2020. The only exception (other than when immediate medical care is needed) is for inmate recreation time . . ." (DE 65-1 at 9-10).

○ "Inmates are required to wear a mask at virtually all times, unless sleeping or quietly sitting on their bunks." (DE 65-2 at 3).

○ "Effective April 16, 2020, . . . inmate meals will be staggered, or inmates may be permitted to eat on their bunks or in their rooms to eliminate congregating during meal time." (DE 65-1 at 22).

On April 27, 2020, Defendants submitted supplemental affidavits for Director Daniel Junior, Director Edith Wright, RN, and Dr. Reggie Egins, MD to provide an update to the information initially provided. According to the supplemental materials, the process of reducing the inmate population remains ongoing and Metro West is operating more than 30% below its inmate capacity. (DE 92-2 at 5). Director Junior maintains that Defendants have voluntarily exceeded the measures imposed by the Court's TRO, "including but not limited to, testing of asymptomatic inmates and staff who have been identified as a potential close contact of a positive case, daily monitoring and temperature checks of all inmates in the housing units, quarantining of new arrestees, and the purchase of additional air filtration technology." (*Id.* at 3). Additionally, "[a]s of April 20, 2020, all inmates are

issued two (2) masks per week, and all inmates who have tested positive for COVID-19 are issued new masks daily." (*Id.* at 4). Notwithstanding the Defendants' opposition to the TRO, Director Junior states that "MDCR will not discontinue any of the requirements in the TRO in the absence of a court order." (*Id.* at 3).

During the second day of the telephonic preliminary injunction hearing, Defendants called state circuit court administrative Judge Nushin G. Sayfie as a witness to testify regarding the procedures in the criminal divisions of the Eleventh Judicial Circuit Court of Florida surrounding COVID-19.[11] Judge Sayfie oversees the felony criminal court divisions, which includes 25 judges, 19 regular divisions and various special divisions, including the bond hearing division. Judge Sayfie testified that as early as March 9, 2020, she began mobilizing the judges in her divisions to prepare for the rapidly changing situation brought about by COVID-19. She also recounted that remote courtrooms have been established to continue holding virtual hearings, that orders are now being signed electronically, and that motions may be submitted via email to the state court criminal judges.

Judge Sayfie testified that judges in the criminal divisions have been reviewing requests for release and entering release orders continuously and immediately since the onset of COVID-19. Judge Sayfie acknowledged that while there is no way to numerically catalog which release orders are predicated on COVID-19 factors and which are being entered in the normal course of business, she believed that a significant number of release orders issued in the past month are related to the pandemic. Based on her testimony and

---

[11] The Court heard Judge Sayfie's testimony over Plaintiffs' objection on the basis that she had not been disclosed as a witness and Defendants had not given them any notice that she might be testifying.

that of Director Junior, it is clear that in the past six weeks the inmate population at Metro West has been reduced from its "normal" level.[12]

But whether this reduction is sufficient to protect Plaintiffs' constitutional rights remains a question before this Court. Hopefully, it can be answered by the continued adherence to the CDC guidelines set forth in the Court's order and the reports issued by Metro West pursuant to that order.[13]

### D. Defendants' Legal Arguments

First, the Court recognizes Defendants' ongoing efforts to respond to an unprecedented pandemic that has created uncertainty and fear for everyone. As many other courts have recently noted when addressing the complex legal issues arising from this emergency situation, "operating and administering a very large physical facility . . is an extraordinarily difficult task." *Mays*, 2020 WL 1812381, at *1 (N.D. Ill. Apr. 9, 2020).

---

[12] In their Response (DE 67) Defendants also represented that as a result of the joint effort between the SAO and PD's Offices, MDCR has released over 624 inmates to either house arrest, pretrial, or early sentence release. The Court requested that Defendants provide a detailed description of this "joint effort." Defendants provided a sample of the orders it receives on a daily basis authorizing release. (DE 90-3). The Court reviewed the 105 orders and found the following. 12 of the orders were for the transport of defendants to Central Intake (5), Mercy Hospital-Behavioral Unit (3), Caroline Housing (1), New Hope CORPS (1), Here's Help (1), and Miami Behavioral Center (Crisis) (1). Many specified that upon completion of assessments and recommendations, defendants are to be returned to the custody of Miami Dade Corrections and Rehabilitation Department. 31 of the defendants in the sample provided were granted some form of home confinement. 27 of the defendants were released on their own recognizance or received some form of bond or bond modification (of these 27, 9 related to quashed fugitive warrants, like those that Judge Sayfie mentioned in her testimony). 8 of the defendants were released into pretrial services. At least 3 defendants had their sentences mitigated/commuted. Finally, various orders within the sample were unrelated to the release of inmates, *e.g.*, requesting defendant be held in protective custody. Indeed, one order directed the return of a defendant from Mercy Hospital Behavioral Unit to the Department of Corrections. Although only 4 of the orders addressed release in light of COVID-19, the Court has now heard from Judge Sayfie and credits her assessment that many of these orders are a result of the state court's "hyper focus" on release because of the health risk presented at the jail. The Court also makes this finding based on the 2 additional administrative orders Defendants submitted on April 27, 2020, prior to Judge Sayfie's testimony. (DE 94).

[13] Although Defendants stated several times in their briefing and during the preliminary injunction hearing that they would already have taken the measures contained in the Court's TRO of their own volition, the Court notes that the information regarding positive COVID-19 cases was not made available to the public until the Court ordered that it be provided.

