FILED BY _HH_ D.C.

Oct 14, 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES COURT OF APPEAL
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 14, 2020

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  20-11622-CC
Case Style: Anthony Swain v. Daniel Junior, et al
District Court Docket No: 1:20-cv-21457-KMW

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

# UNITED STATES COURT OF APPEALS
## For the Eleventh Circuit

_____

No. 20-11622

_____

District Court Docket No.
1:20-cv-21457-KMW

ANTHONY SWAIN,
ALEN BLANCO,
BAYARDO CRUZ,
RONNIEL FLORES,
WINFRED HILL,
et al.,

Plaintiffs - Appellees,

versus

DANIEL JUNIOR,
MIAMI-DADE COUNTY, FLORIDA,

Defendants - Appellants.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: June 15, 2020
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT
_____

No. 20-11622
_____

D.C. Docket No. 1:20-cv-21457-KMW

ANTHONY SWAIN,
ALEN BLANCO,
BAYARDO CRUZ,
RONNIEL FLORES,
WINFRED HILL,
et al.,

Plaintiffs - Appellees,

versus

DANIEL JUNIOR,
MIAMI-DADE COUNTY, FLORIDA,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 15, 2020)

Before MARTIN and NEWSOM, Circuit Judges, and WATKINS,[*] District Judge.

NEWSOM, Circuit Judge:

It would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects.  It has changed everything from the way that friends and families interact to the way that businesses and schools operate to the way that courts hear and decide cases.  The virus, though, poses particularly acute challenges for the administration of the country's jails and prisons.  Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable.  And for their part, prison officials are faced with the unenviable (and often thankless) task of maintaining institutional order and security while simultaneously taking proper care of the individuals in their custody.

Our plaintiffs here—a group of medically vulnerable inmates—challenged the conditions of their confinement at Miami's Metro West Detention Center.  In particular, they assert that Miami-Dade County and Daniel Junior, the Director of the Miami-Dade Corrections and Rehabilitations Department, have inadequately responded to the COVID-19 outbreak and thereby violated their constitutional

---

[*] Honorable W. Keith Watkins, United States District Judge for the Middle District of Alabama, sitting by designation.

rights.  Holding that the plaintiffs were likely to succeed on the merits of their claim and would suffer irreparable injury in the absence of immediate relief, the United States District Court for the Southern District of Florida enjoined the county and Junior to take a number of precautionary measures to halt the virus' spread and ordered them to file regular reports regarding the virus' status.

A motions panel of this Court stayed the injunction pending resolution of the defendants' appeal.  After considering the merits, and with the benefit of outstanding written briefs and oral arguments, we now conclude that the district court erred in issuing the injunction.[1]  Accordingly, we vacate the injunction and remand the case to the district court.

---

[1] For good reason, we have expedited the resolution of this case and the publication of this opinion.  The district court issued its order on April 29, 2020, granting a preliminary injunction "for a period of 45 days."  A motions panel of this Court stayed the injunction on May 5, promulgated a condensed briefing schedule, and directed the Clerk to expedite the appeal for merits disposition and to schedule oral argument before the first available argument panel.  *See Swain v. Junior*, 958 F.3d 1081, 1092 (11th Cir. 2020).  Immediately after oral argument on June 9, we asked the parties to address (1) whether this appeal would become moot on June 15, the Monday following the expiration of the 45-day time period on Saturday, June 13, *see* Fed. R. Civ. P. 6(a), and (2) whether the motions panel's stay order tolled the injunction's 45-day period.  The parties responded (in less than 24 hours) with very capable supplemental briefs that, perhaps not surprisingly, reached diametrically opposite conclusions.  In light of the uncertainties surrounding the mootness issue—and because the parties, who have fully and skillfully briefed and argued the case, are entitled to a decision on the merits—we deemed it prudent to issue this opinion before the injunction was set to expire.

# I

# A

This litigation began on April 5, 2020, when plaintiffs Anthony Swain, Alen Blanco, Bayardo Cruz, Ronniel Flores, Winfred Hill, Deondre Willis, and Peter Bernal—medically vulnerable pretrial detainees at Metro West Detention Center in Miami, Florida—filed a class-action complaint against Miami-Dade County and Daniel Junior in his official capacity as Director of the Miami-Dade Corrections and Rehabilitation Center.[2]  They sought to represent themselves, a class of "all current and future persons detained at Metro West during the . . . pandemic," and a subclass of medically vulnerable detainees.  The plaintiffs asked for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that the defendants had violated (and were continuing to violate) the Eighth and Fourteenth Amendments by acting with "deliberate indifference" to the serious risk posed by COVID-19.  In particular, the plaintiffs asserted that "Metro West has neither the capacity nor the ability to comply with public health guidelines to prevent an outbreak of COVID-19 and cannot provide for" their safety.  More particularly still, the plaintiffs claimed that the defendants didn't "give [them] the ability to practice safe social distancing" and that "conditions force[d] them to sit, stand, walk, eat, and sleep

---

[2] Hill and Bernal have both been released from custody.  Unfortunately, the plaintiffs learned during the pendency of this appeal that one of the putative class members, Charles Hobbs, had died from COVID-related complications.

within six feet of another person," and, furthermore, that the defendants weren't providing adequate cleaning supplies or "free hygiene or personal sanitation supplies." On behalf of the medically vulnerable subclass, the plaintiffs separately petitioned for a writ of habeas corpus under 28 U.S.C. § 2241, seeking immediate release. Along with their complaint, the plaintiffs also filed an emergency motion for a temporary restraining order and a preliminary injunction, as well as a motion to certify the class.

On April 7, the district court entered a 14-day TRO, based largely on the CDC's guidance for correctional facilities. *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (March 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf [hereinafter CDC Guidance]. The guidance provided suggestions regarding cleaning, hygiene, and disease-prevention practices, and also recommended that detention facilities "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)." *Id.* at 9–11 (emphasis omitted). Among other precautions, the district court's TRO required the defendants to provide for six-foot spacing between inmates "[t]o the maximum extent possible" and to ensure that each inmate received soap and cleaning

supplies.  The TRO further ordered the defendants to file a notice describing the

measures that Metro West had employed and identifying medically vulnerable

individuals.

The defendants' notice of compliance, filed two days later, advised the

district court that they had, among other things:

- provided inmates access to cleaning supplies;
- provided personal hygiene supplies, including liquid soap and paper towels;
- acquired "industrial grade fogging type sanitization equipment to sanitize housing units when inmates are in recreation (three times per week)";
- issued masks to all inmates and employees;
- cancelled inmate visitation;
- implemented mandatory wellness screenings for all staff;
- formalized a "new intake quarantine protocol";
- made efforts "to successfully decrease overall inmate population and allow for increased social distancing";
- increased awareness about social distancing and instructed staff "to continually walk throughout [Metro West] to enforce social distancing by officers and inmates";
- modified the "sick call process" in order "to allow for an expedited review" of inmates with COVID-19 symptoms;
- posted notices "in English, Creole and Spanish that encourage social distancing and proper hygiene" and provided other information about the virus; and
- instituted a "COVID-19 Incident Command Center and a Response Line" for tracking the virus' impact on inmates and staff.

The defendants' notice indicated that they had taken many of these measures even

before the plaintiffs had filed suit.

On April 14, the district court extended the TRO and commissioned two

independent experts to inspect Metro West, evaluate the defendants' compliance

6

with the TRO, and submit a report with their findings.  The experts' report—which was filed seven days later—explained that Metro West's administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility" and that they "should be commended for their commitment to protect the staff and the inmates."  Expert Report at 2.  In particular, the report observed that Metro West was conducting staff screenings, that the facility appeared clean, that cleaning supplies were available, that inmates and staff had masks, and that inmates were "staggered and appropriately distanced when going to medical."  *Id.* at 2–3.  The report also stated, however, that while "[t]he bunks are staggered with head to foot configuration," there wasn't six feet between them, that inmates congregated around tables and televisions, that "[t]he areas with the telephones do not allow for social distancing," and that most of the units "were too overcrowded to allow for adequate social distancing."  *Id.* at 2. The report recommended testing, increased screening of inmates, and "an urgent decrease in the population density" because "the high census of Metro West . . . in addition to the dormitory style housing units, makes it impossible to follow CDC guidance for social distancing measures."  *Id.* at 3.

## B

In the run-up to the preliminary-injunction hearing, both parties submitted additional evidence.  For their part, the defendants notified the court that they had

purchased and installed ionizers to purify the air and body-heat cameras to measure inmates' temperatures, and had begun testing even asymptomatic inmates.  The defendants also explained that through their collaboration with state criminal-justice officials, nearly 900 inmates had been released—reducing Metro West's population to less than 70% of its capacity—and that they would continue working to reduce the inmate population.  The defendants further stated that "[v]irtually all of the measures taken after [the lawsuit was filed] would have been taken, regardless of the allegations made in th[e] case" and that "[t]he only aspect of the TRO that had not been in place prior to its entry was the Court-ordered use of paper towels and liquid soap"—which, the defendants had earlier clarified, had been supplied to all housing units by the time they filed their notice of compliance on April 9.  The defendants also represented that they would continue to take necessary precautions "even in the absence of a court order."

The plaintiffs' additional inmate declarations acknowledged some improvements in Metro West's conditions—for instance, they noted that jail staff had put tape on the floor in certain areas to encourage social distancing, made intercom announcements to remind inmates to practice social distancing and to wash their hands, checked inmates' temperatures twice a day, and ensured that units contained liquid soap and paper towels.  Still, though, the inmates continued to stress what they perceived to be a lack of adequate distancing.  They stated that

it was difficult or impossible to distance from other inmates in certain spaces or during certain times of the day—*e.g.*, while using the bathrooms, showers, and telephones, when queuing to receive medication or go to the clinic, while in line to receive food at mealtime and while eating, during pre-recreation pat-downs, and during thrice-daily head counts, when inmates stand shoulder-to-shoulder with their bunkmates and only two to three feet apart from others.  Some of the inmate declarations also indicated that the social-distancing measures that Metro West had promulgated weren't being uniformly enforced.  For example, one stated that while jail administrators had placed tape on the floor to indicate where inmates should stand while in line to receive medication, "mostly people still line up very close together."  For additional support, the plaintiffs presented declarations from four medical experts, who opined that social distancing and further population reductions were necessary.

On April 29, after holding a two-day hearing, the district court issued a preliminary injunction on the plaintiffs' § 1983 claim.  (The court separately denied the plaintiffs relief on their § 2241 petition, and thus refused to order the release of any inmates.  That decision isn't before us.)  The court noted that "[i]t is clear that there remain several factual disputes regarding the extent to which Defendants' stated policies to protect inmates and staff from COVID-19 are being implemented and enforced."  Dist. Ct. Order at 33–34.  But it emphasized that it

was "unrebutted" that "the rate of inmate infections has increased dramatically"
and that undisputed "medical evidence and testimony from numerous doctors"
showed "that other measures—absent social distancing—are not alone sufficient to
stop the spread of the virus." *Id.* at 34. "Thus," the court held, "even if [it] were to
credit all of Defendants' evidence at this stage and discount the factual disputes
about the implementation of Defendants' policies and procedures, Plaintiffs have
nonetheless made a clear showing as to each of the four factors required for
injunctive relief on their Eighth Amendment claim." *Id.* at 35. The court reasoned
that "[b]ecause [the plaintiffs] have demonstrated that the lack of social
distancing—which has not been and cannot be achieved absent an additional
reduction in Metro West's population or some other measure to achieve
meaningful social distancing—and the issues attendant to effectively implementing
CDC standards present an immediate, ongoing risk of harm to Plaintiffs, they have
met their burden." *Id.*

When considering the plaintiffs' likelihood of success on their constitutional
claim, in particular, the district court said much the same thing. Specifically, it
held that "even considering the measures Defendants have adopted—and setting
aside the numerous factual disputes as to the consistency and efficacy of those
measures—the record nonetheless can be seen to demonstrate deliberate
indifference to a serious risk of harm to Plaintiffs." *Id.* at 37. First, the court stated

that the "Defendants' contention that the actions they have taken to date are sufficient is belied by the exponential rate of infection since this case commenced"—emphasizing that whereas no inmates had tested positive at the time the complaint was filed, 163 inmates had tested positive within the ensuing three weeks. *Id.* Second, the court explained that "the evidence adduced in the case shows that inmates at Metro West are not able to achieve meaningful social distancing, and that the experts agree social distancing is a critical step in preventing or flattening the rate of contagion." *Id.* For support, the court referenced inmate declarations "indicat[ing] that social distancing is either not possible . . . or is not uniformly enforced." *Id.* at 37–38. The court then concluded: "Thus, Plaintiffs have met both the subjective and objective components of the Eighth Amendment's deliberate indifference analysis." *Id.* at 38.