"Operating the Jail, even under normal circumstances, is a very challenging task that occupies a large, full-time staff of policymakers, subject matter experts, and front-line correctional officers, medical and mental health workers, counselors, and others." *Id.* And we are not, of course, experiencing "normal circumstances." *Id.* "Fashioning a public policy and public health response to the coronavirus pandemic has challenged government officials across our country and throughout the world, who are facing a crisis unlike any we have faced for decades, and perhaps generations." *Id.* "The task is no less difficult, and no less unfamiliar, for administrators of jails." *Id.* But the fact that Metro West, and society as a whole, are facing extraordinarily difficult circumstances "does not mean, however, that constitutional protections fall by the wayside." *Id.* at 2.

### 1. Exhaustion under the PLRA

The Court first addresses Defendants' argument that Plaintiffs' 1983 claim must be dismissed for failure to exhaust administrative remedies.[14] Although this contention will be fully considered after Defendants' motion to dismiss (DE 66) is ripe, the Court addresses it here only to note that it is not an issue to be decided at the preliminary injunction stage.[15] Rather, the Supreme Court has held that under the PLRA, courts must

---

[14] In addition to their response in opposition to Plaintiffs' emergency motion for a preliminary injunction, Defendants also filed a motion to dismiss Count I (Plaintiffs' 1983 claim) for failure to exhaust administrative remedies on April 21, 2020, which they purported to incorporate fully into their Response. (DE 66). Although the Parties at the hearing on April 27, 2020, expressed confusion as to whether this motion would be taken up by the Court simultaneously with the preliminary injunction motion, the Court clarified that it is not yet addressing the arguments contained in the motion to dismiss. First, Defendants have not properly raised the issues in the motion to dismiss with the Court by attempting to incorporate their entire motion in their Response. Moreover, although Plaintiffs characterized their reply brief as a "consolidated reply" that addressed, among other things, "arguments raised in Defendants' Motion to Dismiss," during the hearing Plaintiffs' counsel expressed an expectation that they would file a formal response to the motion to dismiss. That response is due **May 5, 2020** and Defendants' reply is due **May 12, 2020**.

[15] The exhaustion provision of the Prison Litigation Reform Act of 1995 ("PLRA") states: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available

"regard exhaustion as an affirmative defense," not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 212 (2007) ("Federal Rule of Civil Procedure 8(a) requires simply a 'short and plain statement of the claim' in a complaint, while Rule 8(c) identifies a nonexhaustive list of affirmative defenses that must be pleaded in response. The PLRA itself is not a source of a prisoner's claim; claims covered by the PLRA are typically brought under 42 U.S.C. § 1983, which does not require exhaustion at all . . . This is strong evidence that the usual practice should be followed, and the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense.") (citing *Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 516 (1982)).

Further, Defendants acknowledge that a person "need only exhaust those remedies that are 'available' to him." (DE 66 at 2) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016)).   And there is both a factual dispute regarding whether and to what extent grievance forms were available to inmates to voice their concerns about COVID-19 at Metro West[16] and a legal dispute regarding whether this type of administrative exhaustion may be considered "unavailable" because of exigent circumstances.  *See Fletcher v. Menard Corr. Ctr.*, 623 F.3d 1171, 1173 (7th Cir. 2010) ("If a prisoner has been placed in imminent danger of serious physical injury by an act that violates his constitutional rights, administrative remedies that offer no possible relief in time to prevent the imminent danger from becoming an actual harm can't be thought available.").  But, as noted above, the

---

are exhausted."  42 U.S.C. § 1997e(a).

[16] While Defendants contend that grievance forms have continually been made available to inmates at Metro West, several named Plaintiffs state in their declarations that they were unable to obtain grievance forms when requested. During the telephonic preliminary injunction hearing on April 27, 2020, named Plaintiff Alen Blanco testified that he was not given a grievance form until April 2, 2020, even though he requested forms from officers at Metro West on March 31 and April 1, 2020.

Court will not resolve this factual dispute at this stage because exhaustion in the 1983 context is an affirmative defense.[17]  *See Bryant v. Rich*, 530 F.3d 1368, 1374-75 (11th Cir. 2008) ("Because exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits, an exhaustion defense should be raised in a motion to dismiss.") (internal quotations omitted).

### 2. *Mootness and Voluntary Cessation Exception*

Defendants cite the Eleventh Circuit case *Keohane* for the proposition that Plaintiffs' claim for injunctive relief is moot because "MDCR has already implemented, and has consistently maintained in place, all of the measures ordered by this Court in its TRO." (DE 67 at 27); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). *Keohane*, however, is readily distinguished from the present case because: (1) the district court issued a permanent injunction after a bench trial; (2) *Keohane* involved the formal repeal of an unambiguous policy; and (3) the medical community and all parties agreed on the necessary course of treatment for plaintiff's medical needs.  It is an undisputed fact in the record that all the medical experts agree that a reduction in the prison population is necessary to contain the spread of COVID-19.

The *Keohane* court explained that, in determining whether a plaintiff has met its burden to establish that a challenge is not moot, courts must look to "three broad factors":

---

[17] During the telephonic preliminary injunction hearing on April 27, 2020, the Parties also discussed a recent case decided by the Fifth Circuit, *Valentine v. Collier*, No. 20-20207 (5th Cir. Apr. 22, 2020). There, the Fifth Circuit stayed an order granting injunctive relief to a class of petitioners on the basis that the district court's order was not "narrowly drawn or the least intrusive means available," would be too administratively burdensome on the Texas Department of Criminal Justice and inappropriately enjoined the state to follow state law. *Id.* at 14 (internal quotations omitted).  This case is inapposite because, in addition to the different factual record and procedural posture, the Fifth Circuit's opinion relied on a discussion of exhaustion under the PLRA that does not appear to be consonant with *Jones*.  As discussed above, the Supreme Court has held that exhaustion under the PLRA is an affirmative defense, not a pleading requirement. *Jones*, 549 U.S. at 212.