The district court held that the remaining preliminary-injunction factors favored relief, as well. It concluded—albeit in a single sentence—that the plaintiffs would suffer irreparable injury absent immediate relief because of the danger posed by the virus' spread. *Id.* at 41. The balance of the harms also weighed in the plaintiffs' favor, the court reasoned, because the defendants hadn't shown that the administrative burden of the injunction overcame the threat posed by the virus: Because the defendants "repeatedly stated they were poised to take

the measures in the TRO before its entry and have now implemented those measures and more," the court explained that the injunction would result in "no appreciable impact on them." *Id.* at 43. Finally, the court held that injunctive relief would advance the public interest by reducing the possibility of community spread. *Id.*

The district court's injunction required the defendants to take numerous actions—many of which the court had already ordered in the TRO—including that the defendants, "[t]o the maximum extent possible considering [Metro West's] current population level, provide and enforce adequate spacing of six feet or more between people incarcerated at Metro West so that social distancing can be accomplished." *Id.* at 49–50. It also directed the defendants, among other things, to communicate with inmates about COVID-19 and to ensure that all inmates have access to testing, protective masks, cleaning and hygiene supplies, and adequate medical care. *Id.* at 49–51. The injunction imposed reporting requirements, as well, ordering the defendants to:

- file a notice with the court every three days detailing the number of staff and inmates quarantined or infected, and "continue to provide this information to their state criminal justice partners";
- file a weekly report with the current population of Metro West; and
- submit a proposal within seven days describing the steps that the defendants "will undertake to ensure additional social distancing safeguards in terms of housing inmates and inmate activity (medical visits, telephones, etc.)."

*Id.* at 51–52.

12

The defendants immediately appealed the preliminary injunction and

requested a stay, which we granted in a published order. *Swain v. Junior*, 958 F.3d

1081, 1092 (11th Cir. 2020). This is our review on the merits.

## II

"A preliminary injunction is an extraordinary remedy never awarded as of

right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In order to

obtain one, a party must establish four separate requirements—namely, that "(1) it

has a substantial likelihood of success on the merits; (2) irreparable injury will be

suffered unless the injunction issues; (3) the threatened injury to the movant

outweighs whatever damage the proposed injunction may cause the opposing

party; and (4) if issued, the injunction would not be adverse to the public interest."

*Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020) (quotation omitted).

We will consider each factor, although we will focus our attention where the

district court did—on the likelihood that the plaintiffs will succeed on the merits of

their constitutional claim.[3]

## A

The plaintiffs contend that the defendants have been "deliberately

indifferent" to the serious risk that COVID-19 poses to them, in violation of the

---

[3] "We review a district court's grant of preliminary injunctive relief for abuse of discretion."
*Jones v. Governor of Fla.*, 950 F.3d at 806. The court's underlying legal conclusions are
reviewed de novo, and its factual findings are reviewed for clear error. *Id.*

Fourteenth Amendment to the U.S. Constitution.  Although the plaintiffs' claim

technically arises under the Fourteenth Amendment because they are pretrial

detainees rather than convicted prisoners, it is "evaluated under the same standard

as a prisoner's claim of inadequate care under the Eighth Amendment." *Dang ex*

*rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017).

The Eighth Amendment—and therefore the Fourteenth also—is violated when a

jailer "is deliberately indifferent to a substantial risk of serious harm to an inmate

who suffers injury." *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016).

To establish a deliberate-indifference claim, a plaintiff must make both an

objective and a subjective showing.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Under the objective component, the plaintiff must demonstrate "a substantial risk

of serious harm."  *Id.*  Here, the defendants seem to agree—wisely, we think—that

the risk of COVID-19 satisfies this requirement.  Under the subjective component,

the plaintiff must prove "the defendants' deliberate indifference" to that risk of

harm by making three sub-showings: "(1) subjective knowledge of a risk of serious

harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."

*Lane*, 835 F.3d at 1308 (quotation omitted).[4]  Helpfully, the defendants seem not to

---

[4] The Supreme Court's decision in *Kingsley v. Hendrickson*, which held that pretrial detainees
alleging excessive force need only show objective unreasonableness, doesn't change our analysis
here.  135 S. Ct. 2466, 2470 (2015).  This case doesn't arise in the excessive-force context, and
we have otherwise continued to require detainees to prove subjective deliberate indifference.  *See
Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (explaining that a plaintiff suing on behalf
of a deceased pretrial detainee had to prove deliberate indifference to the detainee's serious

dispute that they had "subjective knowledge" of the risk that the virus poses.  The

inquiry here thus hinges on whether the defendants "disregard[ed]" the risk "by

conduct that is more than mere negligence," *id.* (quotation omitted)—or more

simply stated, whether they "recklessly disregard[ed] that risk," *Farmer*, 511 U.S.

at 836.

　　As applied in the prison context, the deliberate-indifference standard sets an

appropriately high bar.  A plaintiff must prove that the defendant acted with "a

sufficiently culpable state of mind."  *Id.* at 834 (quotation omitted).  Ordinary

malpractice or simple negligence won't do; instead, the plaintiff must show

"subjective recklessness as used in the criminal law."  *Id.* at 839–40.  Indeed, even

where "prison officials . . . actually knew of a substantial risk to inmate health or

safety," they may nonetheless "be found free from liability if they responded

reasonably to the risk"—and, importantly for present purposes, "even if the harm

ultimately was not averted."  *Id.* at 844.  This is so because "[a] prison official's

duty under the Eighth Amendment is to ensure reasonable safety, a standard that

incorporates due regard for prison officials' unenviable task of keeping dangerous

men in safe custody under humane conditions."  *Id.* at 844–45 (quotations and

---

medical need); *see also Dang*, 871 F.3d at 1279 n.2 (stating that *Kingsley* didn't abrogate our
standard for considering claims of constitutionally deficient medical care brought by pretrial
detainees because *Kingsley* "involved an excessive-force claim, not a claim of inadequate
medical treatment due to deliberate indifference").

internal citations omitted); *see also Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates . . . ." (quotation omitted)).

The district court here held that the plaintiffs were likely to succeed on the merits of their Eighth Amendment claim. In reviewing that determination, we consider two questions. First, and principally, we must evaluate whether the district court erred in concluding that the defendants acted with deliberate indifference. Second, and separately, we must assess whether the district court erred in refusing to address either the heightened standards for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), or the defendants' contention that the plaintiffs failed to properly exhaust available administrative remedies under the Prison Litigation Reform Act.

### 1

### a

Any fair reading of the district court's order demonstrates that it relied overwhelmingly—if not exclusively—on two considerations in concluding that the defendants acted with the required deliberate indifference: (1) the fact that COVID-19 was continuing to spread at Metro West and (2) the impossibility of achieving adequate social distancing.

The order's plain language tells the story. As an initial matter, when

assessing whether the plaintiffs had met the four requirements to obtain injunctive relief, the district court acknowledged "that there remain several factual disputes regarding the extent to which Defendants' stated policies . . . are being implemented and enforced," but it insisted that two things were undeniable: (1) that "the rate of inmate infections [at Metro West] ha[d] increased dramatically" and (2) that "other measures—absent distancing—are not alone sufficient to stop the spread of the virus."  Dist. Ct. Order at 33–34.  The court then held: "*Thus*, even if the Court were to credit all of Defendants' evidence at this stage and discount the factual disputes about the implementation of Defendants' policies and procedures, Plaintiffs have nonetheless made a clear showing as to each of the four factors required for injunctive relief on their Eighth Amendment claim."  *Id.* at 35 (emphasis added).

The district court made the basis of its decision even clearer when analyzing deliberate indifference specifically.  There, the court again bracketed any factual disputes and yet still concluded the defendants had acted with deliberate indifference, holding that "even considering the measures Defendants have adopted—and setting aside the numerous factual disputes as to the consistency and efficacy of those measures—the record nonetheless can be seen to demonstrate deliberate indifference to a serious risk of harm to Plaintiffs."  *Id.* at 37.  For support, the district court said two things in particular.  First, it concluded that the

"Defendants' contention that the actions they have taken to date are sufficient is belied by the exponential rate of infection since this case commenced." *Id.* Second, it explained that the evidence "show[ed] that inmates at Metro West are not able to achieve meaningful social distancing," noting specifically that the inmates' declarations asserted "that social distancing is either not possible . . . or is not uniformly enforced." *Id.* at 37–38.  From those two premises, the court concluded: "*Thus*, Plaintiffs have met both the subjective and objective components of the Eighth Amendment's deliberate indifference analysis." *Id.* at 38 (emphasis added).

Accordingly, even while the district court seemed to assume a state of affairs in which the defendants had taken numerous measures to combat the virus, it held that the defendants were nonetheless deliberately indifferent based on two considerations: (1) the increase in the rate of infections at Metro West and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility. In so concluding, the district court erred.  Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40 (quotation omitted).

First, and most obviously, the district court erred in relying on the increased rate of infection.  On this point, the Supreme Court's decision in *Farmer* couldn't

be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id.* at 844 (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *10 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

Second, and separately, the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference.  The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible."  *See, e.g.*, Dist. Ct. Order at 7, 11, 12, 13, 16, 38.  (The plaintiffs acknowledge the same at least six times in their brief.  *See, e.g.*, Br. of Appellees at 4, 8, 12, 15, 19, 54.)  The court-commissioned expert report likewise observed that Metro West's population made it "impossible to follow CDC guidance for social distancing measures."  Expert Report at 3.  And indeed, the district court noted that the inmates' own declarations supported the conclusion that social distancing "is impossible to achieve given the

19

current population at Metro West."  Dist. Ct. Order at 12.  Failing to do the "impossible" doesn't evince indifference, let alone deliberate indifference.

## b

So much for what the district court said.  Now for what it didn't say.  As already explained, the fundamental question in any deliberate-indifference case is whether the defendants exhibited "a sufficiently culpable state of mind."  *Farmer*, 511 U.S. at 834 (quotation omitted).  In evaluating that question, we must focus not on isolated failures—or impossibilities, as the case may be—but rather on the defendants' entire course of conduct.  And in assessing that course of conduct here, we must take the case as the district court left it—*i.e.*, as one in which we "credit all of Defendants' evidence," "discount the factual disputes about the implementation of Defendants' policies and procedures," and "set[] aside the numerous factual disputes" about the various measures that the defendants claim to have adopted.  Dist. Ct. Order at 35, 37.  So framed, it seems to us quite unlikely that the plaintiffs can succeed on the merits of their constitutional claim.

It bears repeating that deliberate indifference is *not* a constitutionalized version of common-law negligence.  To the contrary, we (echoing the Supreme Court) have been at pains to emphasize that "the deliberate indifference standard . . . is far more onerous than normal tort-based standards of conduct sounding in negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir.

20

2013), and is in fact akin to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40; *see also id.* at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, "the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

It is undisputed, as the district court said, that the defendants didn't succeed in preventing the virus' spread. It is also undisputed that they didn't do the "impossible" by ensuring six-foot social distancing. But what *did* the defendants do? And can we say that their response was reckless? First, with respect to social distancing in particular, as the court-commissioned expert report summarized, the defendants "d[id] their best." Expert Report at 2. In particular, the report observed that the defendants put "tape on the floor to encourage social distancing in lines," that "bunks are staggered with head to foot configuration" in order to maximize the distance between faces during sleep, and that "[p]atients are staggered and appropriately distanced when going to medical." *Id.* Importantly, we think, while the report noted some social-distancing violations, it concluded that Metro West's

administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility," and that they "should be commended for their commitment to protect the staff and the inmates." *Id.* It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." CDC Guidance at 1. Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." *Id.* at 11. It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them." *Id.*

Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:

- "requiring staff and inmates to wear face masks at all times (other than when sleeping)";

- "conducting screening for all staff entering the facility";
- "conducting daily temperature screenings for all inmates";
- "suspending all outside visitation"; and
- "providing disinfecting and hygiene supplies to all inmates."