(1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction"; (2) "whether the government's decision to terminate the challenged conduct was unambiguous"; and (3) "whether the government has consistently maintained its commitment to the new policy." *Keohane*, 952 F.3d at 1268 (citing *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1256 (11th Cir. 2017) (*en banc*)) (internal quotations omitted).

Here, after weighing these three factors, the Court finds that, even assuming Defendants are in full compliance with the Court's TRO (which is highly disputed), the voluntary cessation exception to mootness would nonetheless apply because: (1) the measures taken by Defendants to curb the spread of COVID-19 at Metro West appear to have been initiated, to some degree, by this litigation given the timing of their implementation; (2) there is no formal policy indicating that the decision to implement these measures and terminate Defendants' previous conduct was "unambiguous" and permanent; and (3) the pace at which this case and the conditions at Metro West have evolved have not provided an opportunity for Defendants to demonstrate whether they are committed to maintaining these new, informal policies and procedures—meaning the Court cannot weigh the third factor one way or another. *See Mays*, No. 20-CV-2134 (N.D. Ill. Apr. 27, 2020) (DE 73 at 58-59) ("Although the Sheriff appears to have complied with the TRO, the Court cannot say that the constitutional violations the Court sought to address will not recur absent an extension of the TRO's requirements. The Sheriff's actions to develop policies on sanitation and coronavirus testing, distribute soap and cleaning supplies, and distribute facemasks to detained persons who are quarantined—at least those done after the April 9 TRO—cannot be said to have been undertaken entirely

voluntarily."); *see also United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009) ("The court may consider how easily former practices might be resumed at any time in determining the appropriateness of injunctive relief.").

### 3. Requirements under Monell

Defendants also contend Plaintiffs are not entitled to a preliminary injunction because they have not shown that the County "has a custom or practice of permitting the constitutional violation" and have not "identif[ied] a final policymaker," as required to prevail on a 1983 claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). (DE 67 at 24-25). A plaintiff seeking to hold a municipality liable for a constitutional violation "must identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329. At the preliminary injunction stage, however, Plaintiffs are not required to "prove a custom" or "identify a final policymaker."[18] *See, e.g., Groden v. City of Dallas*, 826 F.3d 280, 283 n.3 (5th Cir. 2016) (noting that "no circuit has held that plaintiffs must, as a pleading requirement, identify the policymaker").

Moreover, the Eleventh Circuit has found that "a municipality can be held liable 'on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority.'" *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (quoting *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002). "So not all

---

[18] Similarly premature is Defendants' contention that Plaintiffs have failed to "provide evidence of a single constitutional right that the County has actually been held to have violated or admitted to have violated." (DE 67 at 25). The Court fails to understand how the County could be "held to have violated" any of Plaintiffs' constitutional rights when this matter is at the preliminary injunction stage.

theories of municipal liability under § 1983 require (or depend on) a single final policymaker." *Id.* The Court in *Hoefling* went on to hold that "identifying and proving that a final policymaker acted on behalf of a municipality is 'an evidentiary standard, and not a pleading requirement.'" *Hoefling*, 811 F.3d at 1280 ("Although Mr. Hoefling may ultimately have to identify (and provide proof concerning) a single final policymaker in order to survive summary judgment or prevail at trial . . . we do not think that he had to name that person in his complaint in order to survive a Rule 12(b)(6) motion. All he needed to do was allege a policy, practice, or custom of the City.") (quoting *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510 (2002)).

Simply put, Defendants' assertion that Plaintiffs must "prove" every element of their 1983 claim under the standards in *Monell* before they are entitled to injunctive relief is misplaced. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing."). And as to the constitutional violation prong of *Monell*, Plaintiffs have demonstrated a likelihood of success as to their Eighth Amendment deliberate indifference claim, as discussed below.

### 4. Preliminary Injunction as to Plaintiffs' 1983 Claim

It is clear that there remain several factual disputes regarding the extent to which Defendants' stated policies to protect inmates and staff from COVID-19 are being

implemented and enforced.  And where, as here, the medical reality is rapidly evolving and lives are at stake, accurate information about the implementation of those stated policies is critical.  *See Mays*, No. 20-CV-2134 (N.D. Ill. Apr. 27, 2020) (DE 73 at 62) ("[F]rom a constitutional-law standpoint, it is difficult to believe that 'do what you can, but if you can't, so be it' satisfies a jailer's constitutional obligation to . . . mitigate known risks to the life and health of people in his custody who are detained awaiting determination of their guilt or innocence.").  What is not in dispute is the medical evidence and testimony from numerous doctors that other measures—absent social distancing—are not alone sufficient to stop the spread of the virus.[19]  Also unrebutted is the fact that over the brief course of this litigation, which began April 5, 2020, the rate of inmate infections has increased dramatically—inmate infections at Metro West have increased by approximately 994% so far this month.