Dist. Ct. Order at 20. And as already explained, before the preliminary injunction was entered, the defendants notified the district court that they had purchased and installed ionizers to clean the facility's air and body-heat cameras to measure inmates' temperatures, and had even begun testing asymptomatic detainees for the virus as resources became more widely available. Remember, the district court made no findings that these measures hadn't been implemented. Quite the opposite, in fact: The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants *had* implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because (1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[5]

---

[5] This marks a fundamental methodological disagreement with the dissent. We take the district court at its word that it assumed for purposes of its decision that the defendants *had* implemented numerous precautionary measures but nonetheless held that the defendants were deliberately indifferent. The dissent, by contrast—and we think incorrectly—takes the plaintiffs' allegations as true and evaluates the case "[o]n th[e] record" as detailed therein. Dissenting Op. at 36; *see also id.* ("Plaintiffs also submitted nearly two dozen sworn affidavits describing . . . ."); *id.* at 38 ("My review of this record . . . ."); *id.* at 47 ("[T]he statements of the people detained at Metro West . . . paint a far different picture."); *id.* at 48 ("Detainees say . . . ."); *id.* at 49 ("The detainee declarations also suggest . . . ."); *id.* at 50 ("In light of the plaintiffs' evidence here . . . ."); *id.* (referring to "the practices attested to in the detainee declarations" and "the actual conditions described by detainees").

Whatever deliberate indifference is, the defendants' conduct here doesn't show it.  The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law."  *Farmer*, 511 U.S. at 839–40.  We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best."  Because the defendants "act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment.  *See id.* at 845; *see also Williams*, 2020 WL 3056217, at *7.

\* \* \*

We pause briefly to address two arguments that the plaintiffs have raised on appeal.  They contend that whatever the district court's order *said*, its deliberate-indifference conclusion was *actually* premised on (1) the defendants' failure to implement what the plaintiffs call "feasible" social-distancing measures and (2) Junior's continued enforcement of pretrial-detention orders despite the fact that Metro West's current population precludes adequate distancing.  For reasons already explained, we don't think the district court's order says either of those things.  And even if it did, our conclusion would remain unchanged.

First, "feasible" distancing.  The plaintiffs assert that the district court determined that the defendants—despite knowing that social distancing is critically

24

important—were deliberately indifferent because they "neither adopted nor implemented *feasible* social-distancing measures." Br. of Appellees at 27 (emphasis added). But the portion of the district court's analysis that the plaintiffs cite doesn't say that at all; indeed, although the plaintiffs refer to "feasible" social distancing some 14 times in their brief, *see, e.g.*, *id.* at 3, 4, 10, 16, 19, 26, 27, 28, 29, 31, 41, 54, the district court didn't mention "feasible" social distancing even once.

At most, it seems to us, the district court's order can be read to hold that social distancing was "not uniformly enforced" in certain instances, "such as when inmates line up to receive food and eat together in their unit; when inmates line up for headcount; when inmates line up outside the clinic to receive medication; and when inmates participate in mandatory outdoor recreation once a week." Dist. Ct. Order at 38. But again, assuming the same state of affairs that the district court did—one in which we "discount the factual disputes about the implementation of Defendants' policies and procedures"—the allegedly nonuniform enforcement of social distancing cannot alone constitute deliberate indifference. The district court *never* found that the defendants knew of any potential lapses in enforcement and deliberately ignored them.[6] As we have explained, while the expert report noted

---

[6] Defendant Junior's declaration stated that he was "not aware" of any lapses in the enforcement of Metro West's policies, that he had deployed an "internal auditing team to ensure compliance

some distancing violations, it also observed that social-distancing measures had been implemented and that Metro West's staff members were "doing their best."

Second, ongoing confinement. The plaintiffs assert that "[t]he district court separately found that plaintiffs will likely establish that Junior has exhibited deliberate indifference by enforcing plaintiffs' ongoing confinement when the jail's population precludes adequate distancing." Br. of Appellees at 34. But again, that's just not what the district court's order says. To the contrary, in fact, the district court recognized state criminal-justice officials' role—separate from Junior's—in determining which inmates would be released; in its injunction order, the court ordered the defendants to provide "their state criminal justice partners" with updated information about the virus, presumably so that the defendants, in coordination with state-level actors, could reduce Metro West's population. Dist. Ct. Order at 51–52.

Even if the plaintiffs' posited determination existed, we would reject their reliance on it. Assuming for present purposes (only) that "failing to take an action one knows to be necessary to prevent serious harm—even if outside one's legal authority—can establish the requisite intent for deliberate indifference," Br. of

---

throughout the facility," and that the defendants would "take appropriate corrective action" if procedures were violated.

Appellees at 35, that intent hasn't been shown here.[7]  By taking other measures,

besides release—including, among many other things, implementing some social-

distancing measures, distributing face masks, screening inmates and staff, and

providing cleaning and personal hygiene supplies—Junior has responded

reasonably to the risk of the virus.  Moreover, Junior has been working toward

*exactly* what the plaintiffs seek: a reduction in Metro West's population.  Indeed,

by the time the district court entered its injunction, Junior and state criminal-justice

officials had together secured the release of 894 inmates, thereby reducing Metro

West's population to less than 70% capacity.[8]

---

[7] While we needn't decide it now, legal authority must have *some* bearing on this question.  We have suggested—albeit in dicta—that resource limitations cannot alone preclude deliberate-indifference liability.  *See, e.g.*, *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991) (stating that "a lack of funds allocated to prisons by the state legislature . . . will not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment").  And some of our precedent suggests that "an allegedly contrary duty at state law" won't "excuse the perpetuation of unconstitutional conditions of confinement."  *Smith v. Sullivan*, 611 F.2d 1039, 1043–44 (5th Cir. 1980).  But it certainly isn't the law that *any* person with physical capacity to provide relief to an inmate—say, a custodian at Metro West—can be deemed deliberately indifferent for failing to do so.

[8] The plaintiffs' reliance on *Ex parte Young*, 209 U.S. 123 (1908), is misplaced.  They contend that their suit can be understood as an action against Junior "as enforcer of state-court detention orders, under the well-established doctrine of *Ex parte Young*."  Br. of Appellees at 37.  Even if we were to assume that Junior is a proper defendant under *Ex parte Young*, that does no more than tell us that a suit could lie against him for "prospective equitable relief to end continuing violations of federal law."  *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir. 2000); *see also McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 992–93 (6th Cir. 2019) (upholding an injunction prohibiting a sheriff from detaining probation violators under possibly unconstitutional bail requirements); *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (holding that injunctive relief could be sought against a sheriff due to his enforcement of an allegedly unconstitutional eviction procedure).  Just because Junior could be *ordered to* take an action on pain of contempt doesn't mean that failing to take such an action necessarily constitutes deliberate indifference.  And for all the

**2**

Shifting gears, the defendants separately contend that the district court erred

in its likelihood-of-success-on-the-merits analysis because it failed to consider

"two threshold issues": (1) the heightened standard for municipal liability under

*Monell v. Department of Social Services*, 436 U.S. 658 (1978), and (2) PLRA

exhaustion.  We agree.

Regarding municipal liability, the district court reasoned that "[a]t the

preliminary injunction stage . . . Plaintiffs are not required to 'prove a custom' or

'identify a final policymaker,'" Dist. Ct. Order at 32, as would normally be

required under *Monell*, *see* 436 U.S. at 690–91.  That is incorrect.  The Supreme

Court has recently reiterated that "[i]t is well established that in a § 1983 case a

city or other local governmental entity cannot be subject to liability *at all* unless

the harm was caused in the implementation of 'official municipal policy.'"

*Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1951 (2018) (emphasis added)

(quoting *Monell*, 436 U.S. at 691).  Municipal liability is thus plainly part of the

likelihood-of-success-on-the-merits inquiry at the preliminary-injunction stage, and

the district court erred in sidestepping the issue.  *See Church v. City of Huntsville*,

30 F.3d 1332, 1347 (11th Cir. 1994) (holding that "the plaintiffs have failed to

---

reasons explained in text, we reject the contention that the defendants have been deliberately
indifferent.

establish the existence of a municipal policy or a pervasive practice that could

serve as a predicate to municipal liability under section 1983" and that "[t]herefore,

they have not shown a substantial likelihood of success on the merits").

The district court also erred in refusing to consider the defendants'

arguments with respect to PLRA exhaustion.[9]  "There is no question that

exhaustion is mandatory under the PLRA and that unexhausted claims *cannot be*

*brought* in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007) (emphasis added); *see*

*also Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004) ("A district court

must dismiss the suit when it finds that the plaintiff-inmate has not exhausted his

administrative remedies.").  Accordingly, the plaintiffs could show a substantial

likelihood of success on the merits only if the defendants were unlikely to

demonstrate a lack of PLRA exhaustion.  *See Gonzales v. O Centro Espirita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (explaining that "the

burdens at the preliminary injunction stage track the burdens at trial").

## B

While the failure to show likelihood of success on the merits alone warrants

reversal, we briefly address the district court's analysis of the remaining

---

[9] We reject the plaintiffs' argument that the district court declined to consider PLRA exhaustion because the defendants had waived it.  The district court alluded to waiver in a footnote, but clearly explained that exhaustion would "be fully considered" as part of the defendants' motion to dismiss at a later time, noting simply that it didn't think exhaustion was an appropriate "issue to be decided at the preliminary injunction stage."  Dist. Ct. Order at 28.

preliminary-injunction factors—irreparable harm, the balancing of the harms, and the public interest. *Jones v. Governor of Fla.*, 950 F.3d at 806.

First, the district court erred in holding, without any meaningful analysis, that the plaintiffs would suffer irreparable injury absent an injunction on the ground that "COVID-19 will continue to spread throughout Metro West and infect additional inmates and staff." Dist. Ct. Order at 41. We agree with the defendants that the inquiry isn't whether the plaintiffs have shown that the virus poses a danger to the inmates in the abstract—it undoubtedly does—but rather whether they have shown that they will suffer irreparable injury "unless the injunction issues." *Jones v. Governor of Fla.*, 950 F.3d at 806.

Although the district court acknowledged that our precedent calls the irreparable-injury element "the *sine qua non* of injunctive relief," it devoted only a single conclusory sentence to addressing that requirement—and it gave no consideration to whether the plaintiffs were likely to suffer irreparable injury *absent an injunction*. Dist. Ct. Order at 41. To be sure, the court asserted that without injunctive relief, the virus would continue to spread. But given the way it decided the case, the court couldn't properly determine whether the plaintiffs would be injured absent injunctive relief because it declined to make factual findings about the extent and efficacy of the measures that the defendants were already taking. "As we have emphasized on many occasions, the asserted

irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation omitted); *see also Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  Although the district court suggested that there were "factual disputes" regarding the degree to which the defendants were implementing protective measures, it opted not to resolve them. While the court didn't have to accept the defendants' representations that they would continue to take measures to safeguard inmates from COVID-19, it clearly had to reject those measures as insufficient before deciding that *only* a mandatory injunction could prevent the plaintiffs from suffering irreparable harm.

Second, the district court erred in its determination of the balance-of-the-harms and public-interest factors, which "merge" when, as here, "the Government is the opposing party."  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting as much in the stay context).  The district court held that "[t]he threat of a continuing outbreak of COVID-19" outweighed "the damage to Defendants caused by an injunction requiring Defendants to comply with the CDC Guidance" because, the court said, the defendants had "not offered any evidence as to why the administrative burden resulting from compliance with an injunctive order

31

outweighs the threat of serious illness or death" that would result from the virus. Dist. Ct. Order at 42–43.  With regard to the public interest, it held that "an order requiring Defendants to implement various measures to reduce the spread of the virus in Metro West advances the public interest by reducing the chance of community spread." *Id.* at 43.