---

[19] The declarations from doctors submitted by Plaintiffs are uniform in their recommendation that a reduction in population is necessary to reduce the spread of COVID-19 and allow for adequate social distancing measures.  *See* (DE 80-33 at 3) ("Upon reviewing the April 18, 2020 Inspection Report and noting the upward tick of positive cases within the jail, I must concur with the report's overarching recommendation to reduce the population of the jail to prevent further spread of the virus. It is clear from this report that though the officials and staff of the Metro West Detention Center seem to be attempting to comply with the conditions in the temporary restraining order, the number of people in each cell in this jail environment make it impossible to provide the adequate distance and protections necessary to prevent an outbreak at Metro West."); (DE 1-5 at 8) ("Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large."); (DE 1-9 at 3) ("For detainees who are at high risk of serious illness or death should they contract the COVID-19 virus, release from detention is a critically important way to meaningfully mitigate that risk. Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility."); (DE 1-10 at 15) ("Even with the best-laid plans to address the spread of Coronavirus in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my professional opinion, the only viable public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of an effective vaccine for prevention or effective treatment for the disease at this stage. My professional opinion is consistent with the view of the medical profession as a whole that there are no conditions of confinement in carceral settings that can adequately manage the serious risk of harm for high-risk individuals during the COVID-19 pandemic."); (DE 1-12 at 10) ("Reducing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for [those] who . . . are housed and work within those facilities and for the community at large.").

Thus, even if the Court were to credit all of Defendants' evidence at this stage and discount the factual disputes about the implementation of Defendants' policies and procedures, Plaintiffs have nonetheless made a clear showing as to each of the four factors required for injunctive relief on their Eighth Amendment claim. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."); *see also Mays*, (DE 73 at 58-59) (entering a preliminary injunction against the Cook County Sheriff and noting that "the ongoing risk to detained persons at the Jail, confirmed by increases in the number who have tested positive for coronavirus and the death of six detained persons from coronavirus disease as of April 23, is the backdrop against which the Court must view the Sheriff's conduct"). Because they have demonstrated that the lack of social distancing—which has not been and cannot be achieved absent an additional reduction in Metro West's population or some other measure to achieve meaningful social distancing—and the issues attendant to effectively implementing CDC standards present an immediate, ongoing risk of harm to Plaintiffs, they have met their burden. *See, e.g.*, *FHR TB, LLC v. TB Isle Resort, LP*, 865 F. Supp. 2d 1172, 1192 (S.D. Fla. 2011) ("When the moving party is seeking a mandatory injunction, it faces 'a particularly heavy burden of persuasion' . . . Moreover, if the requested injunction is mandatory, then [the movant's] burden is elevated to making a 'clear' showing on each of the four elements (instead of proceeding under a preponderance of the evidence standard)."). The Court discusses the four factors necessary for the entry of a preliminary injunction below.

### i. Plaintiffs have shown a substantial likelihood of success on the merits of their Section 1983 claim

"Controlling precedent is clear that injunctive relief may not be granted unless the plaintiff establishes the substantial likelihood of success criterion."  *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).  With respect to their first claim, the Emergency Motion seeks injunctive relief for violations of Plaintiffs' rights under the Eighth and Fourteenth Amendments.[20]  The crux of the issue before the Court is whether "the conditions and procedures at Metro West to address COVID-19 show a deliberate indifference to the risk of serious and immediate harm to Plaintiffs."  (DE 67 at 13).

"The Eighth Amendment can give rise to claims challenging specific conditions of confinement, the excessive use of force, and the deliberate indifference to a prisoner's medical needs."  *Thomas v. Bryant*, 614 F.3d 1288, 1303-04 (11th Cir. 2010); *see also Fernandez v. United States*, 941 F.2d 1488, 1494 (11th Cir. 1991) ("To establish a valid eighth amendment claim, 'a prisoner must allege acts or omissions sufficiently harmful to evidence [the] deliberate indifference [of prison officials] to [his] serious medical needs.'") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)); *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (*en banc*) ("The subjective element of an Eighth Amendment claim for injunctive relief requires not only that [the plaintiff] show that the treatment she received was constitutionally inadequate, but also that the DOC was—and continues to be— deliberately indifferent to her serious risk of harm.").  "The Fourteenth Amendment protects

---

[20] The Court agrees with Defendants that "[b]ecause Plaintiffs are pretrial detainees, their claims technically arise under the Fourteenth Amendment, but the same Eighth Amendment caselaw and scrutiny applies." (DE 67 at 11, n.8) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009)).

pretrial detainees, who are entitled to a constitutional presumption of innocence, from being held in conditions that amount to punishment."  *Mays*, No. 2020 WL 1812381, at *7 (citing *Miranda v. County of Lake*, 900 F.3d 335, 350-51 (7th Cir. 2018)).

Here, even considering the measures Defendants have adopted—and setting aside the numerous factual disputes as to the consistency and efficacy of those measures—the record nonetheless can be seen to demonstrate deliberate indifference to a serious risk of harm to Plaintiffs.  *See Helling*, 509 U.S. at 33, 35 (holding, in the context of an Eighth Amendment deliberate indifference claim, that "exposure of inmates to a serious, communicable disease" that poses a risk of future harm is a deprivation sufficiently serious to invoke constitutional protections).  Defendants' contention that the actions they have taken to date are sufficient is belied by the exponential rate of infection since this case commenced: as of April 5, 2020, when Plaintiffs filed their emergency motion, there were no publicly known cases of inmates with COVID-19 within Metro West; as of April 28, 2020, 163 inmates have tested positive.  And given the prevalence of asymptomatic hosts of the virus, the actual number is likely significantly higher.[21]  Moreover, the evidence adduced in the case shows that inmates at Metro West are not able to achieve meaningful social distancing and that the experts agree social distancing is a critical step in preventing or flattening the rate of contagion.

Several of the affidavits submitted by Plaintiffs from either current or recent Metro

---

[21] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. TIMES (Mar. 31, 2020, updated Apr. 20, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html ("As many as 25 percent of people infected with the new coronavirus may not show symptoms, the director of the Centers for Disease Control and Prevention warns [and] . . . the high level of symptom-free cases is leading the C.D.C. to consider broadening its guidelines on who should wear masks.").