While the virus unquestionably poses a serious threat to inmates, the district court gave insufficient consideration to the burdens with which the injunction would saddle the defendants. *Cf. Williams*, 2020 WL 3056217, at *11 (noting that the district court's preliminary-injunction analysis was "incomplete" because "the district court gave scant attention to the harms the BOP argued would result from the injunction").  And to be clear, this is not (solely) about weighing health and safety against security and administrative efficiency; it is also about weighing health and safety against health and safety.  As this Court explained in its stay order, the injunction stripped away at least some of the defendants' discretion "to allocate scarce resources among different county operations necessary to fight the pandemic." *Swain*, 958 F.3d at 1090.  For example, because "the injunction require[d] that the defendants test all inmates with COVID-19 symptoms and everyone with whom they have been in contact," it forced the defendants to "allocate limited testing resources to Metro West at the expense of other county facilities," under pain of contempt. *Id.*  Perhaps especially in the prison context,

government officials have a keen interest in maintaining the necessary flexibility to react quickly in response to new information about the virus.  The district court therefore erred in failing to consider the "damage [its] proposed injunction may cause" the defendants.  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (quotation omitted).

Finally, while it doubtlessly advances the public interest to stem the spread of COVID-19, at Metro West and everywhere, the same public interest just as doubtlessly favors a proper allocation of public-health resources—an allocation that politically accountable (and often local) officials are best equipped to make. *See S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056 (U.S. May 29, 2020) (Roberts, C.J., concurring in denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)).[10]

---

[10] Because we conclude that the district court erred in granting the preliminary injunction, we needn't address whether the terms of the injunction violated the PLRA and Federal Rule of Civil Procedure 65.  We pause to note, however, that the district court's formulaic recitation at the end of its order—that "the relief set forth herein is 'narrowly drawn, extends no further than necessary to correct the violation of' Plaintiffs' Eighth Amendment rights, 'and is the least intrusive means necessary to correct' Defendants' violation of those rights," Dist. Ct. Order at 48–49—may well be insufficient to meet this Court's reading of PLRA § 3626(a)(1) "to require particularized findings that each requirement imposed by the preliminary injunction satisfies each of the need-narrowness-intrusiveness criteria," *United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228 (11th Cir. 2015) ("We see no reason why the term 'finds' in § 3626(a)(1) does not require the same particularity as the term 'findings' in § 3626(b)(3)."); *see also Cason v. Seckinger*, 231 F.3d 777, 785 (11th Cir. 2000) (requiring particularized findings under 18

# III

While COVID-19 poses novel health risks to incarcerated inmates—and novel administrative challenges for jail and prison administrators—the law that the district court was bound to apply is well established.  In order to obtain a preliminary injunction, the plaintiffs had to show a substantial likelihood of success on the merits of their constitutional claim, which means that they had to demonstrate the defendants' deliberate indifference—which is to say their utter recklessness.  Because the district court erred, among other ways, in erroneously concluding that the plaintiffs had met that requirement, we conclude that it abused its discretion in granting the preliminary injunction.[11]

**VACATED AND REMANDED.**

---

U.S.C. § 3626(b)(3) and holding that a "district court's summary conclusion" that relief met the PLRA's requirements was "seriously deficient").

[11] There is one loose end: We recognize that, due to the evolving nature of both the COVID-19 virus and the public-health community's recommended responses to it, the district court might be faced on remand with a factual landscape that has changed since it issued its injunction.  We emphasize the Supreme Court's admonition that, in a suit in which a plaintiff "seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, 'the subjective factor, deliberate indifference, should be determined in light of the prison authorities' *current attitudes and conduct*': their attitudes and conduct at the time suit is brought *and persisting thereafter*."  *Farmer*, 511 U.S. at 845 (emphasis added) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  Accordingly, any future assessment of the defendants' conduct must take account of additional measures and precautions that the defendants have instituted during the pendency of this appeal.

MARTIN, Circuit Judge, dissenting:

The COVID-19 pandemic is a health crisis without precedent in living memory.  At the time we heard oral argument in this case, the virus had already claimed the lives of over 100,000 Americans.  Ctrs. for Disease Control & Prevention, United States Coronavirus (COVID-19) Death Toll Surpasses 100,000 (May 28, 2020), https://www.cdc.gov/media/releases/2020/s0528-coronavirus-death-toll.html.  COVID-19 is highly infectious and easily communicable.  Of those infected, approximately 20% will become seriously ill and 1 to 3% will die.  People with common health conditions including lung or heart disease, diabetes, and chronic liver or kidney conditions are at much greater risk of death.  About 15% of them will die if they contract COVID-19.  Those who survive may nonetheless experience permanent organ and neurological damage.  There is no known vaccine or effective antiviral medication to prevent or treat infection from COVID-19.  The only effective way to protect people is to take precautionary measures to avoid infection.

Against this background, seven pretrial detainees held at the Miami-Dade Metro West Detention Center ("Metro West") brought suit against Daniel Junior, the director of the Miami-Dade Corrections and Rehabilitation Department ("MDCR"), and Miami-Dade County.  They sued on behalf of a putative class of people detained at Metro West during the COVID-19 pandemic, as well as a subset

of people in pretrial custody at Metro West who are particularly vulnerable to injury or death if they contract the virus.  The named plaintiffs all have preexisting medical conditions that place them among those at highest risk of death or serious illness if they are infected.  They sought emergency declaratory and injunctive relief that would compel Metro West to take steps to reduce the risk of transmission of COVID-19 at the facility.[1]

As part of their emergency request for relief, Plaintiffs presented extensive evidence showing a unified expert consensus on two essential facts.  First, the best way to prevent infection is through social distancing.  Second, adequate social distancing was not possible at the population level in Metro West at the time they sought the injunction.  Plaintiffs also submitted nearly two dozen sworn affidavits describing how jail staff and administrators had failed to implement adequate measures to maintain safe conditions even while Metro West remains dangerously crowded.  On this record, I believe Plaintiffs are likely to succeed on their deliberate indifference claim.  I would therefore affirm the preliminary injunction imposed by the District Judge.

---

[1] Plaintiffs also sought a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on behalf of the subset of medically vulnerable individuals.  Through this request, Plaintiffs sought the immediate release of themselves and all other members of the subset.  The District Court denied the petition.  The denial of that petition is not now before us.

# I.

Because incarceration "strip[s] [detainees] of virtually every means of self-protection and foreclose[s] their access to outside aid," the Constitution imposes affirmative obligations on jail officials to provide prisoners with "adequate food, clothing, shelter, and medical care," and to "take reasonable measures to guarantee [their] safety."[2]  Farmer v. Brennan, 511 U.S. 825, 832–33, 114 S. Ct. 1970, 1976–77 (1994) (quotation marks omitted).  Jail officials violate the Eighth and Fourteenth Amendment when they fail to respond reasonably to a known, substantial risk of serious harm, such as "exposure . . . to a serious, communicable disease."  See Helling v. McKinney, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480 (1993); see also Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (per curiam) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates." (quotation marks omitted)).

Plaintiffs seeking to prove this type of Fourteenth Amendment violation must show that jail officials acted with "deliberate indifference."  Farmer, 511 U.S. at 840, 114 S. Ct. at 1980.  Plaintiffs must show that they face a substantial risk of serious harm and that defendants were deliberately indifferent to that risk.

---

[2] While the Fourteenth Amendment governs the constitutional limits of pretrial detention conditions, our circuit treats deliberate indifference claims brought under the Fourteenth Amendment similarly to those brought on behalf of convicted prisoners under the Eighth Amendment.  See Taylor v. Hughes, 920 F.3d 729, 733 (11th Cir. 2019).

Goodman, 718 F.3d at 1331.  While the first prong is objective, the second prong

has both subjective and objective components.  There must be a showing that jail

officials actually knew of the risk and either disregarded it or failed to respond in a

reasonable manner.  Marbury, 936 F.3d at 1233; see Rodriguez v. Sec'y for Dep't

of Corr., 508 F.3d 611, 620 (11th Cir. 2007).

My review of this record amply supports the District Court's holding that

Plaintiffs are likely to show their treatment amounted to deliberate indifference.

Defendants acknowledge their subjective awareness of the objectively grave risk

the COVID-19 pandemic poses to the safety of those detained at Metro West.  But

Defendants say they took reasonable steps, within the limits of their legal

authority, to ensure detainee safety in the face of the COVID-19 threat.  Unlike the

majority, I see no abuse of discretion in the District Court's finding to the contrary.

This record shows that Defendants knowingly maintained conditions that placed

detainees at an impermissibly high risk of illness and death in two ways: first, by

maintaining a dangerously high jail population; and second, by failing to

implement needed safety measures that would reduce the risk of infection in that

already unsafe population level.  I address these two independent bases for finding

deliberate indifference in turn.

A.

First there is Metro West's unsafe population density.  I view the evidence

that Defendants willfully incarcerated people at a population density that they

knew to be unsafe as sufficient to show deliberate indifference.  The majority

opinion nonetheless concludes that Defendants cannot be found deliberately

indifferent because they took other steps to decrease the risk of COVID-19

transmission and because they lack authority to release detainees without a state

criminal court order.  Maj. Op. at 27 & n.7.  I reject this reasoning.

Social distancing is the most effective measure for reducing the risk of

COVID-19 transmission.  But we have unrebutted expert testimony showing that

adequate social distancing was not possible at Metro West's population level at the

time the preliminary injunction issued.  Dr. Dushyantha Jayaweera and Dr. Hansel

Tookes were appointed by the District Court to inspect and report on conditions at

Metro West.  They reflected the overwhelming expert consensus when they opined

that the dense population of Metro West "makes it impossible to follow CDC

guidance for social distancing measures, placing staff and inmates at risk for

COVID-19 infection."  Because of this impossibility, the experts recommended an

"urgent decrease" in the jail's population and increased screening for COVID-19.

Defendants do not dispute the importance of social distancing or that it was

effectively impossible to achieve social distancing with the population levels at

Metro West when the injunction issued. Yet despite knowledge that the population

level was unsafe, Defendants continued to detain significantly more people than

Metro West can safely hold during this pandemic. As a result, people at Metro

West were much more likely to contract COVID-19 than if the jail population were

reduced.

Taken together, these facts make out elements of a claim of deliberate

indifference. Defendants knew of the risk posed by overcrowding, knew that this

risk could be most effectively abated by lowering the jail population, and yet did

not take that step. This knowing failure to take necessary steps to prevent grave

harm sits comfortably at the heart of what our Court considers to be deliberate

indifference. See Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th

Cir. 1985) (holding that "if necessary medical treatment has been delayed for non-

medical reasons, a case of deliberate indifference has been made out"). In the

following sections I address the majority opinion's two main reasons for rejecting

this conclusion: that Defendants took other measures to address the pandemic and

that they lacked the authority to release detainees.

1.

The majority says that by taking other measures short of releasing detainees,

Director Junior "has responded reasonably to the risk of the virus." Maj. Op. at 27.

But his taking some steps to reduce the risk of COVID-19 does not excuse his

40

failure to take the most important step for ensuring detainee safety.  That is an
"urgent decrease" in the detained population of Metro West.  Director Junior's
knowing failure to do so supports a finding of deliberate indifference.

Under this Court's precedent, "good faith efforts" to resolve health risks are
insufficient to overcome evidence that jail staff "recklessly disregarded the
necessary means to protect inmate safety."  LaMarca v. Turner, 995 F.2d 1526,
1538 (11th Cir. 1993).  We know deliberate indifference may be shown by proving
that a detention center knowingly took "an easier but less efficacious course of
[medical] treatment."  McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999).
And this Court has also found deliberate indifference where prison staff delayed or
"fail[ed] to provide service acknowledged to be necessary."  Ancata, 769 F.2d at
704.

Here, the experts speak with one voice when they say reducing the
population density at Metro West is "necessary" to reasonably prevent the spread
of infection.  Defendants were subjectively aware of the gravity of the threat posed
by COVID-19.  Director Junior familiarized himself with the CDC
recommendations and communicated to jail staff that it was "now more important
than ever that we all practice strict social distancing at all times, no exceptions."  It
cannot seriously be doubted that Director Junior knew decreasing the jail
population was the most effective way to reduce the risk of infection.  Despite this,

the population density of Metro West was still critically high at the time the preliminary injunction issued.