West inmates indicate that social distancing is either not possible (such as when inmates are lying on their bunks 2-3 feet away from another bunk; when inmates are on the phones, which are stationary and one or two feet apart; when inmates are in the bathroom because the toilets and showers are all generally less than 6 feet apart; or when dozens of inmates are attempting to view one television) or is not uniformly enforced (such as when inmates line up to receive food and eat together in their unit; when inmates line up for headcount; when inmates line up outside the clinic to receive medication; and when inmates participate in mandatory outdoor recreation once a week).

Thus, Plaintiffs have met both the subjective and objective components of the Eighth Amendment's deliberate indifference analysis.[22]  *See Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 22, 2020) (DE 22 at 16) ("Petitioners obviously satisfy this [objective] component. At this moment a deadly virus is spreading amongst Elkton's population and staff. For infected inmates, the virus can lead to pneumonia. In the worse pneumonia cases, COVID-19 victims suffer diminishing oxygen absorption, with resulting organ failure leading to death. Victims choke to death. While not every inmate who contracts the virus will die, the subclass members are at a much greater risk of doing so. They have a very serious medical need to be protected from the virus.").

The court in *Wilson* found that Plaintiffs had satisfied the subjective component of

---

[22] Although "Plaintiffs preserve the argument that the subjective component of the standard is not required for presumptively innocent pretrial detainees after *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015) (requiring pretrial detainees need only show the objective prong of the 'deliberate indifference' test in excessive force context)," they acknowledge that "the Eleventh Circuit's decision in *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (holding that pretrial detainee still must show the officer's subjective knowledge of a risk of harm in cases involving a claim of inadequate medical treatment), created a circuit split." (DE 85 at 17, n.19). The Court need not resolve the issue here because it finds that Plaintiffs have met both the subjective and objective components of the analysis.

their Eighth Amendment claim at the preliminary injunction stage because, like here, the defendant has "failed to separate its inmates at least six feet apart, despite clear CDC guidance for some time that such measures are necessary to stop the spread and save lives." *Wilson*, (DE 22 at 16); *see also Farmer v. Brennan*, 511 U.S. 825, 846 n.9 (1994) ("If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness . . ."); *Basank v. Decker*, No. 20 CIV. 2518, 2020 WL 1953847, at *11 (S.D.N.Y. Apr. 23, 2020) (noting that "confining vulnerable individuals without enforcement of requisite social distancing and without specific measures to protect their delicate health poses an unreasonable risk of serious damage to their future health and demonstrates deliberate indifference") (internal quotation marks, citation, and alternation omitted); *Valenzuela Arias v. Decker*, 2020 WL 1847986, at *7 (S.D.N.Y. Apr. 10, 2020) ("Petitioners have established that Respondents have left in place conditions of confinement that make COVID-19 an unreasonable risk of serious damage to their health . . . conditions in the Essex County Jail plainly do not allow for the social distancing measures recommended by the CDC—most obviously, maintaining *at least* six feet of distance from other persons at all times. . . To the contrary, Respondents conceded at oral argument that detainees sleep in bunk beds, necessarily putting them within six feet of one another for sustained periods of time."); *Ibrahim Fofana v. Albence*, 2020 WL 1873307, at *8 (E.D. Mich. Apr. 15, 2020) ("The detainees eat 4 to 6 people per table. While Monroe County Jail has ceased accepting new detainees and is operating at half capacity, roughly 48 detainees are confined to one housing unit. This violates recommended guidelines to socially distance with at least six feet distance between people

and for no more than ten people to gather in one space."); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Failure to respond to a known medical problem can also constitute deliberate indifference."); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) ("[T]he continuing disregard of Brown's HIV and hepatitis constitutes deliberate indifference.").

Moreover, despite Defendants' assurances, the record does not unequivocally demonstrate successful implementation of the policies, protocols and procedures identified in their declarations. At the start of this litigation, Defendants argued that everything that could be done was being done and that the *de minimus* numbers of COVID-19 positive cases reflected this. As the numbers increased, Defendants continued to maintain that their efforts were sufficient to contain the virus. Even with the most recent, dramatic numbers, Defendants contend that the remedy of curative quarantine and appropriate medical treatment is available and successful. But the Court, on this record, cannot ignore the medical data and say that this is accurate. As the court recently noted in granting habeas to federal inmates in *Wilson*, while these may be "good efforts . . . at this preliminary stage of the litigation, the Petitioners have sufficiently met the threshold for showing that Respondents have been deliberately indifferent." *Wilson*, (DE 22 at 16). And although Defendant Junior states that he planned to implement, or would have ultimately adopted, policies that are now required by the TRO, the Court cannot rest its analysis on this assurance alone. The Court must also rely on expert testimony, medical data on the presence and progress of the virus, and the inescapable fact that Metro West is in the crosshairs of this contagion.

Therefore, the Court finds that Plaintiffs have made a clear showing on both the

objective and subjective components of their Eighth Amendment claim and, "[h]aving met both prongs of the Eighth Amendment analysis, [Plaintiffs] have demonstrated a likelihood of success on the merits." *Wilson*, (DE 22 at 16).