This record shows that Defendants recklessly failed to take the most essential step to ensuring the safety of Metro West detainees.  In light of this, I am not persuaded that the other measures implemented at Metro West in place of lowering the jail population were sufficient to preclude a finding of deliberate indifference.

2.

Defendants claim they cannot be found deliberately indifferent for their failure to address unsafe crowding at Metro West because they lacked the authority to release detainees without a state court order.  Unlike the majority, I do not think the scope of Defendants' authority under Florida law controls the outcome of the deliberate indifference inquiry.  Maj. Op. at 27 n.7.

State laws that compel jail officials to detain people in manifestly unsafe conditions cannot preclude a finding of deliberate indifference.  In Smith v. Sullivan, 611 F.2d 1039 (5th Cir. 1980),[3] our predecessor Court rejected a county sheriff's objection to a court order requiring him to decrease the total jail population on the grounds that it would "violate his statutory duty to accept

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

prisoners." Id. at 1043.  The Smith panel reasoned that an "allegedly contrary duty

at state law" cannot "excuse the perpetuation of unconstitutional conditions of

confinement."  Id. at 1044.  In the same way, this Court has held that state-imposed

budget limitations "will not excuse the failure of correctional systems to maintain a

certain minimum level of medical service necessary to avoid the imposition of

cruel and unusual punishment."  Harris v. Thigpen, 941 F.2d 1495, 1509 (11th Cir.

1991); see also Costello v. Wainwright, 525 F.2d 1239, 1252 (5th Cir. 1976)

("[T]he obligation of [prison officials] to eliminate unconstitutionalities does not

depend upon what the Legislature may do . . . ." (quotation marks omitted)),

vacated in part on reh'g, 539 F.2d 547 (5th Cir. 1976) (en banc), rev'd, 430 U.S.

325, 97 S. Ct. 1191 (1977), and opinion reinstated, 553 F.2d 506 (5th Cir. 1977).

These cases reflect the longstanding rule that, in enforcing state law, officials may

not knowingly detain people in jails that fall below the minimum constitutional

standard of safety.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489

U.S. 189, 200, 109 S. Ct. 998, 1005 (1989) ("[W]hen the State by the affirmative

exercise of its power so restrains an individual's liberty that it renders him unable

to care for himself, and at the same time fails to provide for his basic human

needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it

transgresses the substantive limits on state action set by the Eighth Amendment

and the Due Process Clause."); <u>Helling</u>, 509 U.S. at 33, 113 S. Ct. at 2481 (holding

it is cruel and unusual punishment to hold prisoners "in unsafe conditions").

If contrary state law obligations precluded finding deliberate indifference,

federal courts would be powerless to enjoin unconstitutional prison conditions

wherever state legislatures act to withhold prison officials' authority to remedy

them.  But this cannot be the rule.  In <u>Brown v. Plata</u>, 563 U.S. 493, 131 S. Ct.

1910 (2011), the Supreme Court affirmed relief given to address system-wide,

Eighth-Amendment-violative conditions of confinement caused by overcrowding

and lack of medical resources.  <u>See id.</u> at 500, 520–25, 131 S. Ct. at 1922, 1936–

39.  In doing so, the Supreme Court stood behind a court-imposed remedy even

though it required measures beyond the authority given to some jail officials under

state law.  <u>Compare</u> <u>Coleman v. Wilson</u>, 912 F. Supp. 1282, 1317 (E.D. Cal. 1995)

(finding that prison officials' lack of power or authority to address unconstitutional

prison conditions caused in part by overcrowding "does not necessarily

contraindicate scienter") <u>with</u> <u>Brown</u>, 563 U.S. at 500, 131 S. Ct. at 1922

(affirming remedial order of three-judge court convened at the request of the

<u>Coleman</u> court).  Congress has also empowered federal courts to exceed the

bounds of state law in order to correct violations of federal constitutional rights.

The Prison Litigation Reform Act ("PLRA") authorizes district courts to "require[]

or permit[] a government official to exceed his or her authority under State or local

law" when that relief is necessary to correct the violation of a federal right and no other relief is sufficient.  18 U.S.C. § 3626(a)(1)(B).  It is thus clear that federal courts may enjoin the knowing detention of people in unsafe conditions even when state law compels that detention.

This Court's precedent interpreting Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908), further supports the idea that Director Junior's state law obligations to the contrary do not preclude finding deliberate indifference.  Under Young, a plaintiff may seek prospective injunctive relief to remedy ongoing state violations of federal law by suing a state official in his official capacity.  See Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1219 (11th Cir. 2000).  This type of remedy is "designed to end a continuing violation of federal law" and is "necessary to vindicate the federal interest in assuring the supremacy of that law."  Id. (quotation marks omitted); see also Green v. Mansour, 474 U.S. 64, 68, 106 S. Ct. 423, 426 (1985) ("[T]he availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause.").  Here, Director Junior has repeatedly insisted that state law leaves him no discretion to release detainees even though continuing to detain them places them at a significantly heightened risk of contracting COVID-19.  But if it is his non-discretionary, ministerial role in enforcing state laws that creates

unsafe conditions of confinement in Metro West, he may properly be sued for injunctive relief.  See Luckey v. Harris, 860 F.2d 1012, 1015–16 (11th Cir. 1988).[4]

Because Plaintiffs seek injunctive relief against Director Junior in his capacity as a state official, they are not required to prove he personally disregarded the risk to their safety.  In suits against state officials acting pursuant to state authority, "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief." Luckey, 860 F.2d at 1015.  Director Junior's continuing enforcement of state law has created widespread, untenably dangerous conditions for Metro West detainees and staff.  And when state and local officials knowingly fail to meet their affirmative constitutional obligation to ensure safe jail conditions, "judicial authority may be invoked." Hutto v. Finney, 437 U.S. 678,

_____

[4] That Director Junior is employed by Miami-Dade County, not the state of Florida, does not likely make him an improper defendant under Ex parte Young.  A municipal official who "commits an alleged constitutional violation by simply complying with state mandates that afford no discretion . . . act[s] as an arm of the State, not the county."  McNeil v. Cmty. Prob. Servs., LLC, 945 F.3d 991, 995 (6th Cir. 2019) (alteration adopted) (quotation marks omitted); see also Moore v. Urquhart, 899 F.3d 1094, 1103 (9th Cir. 2018) (holding that "[a]ctions under Ex parte Young can be brought against both state and county officials"), cert. denied sub nom. Johanknecht v. Moore, 139 S. Ct. 2615 (2019); Huminski v. Corsones, 396 F.3d 53, 73 (2d Cir. 2005) (finding a county sheriff was "likely a state official when he was performing his general duties for the sheriff's department, particularly when he was acting pursuant to state law"); Scott v. O'Grady, 975 F.2d 366, 371 (7th Cir. 1992) (observing that "[t]he fact that [county sheriffs] normally act as county officials does not mean that they can never act as an arm of the state" and holding a function as an arm of the state when he had no discretion in enforcing state court order).  In this Circuit, we determine whether a county sheriff was a state or municipal official for purposes of Eleventh Amendment liability, by examining "how state law defines the entity, what degree of control the state maintains over the entity, where funds for the entity are derived, and who is responsible for judgment against the entity."  Hufford v. Rodgers, 912 F.2d 1338, 1341 (11th Cir. 1990).

687 n.9, 98 S. Ct. 2565, 2572 n.9 (1978) (quotation marks omitted). A rule that

precludes federal judges from enjoining dangerous jail conditions mandated by

state law would require those judges to abdicate a core function of their office.[5]

## B.

Setting aside Defendants' failure to reduce Metro West's population, I am

also not persuaded Defendants took sufficient steps to minimize the risk of

transmission at that unsafe population level. The District Judge rejected

Defendants' assurances that "everything that could be done was being done" and

found that the record "does not unequivocally demonstrate successful

implementation of the policies, protocols and procedures identified in their

declarations." This record supports her finding. The majority describes in detail

the remedial measures Defendants claim to have taken, noting that the District

Court accepted those claims. Maj. Op. at 21–24. However, the District Court also

set out in great detail the statements of the people detained at Metro West, which

paint a far different picture.[6] Together, they support the finding that Defendants

---

[5] The majority worries that finding deliberate indifference despite a lack of legal authority to act would mean that "any person with physical capacity to provide relief to an inmate" could be held deliberately indifferent. Maj. Op. at 27 n.7. I do not share this concern. Young defines a narrower range of parties who may be sued in their official capacity to remedy unconstitutional jail conditions mandated by state law. That is those who, by virtue of their office, have a connection to the unconstitutional act or conduct taken under requirement of state law. Luckey, 860 F.2d at 1015–16.

[6] The majority notes that the District Court did not resolve factual disputes about the implementation of Defendants' policies and procedures. I do not fault the majority for its careful

systematically failed to implement policies adequate to ensure detainee safety at

this high population level.  This is sufficient, in my view, to support a finding of

deliberate indifference.

In declarations submitted in support of Plaintiffs' motion for a preliminary

injunction, Metro West detainees describe beds placed so close together they can

reach out and touch neighboring bunks.  Tending to even their most basic daily

needs requires close contact with other detainees.  The limited showers, toilets, and

telephones are placed close together and they are shared by up to 60 people.

Detainees say it is often difficult or impossible to clean shared surfaces, such as

phones, because they are not provided with disinfectant or other cleaning supplies.

Defendants tell us that all staff and detainees are required to wear masks, but it

appears adherence to this requirement is problematic.  At the time the injunction

was issued, detainees were each given a mask approximately once a week, but the

---

exegesis of the District Court's order, but I think this degree of scrutiny applied to the scope of
the District Court's factual findings is misplaced.  See Maj. Op. at 16–20.  Our review of
preliminary injunction orders is meant to be "deferential" due to the expedited nature of
preliminary injunction proceedings.  See Jones v. Governor of Fla., 950 F.3d 795, 806 (11th Cir.
2020) (per curiam).  In the preliminary injunction setting, district courts are in the unenviable
position of both evaluating the viability of a plaintiff's claims and balancing the equities of the
case on an emergency timeline.  See id.

The majority also faults Plaintiffs for raising arguments which the District Court did not
address in the preliminary injunction order, including Defendants' failure to implement
"feasible" social distancing measures.  See Maj. Op. at 24–25.  It is a mistake to hold this against
Plaintiffs.  After all, an appellee who does not take a cross-appeal may urge affirmance based on
"any ground that finds support in the record," including through arguments at odds with the
reasoning of the lower court.  Jaffke v. Dunham, 352 U.S. 280, 281, 77 S. Ct. 307, 308 (1957)
(per curiam); see also Jennings v. Stephens, 574 U.S. 271, 276, 135 S. Ct. 793, 798 (2015).

masks are "soft," "rip a lot," and "get really dirty."  Sometimes the masks break

after "two to three days."  Despite this, detainees are not always provided with

replacements for broken masks and may be chastised or threatened with

disciplinary action if they request a new one.

The detainee declarations also suggest Defendants have implemented

policies that make it impossible to maintain adequate distancing.  For example,

three times a day, detainees must line up "shoulder-to-shoulder," less than three

feet apart, to be counted.  Detainees also participate in mandatory outdoor

recreation in a space shared with people from quarantined cells.  Before going

outside, they are lined up less than a foot apart for pat-down inspections.  Three

days can pass between placing a sick call and receiving medical attention.  Trips to

the clinic are made in groups of eight to ten and, once there, detainees must wait

"shoulder-to-shoulder," sometimes with people from other cells.

Taken together, the repeated failures to enact adequate social distancing

measures documented in these declarations are sufficient to demonstrate a

systemic, institutional pattern of deliberate indifference.  The majority opinion is

not sufficiently attentive to the way our Circuit has historically addressed

deliberate indifference claims based on widespread unconstitutional conditions

within a jail or prison.  In cases like these, this Court has held that systemic

deliberate indifference may be proved through a series of related examples that

demonstrate a pattern of "indifference . . . to the suffering that results." Thigpen, 941 F.2d at 1505 (quotation marks omitted).   We have allowed plaintiffs to show deliberate indifference through a pattern of "systemic deficiencies" or "[r]epeated examples of delayed or denied medical care." Rogers v. Evans, 792 F.2d 1052, 1057–59 (11th Cir. 1986).  Similarly, a series of incidents closely related in time "may disclose a pattern of conduct amounting to deliberate indifference." Id. at 1058–59.  In light of the plaintiffs' evidence here, I believe they are likely to prove a reckless failure to take medically necessary safety precautions at Metro West.