### ii. Plaintiffs have shown they will suffer irreparable harm absent an injunction

As the Eleventh Circuit has recognized, "[a] showing of irreparable injury is 'the *sine qua non* of injunctive relief.'" *See Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Here, Plaintiffs have clearly shown that they will suffer irreparable injury without a preliminary injunction because, absent injunctive relief, COVID-19 will continue to spread throughout Metro West and infect additional inmates and staff, which could lead to serious medical complications, including death, for those who are exposed to the virus. *See Wilson*, (DE 22 at 17) (finding that petitioners had shown they would suffer irreparable harm because "it is more than mere speculation that the virus will continue to spread and pose a danger to inmates if [defendant] does not increase its efforts to stop the spread"); *see also Basank*, 2020 WL 1481503, at *7 ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they are returned to immigration detention constitutes irreparable harm warranting a preliminary injunction."); *Barbecho*, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) ("[B]eing in immigration detention places these Petitioners at a significantly higher risk of contracting COVID-19. Indeed, numerous courts, including this one, have recognized that 'individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases."); *Valenzuela Arias*, 2020 WL 1847986, at *5 ("Petitioners' continued confinement in immigration detention poses a significant risk that they will contract COVID-19, and

41

Petitioners' infection with COVID-19 would almost certainly cause severe—or fatal—damage to their health.  Such an injury constitutes irreparable harm and justifies the issuance of a TRO."); *Bharatkumar G. Thakker v. Doll*, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020) ("Petitioners face a very real risk of serious, lasting illness, or death.  There can be no injury more irreparable."); *Malam v. Adduci*, 2020 WL 1672662, at *7 (E.D. Mich. Apr. 5, 2020) ("The ongoing COVID-19 pandemic creates a high risk that absent an injunction by this Court, Petitioner will suffer irreparable harm in the loss of health or life as a result of contracting the COVID-19 virus.").

> ### iii.   *Plaintiffs have shown that the threatened injury posed by the COVID-19 outbreak at Metro West outweighs any damage to Defendants resulting from an injunction*

The threat of a continuing outbreak of COVID-19 among the inmates and staff at Metro West outweighs the damage to Defendants caused by an injunction requiring Defendants to comply with the CDC Guidance.  *See Wilson*, (DE 22 at 18) ("[T]here is a continued risk of harm to others, including prison staff, if inmates remain in the prison and the virus continues to thrive among the dense inmate population."); *see also Castillo v. Barr*, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020) ("The balance of the equities tip sharply in favor of the Petitioners.  The Petitioners face[] irreparable harm to their constitutional rights and health.  Indeed, there is no harm to the Government from engaging in unlawful practices."); *Fraihat v. U.S. Immigration & Customs Enf't*, 2020 WL 1932570, at *28 (C.D. Cal. Apr. 20, 2020) ("The balance of equities sharply incline in Plaintiffs' favor. 'It is always in the public interest to prevent the violation of a party's constitutional rights.'") (citation omitted); *Hernandez Roman v. Wolf*, 2020 WL 1952656, at *12 (C.D. Cal. Apr. 23, 2020) ("The balance of equities, here, tip sharply in favor of the class members; the

class members face irreparable harm to their constitutional rights and health. The Government is not harmed when a court prevents the Government from engaging in unlawful practices."). While Plaintiffs have made a clear showing that they face immediate, irreparable harm from COVID-19, Defendants have not offered any evidence as to why the administrative burden resulting from compliance with an injunctive order outweighs the threat of serious illness or death of inmates that will result from the spread of the virus throughout Metro West. Indeed, Defendants have repeatedly stated they were poised to take the measures in the TRO before its entry and have now implemented those measures and more; if so, there can be no appreciable impact on them as a result of the injunctive relief granted in this Order. (DE 92-2 at 3) ("Virtually all of the measures taken after April 5, 2020 would have been taken, regardless of the allegations in this case.").

### iv.  *Plaintiffs have shown the injunction will not be adverse to the public interest*

Finally, Plaintiffs have clearly demonstrated that injunctive relief in this matter as to their 1983 claim will not adversely impact the public interest. In fact, because detention facilities have quickly become "hot spots" for COVID-19 throughout the country, an order requiring Defendants to implement various measures to reduce the spread of the virus in Metro West advances the public interest by reducing the chance of community spread in Miami-Dade County linked to COVID-19 cases at Metro West. Indeed, the Supreme Court has recognized that "[t]he third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Niken v. Holder*, 556 U.S. 418, 435 (2009); *see also Wilson*, (DE 22 at 19) (holding that "it is always in the public interest to prevent the violation of a party's constitutional rights") (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)); *Castillo*, 2020

WL 1502864, at *6 (stating that "[t]he emergency injunctive relief sought, here, is absolutely in the public's best interest.  The public has a critical interest in preventing the further spread of the coronavirus.  An outbreak at Adelanto would, further, endanger all of us"); *Bent*, 2020 WL 1812850, at *7 (noting that "an outbreak in a detention facility may strain the resources of regional hospitals and health centers, and reduce the number of hospital[] beds and equipment available for the general population"); *Fraihat*, 2020 WL 1932570, at *28 ("[T]here can be no public interest in exposing vulnerable persons to increased risks of severe illness and death."); *Thakker*, 2020 WL 1671563, at *4 ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest."); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he public has no interest in the enforcement of what is very likely an unconstitutional [policy].").

For the reasons stated above, Plaintiffs have met their burden to demonstrate that they are entitled to a preliminary injunction on their Section 1983 claim.  The terms of the preliminary injunction are set forth below.

### E.  Plaintiffs' Section 2241 Claim

Plaintiffs also seek an order requiring their immediate release pursuant to Section 2241.  Plaintiffs argue that "[t]he members of the Medically Vulnerable Subclass all have conditions that render them exceptionally vulnerable to death or serious harm if exposed to COVID-19."  (DE 3 at 25).  Thus, Plaintiffs contend, "there is no practicable way to ensure that they can avoid infection and no practicable way to ensure that, if infected, they receive prompt and reasonable medical treatment within the jail . . . [and] [t]herefore, their continued detention is a grave risk to their lives and violates the Constitution."  *Id.* at 25-

26.