Remarkably, Defendants have not defended the practices attested to in the detainee declarations.  The majority correctly points out that the CDC's recommendations recognize that "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff."  Maj. Op. at 22 (alteration in original).  Nevertheless, Defendants have given no explanation of why the actual conditions described by detainees were reasonably tailored to Metro West's needs.  With this gap in the evidentiary record, the District Court was not required to credit Director Junior's assertion that the measures he implemented were adequate.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Hale v. Tallapoosa County, 50 F.3d 1579, 1583 (11th Cir. 1995) (quoting Farmer, 511 U.S. at 842, 114 S. Ct. at 1981).

The majority opinion also places too much weight on the broad, laudatory preamble to Dr. Jayaweera and Dr. Tookes' court-ordered inspection report, which praised Metro West staff for "doing their best balancing social distancing and regulation applicable to the facility." Maj. Op. at 7, 22, 24, 26. It appears the District Court either discredited or declined to give dispositive weight to this portion of the report, because it did not mention this language anywhere in the preliminary injunction order. Under the circumstances, this was not clear error. Over Plaintiffs' objection, Dr. Tookes and Dr. Jayaweera's inspection was conducted at a predetermined time and was limited to predetermined locations within the jail. And this record includes declarations from detainees stating that immediately before the inspection Metro West staff made numerous last minute changes, including moving people out of cells that were going to be inspected so they would be less crowded; restocking toilet paper and soap; painting bathroom walls to cover black mold; scrubbing down cells; and placing additional soap in the unit. There are also post-inspection declarations that document widespread failure to implement adequate social distancing measures. I therefore see no error in the District Court's decision to give no weight to the notion that Metro West staff were doing their best.

## II.

In closing, I will briefly describe why I part ways with the majority's analysis of what it describes as "threshold issues": municipal liability under Monell v. Department of Social Services, 436 U.S. 658, 86 S. Ct. 2018 (1978), and the PLRA's administrative exhaustion requirement.  Maj. Op. at 28.

Under Monell, a plaintiff seeking to hold a municipality liable for a constitutional violation must identify either an officially promulgated county policy or an unofficial custom or practice shown through the acts of a final policymaker.  Grech v. Clayton County, 335 F.3d 1326, 1329 (11th Cir. 2003).  I agree with the majority that, typically, district courts should address municipal liability in evaluating whether plaintiffs proceeding against a municipality are likely to succeed on the merits.  Maj. Op. at 28–29.  But I've set out why I think Plaintiffs may properly proceed against Director Junior as a state official under Ex parte Young.  See supra, pages 45–47 & n.4.  If Plaintiffs can get their desired relief by proceeding against Director Junior in his capacity as a state official, I don't believe they are required to also show that they will prevail on their claims against Miami-Dade County under Monell.

Neither do I think the District Court erred in deferring its ruling on exhaustion.  Defendants' brief in opposition to the preliminary injunction included a scant two paragraphs of argument on administrative exhaustion and no citations

to the record.  But they tried to incorporate the arguments they made about exhaustion in a separate motion that is 97 pages long, including a 13-page brief and 84 additional pages of exhibits.  That motion was filed on a different briefing schedule, and Plaintiffs had not yet responded to Defendants' filing at the time the District Court ruled on the preliminary injunction.  The District Court found that Defendants' opposition to the preliminary injunction improperly attempted to incorporate by reference their separate motion to dismiss for failure to exhaust.

Our Court certainly would not opine on an issue that was merely incorporated by reference by one party and not fully briefed (for lack of opportunity) by the other.  I am aware of no basis for requiring district judges to live by a different standard.  Beyond that, administrative exhaustion is an affirmative defense for which Defendants bear the burden of proof.  See Jones v. Bock, 549 U.S. 199, 212, 127 S. Ct. 910, 919 (2007); Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008).  Before ruling on exhaustion, a district court must ensure the plaintiff has "sufficient opportunity to develop a record."  Bryant v. Rich, 530 F.3d 1368, 1376 (11th Cir. 2008).  And although proving exhaustion is a "precondition to an adjudication on the merits," it is not jurisdictional and may be raised by Defendants at various times in the course of litigation.  Id. at 1374 & n.10.

Here, the District Court acted well within its discretion when it rejected
Defendants' attempts to incorporate a separate, sizeable filing into its brief.  This
Court traditionally gives "great deference to a district court's interpretation of its
local rules," Clark v. Hous. Auth. of City of Alma, 971 F.2d 723, 727 (11th Cir.
1992), including its authority to enforce page limitations, Yates v. Cobb Cty. Sch.
Dist., 687 F. App'x 866, 868 (11th Cir. 2017) (per curiam) (unpublished).
Certainly our Court actively polices its own page limits requirements.  For
example, we have said that an attempt to incorporate by reference 25 pages of
lower-court briefing into an appellate brief "makes a mockery of our rules
governing page limitations and length."  Four Seasons Hotels & Resorts, B.V. v.
Consorcio Barr S.A., 377 F.3d 1164, 1167 n.4 (11th Cir. 2004).  I would do the
District Judge the courtesy of allowing her, in turn, to manage her own docket and
page limits.

### III.

The COVID-19 pandemic is a global health crisis that has taken the lives of
thousands and strained every level of our society and government.  But crises do
not lower the constitutional limits on the conditions in which people may be
confined against their will.  People held in prisons and detention centers are among
the most vulnerable to the ravages of this devastating illness.  I do not understand
the Fourteenth Amendment to permit the knowing and willful detention of human

beings in circumstances that place them at great risk of death or grave illness.  I

would affirm the District Court Order granting Plaintiffs' motion for a preliminary

injunction.

I respectfully dissent.

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of **March 23, 2020**.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the following CDC website periodically for updated interim guidance: https://www.cdc.gov/coronavirus/2019-ncov/index.html.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

## In this guidance

- Who is the intended audience for this guidance?
- Why is this guidance being issued?
- What topics does this guidance include?
- Definitions of Commonly Used Terms
- Facilities with Limited Onsite Healthcare Services
- COVID-19 Guidance for Correctional Facilities
- Operational Preparedness
- Prevention
- Management
- Infection Control
- Clinical Care of COVID-19 Cases
- Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons
- Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

## Who is the intended audience for this guidance?



This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., US Immigration and Customs Enforcement and US Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of COVID-19 in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes. **The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.



**cdc.gov/coronavirus**

CS 316182-A   03/27/2020

## Why is this guidance being issued?

Correctional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors. Consistent application of specific preparation, prevention, and management measures can help reduce the risk of transmission and severe disease from COVID-19.

- Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced.

- In most cases, incarcerated/detained persons are not permitted to leave the facility.

- There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

- Persons incarcerated/detained in a particular facility often come from a variety of locations, increasing the potential to introduce COVID-19 from different geographic areas.

- Options for medical isolation of COVID-19 cases are limited and vary depending on the type and size of facility, as well as the current level of available capacity, which is partly based on medical isolation needs for other conditions.

- Adequate levels of custody and healthcare staffing must be maintained to ensure safe operation of the facility, and options to practice social distancing through work alternatives such as working from home or reduced/alternate schedules are limited for many staff roles.

- Correctional and detention facilities can be complex, multi-employer settings that include government and private employers. Each is organizationally distinct and responsible for its own operational, personnel, and occupational health protocols and may be prohibited from issuing guidance or providing services to other employers or their staff within the same setting. Similarly, correctional and detention facilities may house individuals from multiple law enforcement agencies or jurisdictions subject to different policies and procedures.

- Incarcerated/detained persons and staff may have medical conditions that increase their risk of severe disease from COVID-19.

- Because limited outside information is available to many incarcerated/detained persons, unease and misinformation regarding the potential for COVID-19 spread may be high, potentially creating security and morale challenges.

- The ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations. Many facilities restrict access to soap and paper towels and prohibit alcohol-based hand sanitizer and many disinfectants.

- Incarcerated persons may hesitate to report symptoms of COVID-19 or seek medical care due to co-pay requirements and fear of isolation.

CDC has issued separate COVID-19 guidance addressing healthcare infection control and clinical care of COVID-19 cases as well as close contacts of cases in community-based settings. Where relevant, community-focused guidance documents are referenced in this document and should be monitored regularly for updates, but they may require adaptation for correctional and detention settings.

This guidance document provides additional recommended best practices specifically for correctional and detention facilities. **At this time, different facility types (e.g., prison vs. jail) and sizes are not differentiated. Administrators and agencies should adapt these guiding principles to the specific needs of their facility.**

## What topics does this guidance include?

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

√   Operational and communications preparations for COVID-19

√   Enhanced cleaning/disinfecting and hygiene practices

√   Social distancing strategies to increase space between individuals in the facility

√   How to limit transmission from visitors

√   Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

√   Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

√   Medical isolation of confirmed and suspected cases and quarantine of contacts, including considerations for cohorting when individual spaces are limited

√   Healthcare evaluation for suspected cases, including testing for COVID-19

√   Clinical care for confirmed and suspected cases

√   Considerations for persons at higher risk of severe disease from COVID-19

## Definitions of Commonly Used Terms

**Close contact of a COVID-19 case—**In the context of COVID-19, an individual is considered a close contact if they a) have been within approximately 6 feet of a COVID-19 case for a prolonged period of time or b) have had direct contact with infectious secretions from a COVID-19 case (e.g., have been coughed on). Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

**Cohorting—**Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of COVID-19—**Community transmission of COVID-19 occurs when individuals acquire the disease through contact with someone in their local community, rather than through travel to an affected location. Once community transmission is identified in a particular area, correctional facilities and detention centers are more likely to start seeing cases inside their walls. Facilities should consult with local public health departments if assistance is needed in determining how to define "local community" in the context of COVID-19 spread. However, because all states have reported cases, all facilities should be vigilant for introduction into their populations.

**Confirmed vs. Suspected COVID-19 case—**A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms. A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results. If test results are positive, a suspected case becomes a confirmed case.

**Incarcerated/detained persons—**For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting where these guidelines are generally applicable. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e, detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Medical Isolation—**Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials (detailed in guidance below). In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion.

**Quarantine—**Quarantine refers to the practice of confining individuals who have had close contact with a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed under medical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility.

**Social Distancing—**Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication.

**Staff—**In this document, "staff" refers to all public sector employees as well as those working for a private contractor within a correctional facility (e.g., private healthcare or food service). Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff including private facility operators.

**Symptoms—**Symptoms of COVID-19 include fever, cough, and shortness of breath. Like other respiratory infections, COVID-19 can vary in severity from mild to severe. When severe, pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations most at risk for disease and complications are not yet fully understood. Monitor the CDC website for updates on these topics.

## Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails usually employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of confirmed and suspected COVID-19 cases and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they encounter confirmed or suspected cases among incarcerated/detained persons or staff, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with confirmed and suspected COVID-19 cases. Facilities should make contingency plans for the likely event of PPE shortages during the COVID-19 pandemic.

## COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections can be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness**. This guidance is intended to help facilities prepare for potential COVID-19 transmission in the facility. Strategies focus on operational and communications planning and personnel practices.

- **Prevention.** This guidance is intended to help facilities prevent spread of COVID-19 from outside the facility to inside. Strategies focus on reinforcing hygiene practices, intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals).

- **Management.** This guidance is intended to help facilities clinically manage confirmed and suspected COVID-19 cases inside the facility and prevent further transmission. Strategies include medical isolation and care of incarcerated/detained persons with symptoms (including considerations for cohorting), quarantine of cases' close contacts, restricting movement in and out of the facility, infection control practices for individuals interacting with cases and quarantined contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas visited by cases.

## Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and how to respond if they develop symptoms. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

### Communication & Coordination

√ **Develop information-sharing systems with partners.**

   o Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before cases develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.

   o Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

o Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.

o Where possible, put plans in place with other jurisdictions to prevent confirmed and suspected COVID-19 cases and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.

o Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

√ **Review existing pandemic flu, all-hazards, and disaster plans, and revise for COVID-19.**

o Ensure that physical locations (dedicated housing areas and bathrooms) have been identified to isolate confirmed COVID-19 cases and individuals displaying COVID-19 symptoms, and to quarantine known close contacts of cases. (Medical isolation and quarantine locations should be separate). The plan should include contingencies for multiple locations if numerous cases and/or contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for details regarding individual medical isolation and quarantine locations (preferred) vs. cohorting.

o Facilities without onsite healthcare capacity should make a plan for how they will ensure that suspected COVID-19 cases will be isolated, evaluated, tested (if indicated), and provided necessary medical care.

o Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.

o Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the epidemiologic context changes.

√ **Coordinate with local law enforcement and court officials.**

o Identify lawful alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of COVID-19 transmission.

o Explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak.

√ **Post signage throughout the facility communicating the following:**

o **For all:** symptoms of COVID-19 and hand hygiene instructions

o **For incarcerated/detained persons:** report symptoms to staff

o **For staff:** stay at home when sick; if symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting their healthcare provider as soon as possible to determine whether they need to be evaluated and tested, and contacting their supervisor.

o Ensure that signage is understandable for non-English speaking persons and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

## Personnel Practices

√ **Review the sick leave policies of each employer that operates in the facility.**

o Review policies to ensure that they actively encourage staff to stay home when sick.

o If these policies do not encourage staff to stay home when sick, discuss with the contract company.

o Determine which officials will have the authority to send symptomatic staff home.

√ **Identify staff whose duties would allow them to work from home. Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of COVID-19 transmission.**

  o Discuss work from home options with these staff and determine whether they have the supplies and technological equipment required to do so.

  o Put systems in place to implement work from home programs (e.g., time tracking, etc.).

√ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

  o Allow staff to work from home when possible, within the scope of their duties.

  o Identify critical job functions and plan for alternative coverage by cross-training staff where possible.

  o Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.

  o Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

√ **Consider offering revised duties to staff who are at** higher risk of severe illness with COVID-19**.** Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

  o Facility administrators should consult with their occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to COVID-19.

√ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza cases in a facility can speed the detection of COVID-19 cases and reduce pressure on healthcare resources.

√ **Reference the Occupational Safety and Health Administration website for recommendations regarding worker health.**

√ **Review** CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer.

## Operations & Supplies

√ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available, and have a plan in place to restock as needed if COVID-19 transmission occurs within the facility.**

  o Standard medical supplies for daily clinic needs

  o Tissues

  o Liquid soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

  o Hand drying supplies

  o Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)

  o Cleaning supplies, including EPA-registered disinfectants effective against the virus that causes COVID-19

o Recommended PPE (facemasks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when face masks are acceptable alternatives to N95s.

o Sterile viral transport media and sterile swabs to collect nasopharyngeal specimens if COVID-19 testing is indicated

√ **Make contingency plans for the probable event of PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**

o See CDC guidance optimizing PPE supplies.

√ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty.

√ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)

o Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing.

√ I**f not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit tested for any respiratory protection they will need within the scope of their responsibilities.**

√ **Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.** See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with COVID-19 cases or their close contacts.

## Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified. Both good hygiene practices and social distancing are critical in preventing further transmission.

## Operations

√ **Stay in communication with partners about your facility's current situation.**

o State, local, territorial, and/or tribal health departments

o Other correctional facilities

√ **Communicate with the public about any changes to facility operations, including visitation programs.**

√ **Restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.**

- o Strongly consider postponing non-urgent outside medical visits.

- o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case— including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **Implement lawful alternatives to in-person court appearances where permissible.**

√ **Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for respiratory symptoms.**

√ **Limit the number of operational entrances and exits to the facility.**

## Cleaning and Disinfecting Practices

√ **Even if COVID-19 cases have not yet been identified inside the facility or in the surrounding community, begin implementing intensified cleaning and disinfecting procedures according to the recommendations below. These measures may prevent spread of COVID-19 if introduced.**

√ **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

- o Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones).

- o Staff should clean shared equipment several times per day and on a conclusion of use basis (e.g., radios, service weapons, keys, handcuffs).

- o Use household cleaners and EPA-registered disinfectants effective against the virus that causes COVID-19 as appropriate for the surface, following label instructions. This may require lifting restrictions on undiluted disinfectants.

- o Labels contain instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use.

√ **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**

√ **Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.**

## Hygiene

√ **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

√ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signage throughout the facility, and communicate this information verbally on a regular basis.** Sample signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

   o **Practice good cough etiquette:** Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.

   o **Practice good hand hygiene:** Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating or preparing food; before taking medication; and after touching garbage.

   o **Avoid touching your eyes, nose, or mouth without cleaning your hands first.**

   o **Avoid sharing eating utensils, dishes, and cups.**

   o **Avoid non-essential physical contact.**

√ **Provide incarcerated/detained persons and staff no-cost access to:**

   o **Soap—**Provide liquid soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing.

   o **Running water, and hand drying machines or disposable paper towels for hand washing**

   o **Tissues** and no-touch trash receptacles for disposal

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√ **Communicate that sharing drugs and drug preparation equipment can spread COVID-19 due to potential contamination of shared items and close contact between individuals.**

## Prevention Practices for Incarcerated/Detained Persons

√ **Perform pre-intake screening and temperature checks for all new entrants. Screening should take place in the sallyport, before beginning the intake process,** in order to identify and immediately place individuals with symptoms under medical isolation. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

   o **If an individual has symptoms of COVID-19** (fever, cough, shortness of breath):

   ▪ Require the individual to wear a face mask.

   ▪ Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.

   ▪ Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)

   ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

- o **If an individual is a** close contact **of a known COVID-19 case (but has no COVID-19 symptoms):**
  - ▪ Quarantine the individual and monitor for symptoms two times per day for 14 days. (See Quarantine section below.)
  - ▪ Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care.

√ **Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- o **Common areas:**
  - ▪ Enforce increased space between individuals in holding cells, as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area)

- o **Recreation:**
  - ▪ Choose recreation spaces where individuals can spread out
  - ▪ Stagger time in recreation spaces
  - ▪ Restrict recreation space usage to a single housing unit per space (where feasible)

- o **Meals:**
  - ▪ Stagger meals
  - ▪ Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table)
  - ▪ Provide meals inside housing units or cells

- o **Group activities:**
  - ▪ Limit the size of group activities
  - ▪ Increase space between individuals during group activities
  - ▪ Suspend group programs where participants are likely to be in closer contact than they are in their housing environment
  - ▪ Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out

- o **Housing:**
  - ▪ If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
  - ▪ Arrange bunks so that individuals sleep head to foot to increase the distance between them
  - ▪ Rearrange scheduled movements to minimize mixing of individuals from different housing areas

- o **Medical:**
  - ▪ If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering sick call.
  - ▪ Designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for COVID-19 symptoms or case contact, before they move to other parts of the facility.

√ **Communicate clearly and frequently with incarcerated/detained persons about changes to their daily routine and how they can contribute to risk reduction.**

√ **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**

√ **Consider suspending work release programs and other programs that involve movement of incarcerated/detained individuals in and out of the facility.**

√ **Provide** up-to-date information about COVID-19 **to incarcerated/detained persons on a regular basis, including:**

   o Symptoms of COVID-19 and its health risks

   o Reminders to report COVID-19 symptoms to staff at the first sign of illness

√ **Consider having healthcare staff perform rounds on a regular basis to answer questions about COVID-19.**

## Prevention Practices for Staff

√ **Remind staff to stay at home if they are sick.** Ensure that staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

   o In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).

   o Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis, including:**

   o Symptoms of COVID-19 and its health risks

   o Employers' sick leave policy

   o **If staff develop a fever, cough, or shortness of breath while at work:** immediately put on a face mask, inform supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

   o **If staff test positive for COVID-19:** inform workplace and personal contacts immediately, and do not return to work until a decision to discontinue home medical isolation precautions is made. Monitor CDC guidance on discontinuing home isolation regularly as circumstances evolve rapidly.

   o **If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-quarantine at home for 14 days and return to work if symptoms do not develop. If symptoms do develop, follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

√ **If a staff member has a confirmed COVID-19 infection, the relevant employers should inform other staff about their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act.**

   o Employees who are close contacts of the case should then self-monitor for symptoms (i.e., fever, cough, or shortness of breath).

√ **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with respiratory symptoms while interviewing, escorting, or interacting in other ways.**

√ **Ask staff to keep interactions with individuals with respiratory symptoms as brief as possible.**

## Prevention Practices for Visitors

√ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

√ **Perform verbal screening (for COVID-19 symptoms and close contact with cases) and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

o Staff performing temperature checks should wear recommended PPE.

o Exclude visitors and volunteers who do not clear the screening process or who decline screening.

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**

√ **Provide visitors and volunteers with information to prepare them for screening.**

o Instruct visitors to postpone their visit if they have symptoms of respiratory illness.

o If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.

o Display signage outside visiting areas explaining the COVID-19 screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

√ **Promote non-contact visits:**

o Encourage incarcerated/detained persons to limit contact visits in the interest of their own health and the health of their visitors.

o Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.

o Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

√ **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**

o If moving to virtual visitation, clean electronic surfaces regularly. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)

o Inform potential visitors of changes to, or suspension of, visitation programs.

o Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).

o If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation would be done in the interest of incarcerated/detained persons' physical health and the health of the general public. However, visitation is important to maintain mental health.

If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them. See above suggestions for promoting non-contact visits.

√ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

## Management

If there has been a suspected COVID-19 case inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

## Operations

√ **Implement alternate work arrangements deemed feasible in the** Operational Preparedness **section.**

√ **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.**

   o If a transfer is absolutely necessary, perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing. If the transfer must still occur, ensure that the receiving facility has capacity to appropriately isolate the individual upon arrival. Ensure that staff transporting the individual wear recommended PPE (see Table 1) and that the transport vehicle is cleaned thoroughly after transport.

√ **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case).** Subsequently in this document, this practice is referred to as **routine intake quarantine**.

√ **When possible, arrange lawful alternatives to in-person court appearances.**

√ **Incorporate screening for COVID-19 symptoms and a temperature check into release planning.**

   o Screen all releasing individuals for COVID-19 symptoms and perform a temperature check. (See Screening section below.)

      ▪ If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case—including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.

      ▪ If the individual is released before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

      ▪ Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.

√ **Coordinate with state, local, tribal, and/or territorial health departments.**

   o When a COVID-19 case is suspected, work with public health to determine action. See Medical Isolation section below.

   o When a COVID-19 case is suspected or confirmed, work with public health to identify close contacts who should be placed under quarantine. See Quarantine section below.

   o Facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See Facilities with Limited Onsite Healthcare Services section.

## Hygiene

√ **Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility.** (See above.)

√ **Continue to emphasize practicing good hand hygiene and cough etiquette.** (See above.)

## Cleaning and Disinfecting Practices

√ **Continue adhering to recommended cleaning and disinfection procedures for the facility at large.** (See above.)

√ **Reference specific cleaning and disinfection procedures for areas where a COVID-19 case has spent time (below).**

## Medical Isolation of Confirmed or Suspected COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities with Limited Onsite Healthcare Services, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that COVID-19 cases will be appropriately isolated, evaluated, tested (if indicated), and given care.**

√ **As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals.**

√ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

   o Provide medical care to cases inside the medical isolation space. See Infection Control and Clinical Care sections for additional details.

   o Serve meals to cases inside the medical isolation space.

   o Exclude the individual from all group activities.

   o Assign the isolated individual a dedicated bathroom when possible.

√ **Ensure that the individual is wearing a face mask at all times when outside of the medical isolation space, and whenever another individual enters.** Provide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet.

√ **Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.** Cohorting should only be practiced if there are no other available options.

o If cohorting is necessary:

- **Only individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts.**

- Unless no other options exist, do not house COVID-19 cases with individuals who have an undiagnosed respiratory infection.

- Ensure that cohorted cases wear face masks at all times.

√ **In order of preference, individuals under medical isolation should be housed:**

o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

o Separately, in single cells with solid walls but without solid doors

o As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies related to housing in the Prevention section above.

o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section above.

o Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements
(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative.

√ **If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)

o Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

o Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

√ **Custody staff should be designated to monitor these individuals exclusively where possible.**
These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility to the extent possible.

√ **Minimize transfer of COVID-19 cases between spaces within the healthcare unit.**

√ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- o **Cover** their mouth and nose with a tissue when they cough or sneeze

- o **Dispose** of used tissues immediately in the lined trash receptacle

- o **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

√ **Maintain medical isolation until all the following criteria have been met. Monitor the CDC website for updates to these criteria.**

**For individuals who will be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ▪ The individual has tested negative in at least two consecutive respiratory specimens collected at least 24 hours apart

**For individuals who will NOT be tested to determine if they are still contagious:**

- ▪ The individual has been free from fever for at least 72 hours without the use of fever-reducing medications **AND**

- ▪ The individual's other symptoms have improved (e.g., cough, shortness of breath) **AND**

- ▪ At least 7 days have passed since the first symptoms appeared

**For individuals who had a confirmed positive COVID-19 test but never showed symptoms:**

- o At least 7 days have passed since the date of the individual's first positive COVID-19 test **AND**

- o The individual has had no subsequent illness

√ **Restrict cases from leaving the facility while under medical isolation precautions, unless released from custody or if a transfer is necessary for medical care, infection control, lack of medical isolation space, or extenuating security concerns.**

- o If an incarcerated/detained individual who is a COVID-19 case is released from custody during their medical isolation period, contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning.

## Cleaning Spaces where COVID-19 Cases Spent Time

**Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note—these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

- o Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.

- o Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

√ **Hard (non-porous) surface cleaning and disinfection**

   o If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

   o For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

      ▪ Consult a list of products that are EPA-approved for use against the virus that causes COVID-19. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

      ▪ Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

         - 5 tablespoons (1/3rd cup) bleach per gallon of water or

         - 4 teaspoons bleach per quart of water

√ **Soft (porous) surface cleaning and disinfection**

   o For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

      ▪ If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

      ▪ Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 and are suitable for porous surfaces.

√ **Electronics cleaning and disinfection**

   o For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

      ▪ Follow the manufacturer's instructions for all cleaning and disinfection products.

      ▪ Consider use of wipeable covers for electronics.

      ▪ If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

√ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

√ **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ Laundry from a COVID-19 cases **can be washed with other individuals' laundry.**

   o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

   o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

   o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

o   Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

√   **Consult** cleaning recommendations above **to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## Quarantining Close Contacts of COVID-19 Cases

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective quarantine, should coordinate with local public health officials to ensure that close contacts of COVID-19 cases will be effectively quarantined and medically monitored.**

√   **Incarcerated/detained persons who are close contacts of a** confirmed or suspected COVID-19 case **(whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days (see CDC guidelines).**

o   If an individual is quarantined due to contact with a suspected case who is subsequently tested for COVID-19 and receives a negative result, the quarantined individual should be released from quarantine restrictions.

√   **In the context of COVID-19, an individual (incarcerated/detained person or staff) is considered a close contact if they:**

o   Have been within approximately 6 feet of a COVID-19 case for a prolonged period of time OR

o   Have had direct contact with infectious secretions of a COVID-19 case (e.g., have been coughed on)

Close contact can occur while caring for, living with, visiting, or sharing a common space with a COVID-19 case. Data to inform the definition of close contact are limited. Considerations when assessing close contact include the duration of exposure (e.g., longer exposure time likely increases exposure risk) and the clinical symptoms of the person with COVID-19 (e.g., coughing likely increases exposure risk, as does exposure to a severely ill patient).

√   **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

o   Provide medical evaluation and care inside or near the quarantine space when possible.

o   Serve meals inside the quarantine space.

o   Exclude the quarantined individual from all group activities.

o   Assign the quarantined individual a dedicated bathroom when possible.

√   **Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually.** Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

o   If cohorting of close contacts under quarantine is absolutely necessary, symptoms of all individuals should be monitored closely, and individuals with symptoms of COVID-19 should be placed under medical isolation immediately.

o   If an entire housing unit is under quarantine due to contact with a case from the same housing unit, the entire housing unit may need to be treated as a cohort and quarantine in place.

o   Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to a COVID-19 case). Under this scenario, avoid mixing individuals quarantined due to exposure to a COVID-19 case with individuals undergoing routine intake quarantine.

o If at all possible, do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.

√ **If the number of quarantined individuals exceeds the number of individual quarantine spaces available in the facility, be especially mindful of those who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)

√ **In order of preference, multiple quarantined individuals should be housed:**

   o Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

   o Separately, in single cells with solid walls but without solid doors

   o As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions

   o As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door

   o As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

   o As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.

   o As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

   o Safely transfer to another facility with capacity to quarantine in one of the above arrangements

(NOTE—Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

√ **Quarantined individuals should wear face masks if feasible based on local supply, as source control, under the following circumstances** (see PPE section and Table 1):

   o If cohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals).

   o If quarantined separately, individuals should wear face masks whenever a non-quarantined individual enters the quarantine space.

   o All quarantined individuals should wear a face mask if they must leave the quarantine space for any reason.

   o Asymptomatic individuals under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear face masks.

√ **Staff who have close contact with quarantined individuals should wear recommended PPE if feasible based on local supply, feasibility, and safety within the scope of their duties** (see PPE section and Table 1).

   o Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to a COVID-19 case) do not need to wear PPE.

√ **Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks.**

   o If an individual develops symptoms, they should be moved to medical isolation immediately and further evaluated. (See Medical Isolation section above.)

   o See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of COVID-19 cases.

√ **If an individual who is part of a quarantined cohort becomes symptomatic:**

   o **If the individual is tested for COVID-19 and tests positive:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

   o **If the individual is tested for COVID-19 and tests negative:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantined cohort for the remainder of the quarantine period.

   o **If the individual is not tested for COVID-19:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

√ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

√ **Quarantined individuals can be released from quarantine restrictions if they have not developed symptoms during the 14-day quarantine period.**

√ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands after removing gloves.

√ **Laundry from quarantined individuals can be washed with other individuals' laundry.**

   o Individuals handling laundry from quarantined persons should wear disposable gloves, discard after each use, and clean their hands after.

   o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

   o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.

   o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

## Management of Incarcerated/Detained Persons with COVID-19 Symptoms

**NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that suspected COVID-19 cases will be effectively isolated, evaluated, tested (if indicated), and given care.**

√ **If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.**

√ **Incarcerated/detained individuals with COVID-19 symptoms should wear a face mask and should be placed under medical isolation immediately. Discontinue the use of a face mask if it inhibits breathing. See Medical Isolation section above.**

√ **Medical staff should evaluate symptomatic individuals to determine whether COVID-19 testing is indicated.** Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well.

√ **If testing is indicated (or if medical staff need clarification on when testing is indicated), contact the state, local, tribal, and/or territorial health department. Work with public health or private labs as available to access testing supplies or services.**

   o If the COVID-19 test is positive, continue medical isolation. (See Medical Isolation section above.)

   o If the COVID-19 test is negative, return the individual to their prior housing assignment unless they require further medical assessment or care.

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

√ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 cases within the facility, and the need to increase social distancing and maintain hygiene precautions.**

   o Consider having healthcare staff perform regular rounds to answer questions about COVID-19.

   o Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or low-vision.

√ **Implement daily temperature checks in housing units where COVID-19 cases have been identified, especially if there is concern that incarcerated/detained individuals are not notifying staff of symptoms.** See Screening section for a procedure to safely perform a temperature check.

√ **Consider additional options to intensify** social distancing within the facility.

## Management Strategies for Staff

√ **Provide clear information to staff about the presence of COVID-19 cases within the facility, and the need to enforce social distancing and encourage hygiene precautions.**

   o Consider having healthcare staff perform regular rounds to answer questions about COVID-19 from staff.

√ **Staff identified as close contacts of a COVID-19 case should self-quarantine at home for 14 days and may return to work if symptoms do not develop.**

   o See above for definition of a close contact.

   o Refer to CDC guidelines for further recommendations regarding home quarantine for staff.

# Infection Control

Infection control guidance below is applicable to all types of correctional facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with confirmed or suspected COVID-19 cases.

√ **All individuals who have the potential for direct or indirect exposure to COVID-19 cases or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.**

- o  Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.

- o  Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

√ **Staff should exercise caution when in contact with individuals showing symptoms of a respiratory infection.** Contact should be minimized to the extent possible until the infected individual is wearing a face mask. If COVID-19 is suspected, staff should wear recommended PPE (see PPE section).

√ **Refer to PPE section to determine recommended PPE for individuals persons in contact with confirmed COVID-19 cases, contacts, and potentially contaminated items.**

## Clinical Care of COVID-19 Cases

√ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

- o  If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

- o  The initial medical evaluation should determine whether a symptomatic individual is at higher risk for severe illness from COVID-19. Persons at higher risk may include older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes. See CDC's website for a complete list, and check regularly for updates as more data become available to inform this issue.

√ **Staff evaluating and providing care for confirmed or suspected COVID-19 cases should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

√ **Healthcare staff should evaluate persons with respiratory symptoms or contact with a COVID-19 case in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the suspected case is wearing a face mask.**

- o  If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit.

√ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).**

√ **The facility should have a plan in place to safely transfer persons with severe illness from COVID-19 to a local hospital if they require care beyond what the facility is able to provide.**

√ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, using a language line or provide a trained interpreter when possible.**

## Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

√ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with confirmed and suspected COVID-19 cases.**

○ Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95s) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program.

○ For PPE training materials and posters, please visit the CDC website on Protecting Healthcare Personnel.

√ **Ensure that all staff are trained to perform hand hygiene after removing PPE.**

√ **If administrators anticipate that incarcerated/detained persons will request unnecessary PPE, consider providing training on the different types of PPE that are needed for differing degrees of contact with COVID-19 cases and contacts, and the reasons for those differences (**see Table 1). **Monitor linked CDC guidelines in Table 1 for updates to recommended PPE.**

√ **Keep recommended PPE near the spaces in the facility where it could be needed, to facilitate quick access in an emergency.**

√ **Recommended PPE for incarcerated/detained individuals and staff in a correctional facility** will vary based on the type of contact they have with COVID-19 cases and their contacts (see Table 1). Each type of recommended PPE is defined below. **As above, note that PPE shortages are anticipated in every category during the COVID-19 response.**

○ **N95 respirator**

See below for guidance on when face masks are acceptable alternatives for N95s. N95 respirators should be prioritized when staff anticipate contact with infectious aerosols from a COVID-19 case.

○ **Face mask**

○ **Eye protection—**goggles or disposable face shield that fully covers the front and sides of the face

○ **A single pair of disposable patient examination gloves**

Gloves should be changed if they become torn or heavily contaminated.

○ **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**

▪ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with the individual. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.

▪ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, care activities where splashes and sprays are anticipated, and high-contact patient care activities that provide opportunities for transfer of pathogens to the hands and clothing of staff.

√ **Note that shortages of all PPE categories are anticipated during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category can be found on CDC's website:**

○ **Guidance in the event of a shortage of N95 respirators**

▪ Based on local and regional situational analysis of PPE supplies, **face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.

○ **Guidance in the event of a shortage of face masks**

○ **Guidance in the event of a shortage of eye protection**

○ **Guidance in the event of a shortage of gowns/coveralls**

**Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response**

| Classification of Individual Wearing PPE | N95 respirator | Face mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case*) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19 | – | ✓ | – | – | – |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case* (but not performing temperature checks or providing medical care) | – | Face mask, eye protection, and gloves as local supply and scope of duties allow. | | | – |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | – | ✓ | ✓ | ✓ | ✓ |
| Staff having direct contact with (including transport) or offering medical care to confirmed or suspected COVID-19 cases (see CDC infection control guidelines) | ✓** | | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols (see CDC infection control guidelines) | ✓ | – | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | – | – | – | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | ✓ | ✓ |

\*   If a facility chooses to routinely quarantine all new intakes (without symptoms or known exposure to a COVID-19 case) before integrating into the facility's general population, face masks are not necessary.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

- o *Today or in the past 24 hours, have you had any of the following symptoms?*
  - ▪ *Fever, felt feverish, or had chills?*
  - ▪ *Cough?*
  - ▪ *Difficulty breathing?*
- o *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

√ **The following is a protocol to safely check an individual's temperature:**

- o Perform hand hygiene
- o Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
- o Check individual's temperature
- o **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.
- o Remove and discard PPE
- o Perform hand hygiene