Defendants argue that "Plaintiffs cannot obtain habeas relief under 28 U.S.C. § 2241 for three primary reasons: (1) the Eleventh Circuit expressly prohibits inmates from pursuing habeas relief as a remedy for conditions of confinement claims like theirs; (2) only immigration detainees (i.e., federal civil detainees) have been released under § 2241 for reasons involving COVID-19; and (3) Plaintiffs never exhausted their state court remedies prior to filing this suit." (DE 67 at 31).

Plaintiffs have not shown a likelihood of success on the merits as to their 2241 claim seeking the extraordinary remedy of releasing all medically vulnerable inmates at Metro West because the Eleventh Circuit has held that "relief of an Eighth Amendment violation does not include release from confinement." *Gomez*, 899 F.2d at 1126; *see also Fernandez*, 941 F.2d at 1494 ("Release from confinement is not a possible remedy."); *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015) ("Petitioner's § 2241 petition is not the appropriate vehicle for raising an inadequate medical care claim . . . [and] even if Petitioner established a constitutional violation, he would not be entitled to the relief he seeks because release from imprisonment is not an available remedy for a conditions-of-confinement claim.") (internal citations omitted).[23]   The Eleventh Circuit explained in *Gomez* that "[t]he appropriate Eleventh Circuit relief from prison conditions that violate the Eighth Amendment during legal incarceration is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment." *Gomez*, 899 F.2d at 1126.

---

[23] While it is correct that *Vaz* reiterates the language in *Gomez*, *Vaz* is an unpublished Eleventh Circuit opinion concerning a 2241 claim brought by a single petitioner who complained of dental issues. *Vaz*, 634 F. App'x at 781. It is therefore readily distinguishable from the case at hand.

The Court wishes to make two observations.  First, as Plaintiffs point out, the Eleventh Circuit is in the minority of a circuit split regarding whether a 2241 habeas claim— as opposed to a Section 1983 claim—is a proper avenue to challenge conditions of confinement.  *See Dawson v. Asher*, No. C20-0409JLR-MAT,  2020 WL 1704324, at *8 (W.D. Wash. Apr. 8, 2020) ("The majority of federal circuit courts allow detainees to challenge their conditions of confinement via a habeas petition.") (citing *Aamer v. Obama*, 742 F.3d 1023, 1036-37 (D.C. Cir. 2014); *United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006); *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 & n.5 (3d Cir. 2005); *McNair v. McCune*, 527 F.2d 874, 875 (4th Cir. 1975); *Adams v. Bradshaw*, 644 F.3d 481, 482-83 (6th Cir. 2011)).

Second, the precedent cited above may not be as clear cut as Defendants suppose. While the Eleventh Circuit has seemingly foreclosed habeas relief to those challenging conditions of confinement generally, in *Gomez* the court left open the question of whether habeas would be available in a context where there was no constitutional manner of continued confinement (*i.e.*, no remedy absent release), which is precisely what Plaintiffs allege is their current situation.  *See Gomez*, 899 F.2d at 1126-27.  In *Gomez*, the Eleventh Circuit considered whether a petitioner suffering from AIDS was entitled to habeas relief because the prison in which he was detained could not provide him adequate treatment. *Id.* at 1125.  The court stated that the relevant question for habeas relief was "not whether [the prison] can provide adequate treatment under court order, but whether the Bureau of Prisons can give adequate medical treatment any place in its system."  *Id.* at 1126.  The court found that, because the BOP could provide adequate treatment at a federal facility in Missouri, petitioner was not entitled to be released but was instead entitled either to be

transferred to that facility or to "a mandatory injunction to bring his treatment up to constitutional standards." *Id.* at 1127. The Court agrees with Plaintiffs that this holding strongly implies that had no facility been able to treat Gomez as constitutionally required, he may have been entitled to habeas relief.

And other courts have suggested this may be the appropriate reading of *Gomez*. *See Gayle v. Meade*, Case No. 20-21553-COOKE/GOODMAN (Apr. 22, 2020) (DE 63, Report and Recommendations) ("[T]he *Gomez* rule is based on the implicit assumption that a correction or discontinuance of the unconstitutional practice is actually available. If no correction is feasible, then the remedy which the Eleventh Circuit relied upon would become illusory. If that were the case, then the Undersigned would reconsider the conclusion that there is no habeas corpus release remedy for the detainees.") (internal quotations omitted); *see also A.S.M. v. Donahue*, No. 7:20-CV-62, 2020 U.S. Dist. LEXIS 65226, at *5 (M.D. Ga. Apr. 10, 2020) (denying emergency motion for preliminary injunctive relief filed by ICE detainees held at two local detention centers who alleged risk of COVID-19 virus infection, but noting that the court might reconsider habeas relief as persuasive if the conditions "cannot be modified to reasonably eliminate those risks").

Nonetheless, Plaintiffs have not made a "clear showing" that they have exhausted their available state court remedies, a necessary prerequisite for injunctive relief on their 2241 claim.[24]  *See Money*, 2020 WL 1820660, at *21 (denying habeas relief and finding

---

[24] The Court notes that, while Plaintiffs have not met the stringent requirements for obtaining injunctive relief in the form of immediate release of an entire class of inmates from Metro West under Section 2241, their habeas claim is not without viability, especially given the medical community's consensus that there will likely be further "waves" of COVID-19 in the near future.  *See Coronavirus: US health official warns of dangerous second wave*, BBC NEWS, https://www.bbc.com/news/world-us-canada-52378845 ("A second wave of coronavirus cases in the US could be even worse than the first, the country's top health official has warned. [CDC] director Robert Redfield said the danger was higher as a fresh outbreak would likely coincide

that "Plaintiffs have not made a satisfactory showing that the state court system was not every bit as available as the federal courts, if not more so").  The Court need not reach the other three factors of the injunction analysis because Plaintiffs have not shown a likelihood of success on their 2241 habeas claim at this time.  *See Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018) (holding that where the moving party fails to demonstrate that they are likely to prevail, the Court "do[es] not need to address the remaining preliminary injunction requirements").

Although Plaintiffs have not demonstrated that they are entitled to the extraordinary remedy of having this Court enter an injunctive order immediately releasing the named Plaintiffs or a medically vulnerable subclass at this stage, the Court strongly urges Defendants to continue to be guided by the joint conclusion of the expert doctors who inspected Metro West on April 18, 2020: "an urgent reduction in the population in this facility and increased screening for COVID19 infection among the staff and inmates to mitigate the spread of this infection within the community." (DE 70-1 at 1). This recommendation is supported by the view of the CDC and physicians and medical experts nationwide.

Finally, the Court notes that the injunctive measures in this order were carefully crafted and, having examined relevant caselaw, the Parties' written and oral submissions and evidence, and the entire record, the Court concludes that the relief set forth herein is "narrowly drawn, extends no further than necessary to correct the violation of" Plaintiffs'

---

with the flu season.").

And the Supreme Court in *Ross* explicitly recognized an exception to exhaustion where other state court remedies are "unavailable."  *Ross*, 136 S. Ct. at 1856. While the Court has not found that to be the case at this preliminary stage, circumstances may evolve over time that would necessitate revisiting this determination.

Eighth Amendment rights, "and is the least intrusive means necessary to correct" Defendants' violation of those rights. 18 U.S.C. § 3626(a)(1)(A). Additionally, the Court has carefully weighed the impact this injunctive relief will have on the public interest—which is, of course, benefitted by measures that reduce the spread of COVID-19 in our community—and has given "substantial weight" to any adverse impact this injunctive relief may have on Defendants' operation of Metro West, which amounts primarily to the logistical and administrative burden of implementing narrowly-drawn measures critical to safeguarding the health and safety of the pretrial detainee Plaintiffs.

IV.    **CONCLUSION**

Accordingly, it is **ORDERED and ADJUDGED** that Plaintiffs' motion for a preliminary injunction (DE 3) is **GRANTED IN PART, for a period of 45 days**,[25] as follows:

1.    It is **ORDERED** that Defendants shall take the following actions at the Metro West Detention Center:

- Effectively communicate to all people incarcerated at Metro West Detention Center, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

- To the maximum extent possible considering Metro West Detention Center's current population level, provide and enforce adequate spacing of six feet or more between people incarcerated at Metro West so that social distancing

---

[25] The PLRA states that "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry." 18 U.S.C. § 3626(a)(2).

can be accomplished;

- Ensure that each incarcerated person receives, free of charge: (1) an individual supply of soap, preferably liquid as recommended by the CDC, sufficient to allow frequent hand washing each day; (2) hand drying machines, or disposable paper towels as recommended by the CDC, and individual towels, sufficient for daily use; (3) an adequate supply of disinfectant products effective against the virus that causes COVID-19 for daily cleanings; and (4) an adequate supply of toilet paper sufficient for daily use;

- Provide reasonable access to showers and to clean laundry;

- Require that all MDCR staff wear personal protective equipment, including masks, and gloves when physically interacting with any person, and require that, absent extraordinary or unusual circumstances, a new pair of gloves is worn each time MDCR staff touch a different person; and require all inmate workers who are cleaning facilities or preparing food to follow this same protocol;

- Require that all MDCR staff regularly wash their hands with soap and water or use hand sanitizer containing at least 60% alcohol;

- Ensure access to proper testing for anyone displaying known symptoms of COVID-19 in accordance with CDC guidelines and for anyone who has come in contact with an individual who has tested positive for COVID-19;

- Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly

quarantined, with continued access to showers, mental health services, phone calls with family, and communications with counsel; individuals identified as having COVID-19 or having been exposed to COVID-19 shall not be placed in cells normally used for disciplinary confinement absent emergency circumstances;

- Respond to all emergency (as defined by the medical community) requests for medical attention as soon as possible;

- Provide sufficient disinfecting supplies consistent with CDC recommendations in each housing unit, free of charge, so incarcerated people can clean high-touch areas or any other items in the unit between each use;

- Waive all medical co-pays for those experiencing COVID-19-related symptoms;

- Waive all charges for medical grievances during this health crisis; and

- Provide face masks for all inmates at Metro West. The face masks must be replaced at medically appropriate intervals, and Defendants must provide inmates with instruction on how to use a face mask and the reasons for its use.

2.    Defendants are further **ORDERED** to:

- Continue providing the Court with updated information regarding the number of staff and inmates who have tested positive for, or are being quarantined because of, COVID-19. These notices shall be filed every three days for the duration of this Order; Defendants shall also continue to provide this

information to their state criminal justice partners;

- Provide the Court with weekly reports containing the current population data for Metro West; and

- Submit, within 7 days of this Order, a proposal outlining steps Defendants will undertake to ensure additional social distancing safeguards in terms of housing inmates and inmate activity (medical visits, telephones, etc.).

3.    The injunctive provisions set forth in this Order shall expire 45 days from the date of this Order.  At that time, the Court will review the record to determine whether it is necessary to extend the Order.

As to Plaintiffs' 2241 claim, for the reasons stated above, the portion of the emergency motion (DE 3) seeking their immediate release from Metro West is **DENIED** without prejudice.

**DONE AND ORDERED** in chambers in Miami, Florida, this 29th day of April, 2020.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE